**FLITTER MILZ, P.C.**
CARY L. FLITTER
ANDREW M. MILZ
JODY T. LOPEZ-JACOBS
1814 East Route 70, Suite 350
Cherry Hill, NJ 08003
(856) 396-0600

ATTORNEYS FOR PLAINTIFFS
FRANCINE BALDASSANO & SUZANNE
RAFAEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANCINE BALDASSANO, <br><br> SUZANNE RAFAEL, <br>             Plaintiffs, <br>      vs. <br><br> SUNRUN INC., <br><br> VIVINT SOLAR, INC., <br><br> VIVINT SOLAR DEVELOPER, LLC, <br><br> CAMERON CATMULL, <br><br>            Defendants | CIVIL ACTION NO. <br><br><br><br> **COMPLAINT** |

### I.  INTRODUCTION

1.      This is an action for damages brought by New Jersey consumers pursuant to New Jersey's Consumer Fraud Act ("CFA") and other laws.

2.      Defendants Sunrun Inc., Vivint Solar, Inc. and Vivint Solar Developer, LLC ("Vivint") are in the business of soliciting consumers for the purchase of energy generated by solar panels it installs on consumers' homes.  Vivint's door-to-door sales agents solicit consumers to enter into solar power purchase contracts using electronic tablets such as iPads and iPhones, called Power Purchase Agreements ("PPAs").  The standard contract term for the PPA is 20 years.

3.      Vivint's door-to-door sales practices are fraudulent and deceptive, as sales agents regularly misrepresent the nature of the PPA transaction, forge the PPAs, and deliberately conceal the forged PPAs from consumers, who have been promised significant savings.

4.      On August 19, 2019, the New Jersey Office of the Attorney General entered into a Consent Order with Vivint Solar Developer, LLC following an investigation into Vivint's sales practices, and has alleged that Vivint:

(a) Engaged in deceptive door-to-door solicitation practices (e.g. misrepresentations as to overall savings) and failed to provide electricity at the promised savings;

(b) Misrepresented an affiliation with the consumer's local distribution company;

(c) Obtained consumer reports from a consumer reporting agency without the consumer initiating a business transaction and without the consumer's knowledge; and,

(d) Used a form contract that violated clearly established legal rights of consumers.

5.      Despite the Consent Order, Vivint continues to engage in deceptive door-to-door solicitation practices in violation of the CFA and other laws.

6.      Numerous New Jersey consumers have complained about Vivint's deceptive door-to-door business practices, including through the filing of lawsuits such as:

(a) Douglas Littlejohn v. Vivint Solar, Inc., United States District Court, District of New Jersey, No. 1:16-cv-09446-NLH-JS;

(b) Christine Droney and Timothy Droney v. Vivint Solar, Inc., United States District Court, District of New Jersey, No. 1:18-cv-00849;

(c) James Reilly v. Vivint Solar, Inc., United States District Court, District of New Jersey, No 1:18-cv-12356-NLH-JS;

(d) Melissa Knight v. Vivint Solar, Superior Court of NJ, Law Div., Camden Co., No. CAM-L-002852-18; and,

(e) Oluronke Komolafe & Foluso Komolafe v. Vivint Solar, Inc., Vivint Solar Developer, LLC, United States District Court, District of New Jersey, No. 1:20-cv-13905.

7.      The CFA requires that Vivint provide consumers a copy of the PPA at the time of signing.   The CFA also affords consumers the right to cancel the PPA within three days of receiving the contract.

8.      Vivint forged the signatures of Plaintiff Francine Baldassano and her daughter Suzanne Rafael on the 20-year PPA. Vivint did not provide a copy of the forged 20-year PPA at the time of signing—indeed, Plaintiffs had no knowledge of a contract.   Instead, Plaintiffs received a copy of the forged 20-year PPA only *after* the solar panel system was installed on Mrs. Baldassano's home.

9.      Vivint was able to conceal the forged 20-year PPA from Plaintiffs because Vivint, as a part of its routine business practice, fabricates and/or falsifies consumer email addresses to ensure that consumers will not receive copies of the 20-year PPA, which spans no less than 16 pages.

10.      Soon after Plaintiffs learned of the forged 20-year PPA, notice of cancellation was sent to Vivint, but Vivint refused to honor the notice of cancellation.

11.      Vivint has been placed on notice of this illegal activity repeatedly, but has refused to discontinue the practices.

## II. **JURISDICTION**

12.      Jurisdiction arises under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

13.      Venue is proper because the offending conduct took place in this district.

## III. **PARTIES**

14.      Plaintiff Francine Baldassano is a consumer who resides in New Jersey, and whose previous residence was 15 Cameo Drive, Monroe Twp., NJ 08831.

15.      Plaintiff Suzanne Rafael is a consumer who resides in Freehold, NJ.

16.      Defendant Sunrun Inc. is a Delaware corporation with a principal office in San Francisco, CA.

17.      Defendant Vivint Solar Developer, LLC is a Delaware corporation with a principal office in San Francisco, CA.

18.      Defendant Vivint Solar, Inc. is a Delaware corporation with a principal office in San Francisco, CA.

19.      On October 8, 2020, the Sunrun Inc. acquired Vivint Solar, Inc. at an estimated purchase price of $5.0 billion pursuant to an Agreement and Plan of Merger, dated as of July 6, 2020.

20.      As a result of the merger, Vivint Solar, Inc. became a direct wholly-owned subsidiary of Sunrun Inc.

21.      Sunrun Inc. and Vivint Solar, Inc. have been combining operations and integrating the businesses.  (*See* Sunrun Inc.'s Form 10-K for fiscal year ending on December 31, 2021, dated February 17, 2022, available at

https://www.sec.gov/ix?doc=/Archives/edgar/data/1469367/000146936722000033/run-20211231.htm).

22.     Sunrun Inc. has ratified, approved of, and assumed responsibility for the conduct of Vivint Solar, Inc., Vivint Solar Developer, LLC, and their agents.

23.     Sunrun Inc. has assumed the operations and liabilities of Vivint Solar, Inc. and Vivint Solar Developer, LLC.

24.     Defendant Cameron Catmull ("Catmull") is an employee and salesman for Vivint.

25.     On information and belief, Catmull resides at 28868 Brushwood Ln, Santa Clarita, CA 91350.

26.     At all times relevant, Catmull was acting on behalf of Vivint as Vivint's employee and/or agent.

## IV. STATEMENT OF CLAIM

### *Vivint Forges the Contract and Refuses to Honor Plaintiff's Notice of Cancellation*

27.     On or about May 2018, Francine Baldassano was solicited by a door-to-door salesperson from Vivint at her home in Monroe Township, NJ.

28.     Vivint's salesman was Cameron Catmull.

29.     During the sales pitch, Catmull explained that the solar panels were free through a government program for elderly seniors, and that she would save money in electricity costs.

30.     Mrs. Baldassano explained that the roof was in bad condition and that she intended to sell the house in a few years.  Vivint's salesman responded that the roof was not an issue, and that Mrs. Baldassano could simply pay $500 to remove the panels and another $500 to reinstall them on the new roof.

31.     Mrs. Baldassano was not provided, nor given the opportunity to review, any paperwork or documents, paper or electronic.

32.     Based on the promise of significant savings, Mrs. Baldassano continued conversations with Vivint regarding the installation of solar panels.

33.     Eventually, Mrs. Baldassano agreed to have the solar panels installed.  But again, no contract (PPA or otherwise) was provided, presented, or made available to her for her review.

34.     Vivint eventually installed solar panels on Mrs. Baldassano's home, even though no contract was provided to Mrs. Baldassano or signed by Mrs. Baldassano.

35.     On or about February 2021, Mrs. Baldassano received an offer to purchase her home, and Mrs. Baldassano tentatively agreed to sell the home.

36.     The prospective purchaser informed Mrs. Baldassano of a lien on Mrs. Baldassano's home.

37.     Indeed, on or about September 18, 2018, Vivint Solar Developer, LLC filed a UCC Financing Statement identifying Vivint Solar Developer, LLC as the "secured party" and identifying the purported "DEBTOR[S]" and "RECORD OWNER[S]" of real estate located at 15 Cameo Drive, Monroe Township, NJ 08831, as Francine Rafael and Suzanne Rafael.

38.     Suzanne Rafael does not own the real estate located at 15 Cameo Drive, Monroe Township, NJ 08831, and is not a record owner of the same.

39.     Prior to being informed about the lien, Mrs. Baldassano had no knowledge of this UCC Financing Statement or any lien on her property.

40.     The prospective buyer asked Mrs. Baldassano for a copy of any contract with Vivint.

41.      Mrs. Baldassano called Vivint and requested a copy of Vivint's contract.  To her surprise, Vivint produced a 20-year PPA bearing her name and forged signature, even though she did not sign anything concerning the solar panels.

42.      The 20-year PPA purported to bear the signatures of both Mrs. Baldassano and her daughter, Suzanne Rafael. Both of the signatures on the contract are forgeries.

43.      The email address on the 20-year PPA was also incorrect.  This ensured that Plaintiffs would not receive a copy of the 20-year PPA at the time that Vivint forged it because the email was only sent to the incorrect email address appearing on the contract.

44.      On information and belief, Vivint, as a pattern and practice, regularly forges and/or falsifies email addresses on consumer contracts.  Vivint does this to ensure that consumers do not receive a copy of the forged contract, and are kept in the dark about the existence of the contract and its onerous terms.

45.      Indeed, this very Vivint salesman, Cameron Catmull has been accused of virtually identical fraud (including forging signatures and the falsification of an email address). See, for example, the lawsuit in District of New Jersey, stylized *Komolafe v. Vivint Solar, Inc.*, No. 1:20-cv-13905.

46.      The forged 20-year PPA also contains a standalone arbitration provision, which the consumer may only consent to by checking a box on the contract.  The arbitration assent provision is depicted below:

✓  BY  CHECKING THIS BOX, YOU AGREE TO ARBITRATION AND WAIVE THE RIGHT TO A JURY TRIAL AS DESCRIBED IN SECTION 5, AND AGREE THIS CHECKBOX CONSTITUTES YOUR ELECTRONIC SIGNATURE. [DO NOT CHECK THIS BOX IF YOU LIVE IN PENNSYLVANIA, AND SEE BELOW INSTEAD].

47.     Plaintiffs did not check the box indicating assent to the arbitration provision. Indeed, before the panels were installed, Plaintiffs were never presented any contract documents in paper or electronic format.

48.     Neither Plaintiffs agreed to arbitrate any issue or claim with Vivint.

49.     Shortly after receiving the forged 20-year PPA for the first time, Plaintiffs sent notice of cancellation to Vivint, requesting cancellation of the contract.

50.     Despite receiving this notice of cancellation, Vivint did not cancel the forged 20-year PPA.

51.     Vivint continues to deem Plaintiffs bound by the forged 20-year PPA and the payment terms therein.

### *Vivint Submits Forged Documents to the State of New Jersey to get Government Benefits*

52.     Before Plaintiffs learned about the existence of the forged 20-year PPA, Vivint submitted the forged 20-year PPA and other forged documents to the State of New Jersey for the purpose of registering with the New Jersey Clean Energy Program.

53.     Vivint's submissions to the State of New Jersey allowed it to become eligible to receive solar renewable energy credits in connection with the solar energy produced by the solar panel system installed on Mrs. Baldassano's home.

54.     Vivint did not disclose the existence of these forged documents to Plaintiffs.

### *Vivint Solar's Pattern and Practice of Fraudulent and Deceptive Conduct*

55.     Vivint, as a pattern and practice, regularly engages in forgeries and other fraudulent and deceptive conduct.

56.     In Vivint's training materials (including training videos), Vivint instructs and encourages its salespersons to engage in deceptive sales tactics, including misrepresenting the

company's association with local electricity companies/utilities, withholding information from consumers, and to get something signed at all costs.

57.     Consumers across New Jersey and across the country have complained to Vivint that Vivint's agents have engaged in forgeries and other fraudulent and deceptive conduct.

58.     Some of these irate consumers have filed lawsuits, including several in this Court dating back to 2016.

59.     Despite ample notice of this problem, Vivint continued to allow and enable its salespeople to engage in forgeries and other fraudulent and deceptive conduct.

60.     Further, Defendants' corporate officers were put on notice as early as October 2017 that there was a problem relating to Defendants' sales agents' fraud and falsification of emails.  These corporate officers include, but may not be limited to, former Chief Commercial Officer Thomas Plagemann, Chief Sales Officer Chance Allred, and Chief Revenue Officer Paul Dickson.

61.     In January 2017, Vivint's financing partner Solar Mosaic, Inc. put Vivint on notice that Vivint's sales representatives were falsifying consumer emails, stating "this is looking more and more like a systemic issue. It's already big, I'm trying to stop it from getting bigger." (**Ex. A**, Mosaic Email at Solar Mosaic_Cardona-Brown 000794.)

62.     Despite having notice of these problems, Vivint's above-named corporate officers continued to recklessly disregard the rights of consumers, including those of Plaintiff.

63.     Indeed, a former Vivint employee named Tanner Baumgarten—who worked in Vivint's Resolution Department where his job was to "deal with frustrated customers" and serve as "the end of the line on the phone process" for consumer complaints—resigned from the company because he was "tired of dealing with customer complaints that did seem very valid

and, you know, I felt like I was in a position to be deceptive myself by trying to resolve something or **sweep it under the rug**, so to speak, **when it was a valid complaint**. . . . [T]here were other situations that – that put me in a position where I felt like I needed to resign." **Ex. B**, Baumgarten Deposition Excerpts at pp. 10-12, 55-57 (emphasis added).

64.     Stated another way, Tanner Baumgarten "didn't feel comfortable paying off customers anymore to keep their mouths quiet, if that makes sense, and so I quit." (*Id.* at pp. 56:22–57:22.)

65.     Evidence pertaining to Vivint's knowledge of a pattern and practice of fraudulent conduct has been revealed in a securities class action case filed against Vivint in the Eastern District of New York. *See In re Vivint Solar, Inc. Sec. Litig.*, No. 1:19-cv-05777 (E.D. N.Y., Consolidated Class Action Complaint filed at ECF 26). This case is herein referred to as the "Vivint Securities Fraud Case."

66.     The allegations in the Vivint Securities Fraud Case detailed and specific allegations of "widespread fraudulent sales practices" that Vivint concealed from the public and its investors. (**Ex. C**, Consolidated Class Action Complaint ¶¶ 5, 9, 139.)

67.     The Class Action Complaint in the Vivint Securities Fraud Case identifies the statements of former Vivint employees describing Vivint's corporate culture of fraud, including one former worker who had personal knowledge of "several dozen" written communications to and from the Vivint Solar CEO David Bywater describing "serious allegations" of wrongdoing. (*Id.* ¶¶ 39, 17.)

68.     According to a former Vivint employee who worked at Vivint's Utah headquarters handling the escalation of consumer complaints within the company as an "Executive Resolutions" specialist, his direct manager, Senior Manager of Executive Resolutions

Tyler Anderson, "communicated regularly with senior management, including defendant [and Vivint CEO David] Bywater." (*Id.* ¶¶ 56–57 (emphasis added).)

69.     According to this former Vivint employee, the Executive Resolutions team "logged the complaints in a Google Spreadsheet which included labels for complaints sent directly to Bywater's email address and those sent to Bywater via the 'CEO Promise Page' on Vivint's website." (*Id.* ¶ 57.)

70.     According to another former Vivint employee, Vivint CEO "Bywater would send emails to the Company's entire sales team urging representatives to 'pick it up' when sales numbers were down." (*Id.* ¶ 128.) This employee "stated that senior management held weekly telephone conference calls with all of the Company's sales managers where deceptive sales practices" were discussed. (*Id.* ¶ 54.)

71.     Another former employee "described weekly meetings with Bywater and other senior management where Anderson provided updates on the escalated complaints." (*Id.* ¶ 59.)

72.     The investigatory team "emailed summaries of the investigation and findings to Anderson who would then send the emails to Bywater and/or reference them in weekly meetings." (*Id.* ¶ 60.)

73.     Yet another former Vivint employee stated he "was copied on emails regarding customer complaints and stated that if serious allegations were made, such as forgery, Vivint senior management was copied on the emails, including regional vice presidents, vice presidents overseeing sales on the West and East Coasts, and Chief Sales Officer Chance Allred[,] and Chief Revenue Officer Paul Dickson who both reported directly to [Vivint CEO David] Bywater." (*Id.* ¶ 39 (emphasis added).) He recalls "several dozen" emails sent to CEO Bywater containing "serious allegations" of wrongdoing. (*Id.*)

74.     Plaintiffs intend to prove these allegations through document discovery of these communications and through depositions of these witnesses, including Vivint's CEO David Bywater, who personally received many of these emails and communications.

***Damage from Vivint's Fraudulent Conduct***

75.     As a result of Vivint's willful, wanton, reckless, and/or negligent actions, Plaintiffs have been damaged.

76.     Vivint's willful, wanton, reckless, and/or negligent conduct has resulted in Plaintiff Baldassano being fraudulently duped into a contract she never saw and burdened with solar panels under terms she never agreed to.

77.     Vivint's willful, wanton, reckless, and/or negligent conduct has resulted in Plaintiff Rafael being deemed obligated to the PPA and its obligations to purchase solar energy.

78.     Vivint's willful, wanton, reckless, and/or negligent conduct has prevented the sale of Plaintiff's home, which was originally scheduled to have a closing date in April 2021. Plaintiff had already moved out of the home and incurred costs to facilitate the real estate transaction.

79.     Plaintiffs have suffered mental and emotional distress, worry, and aggravation as a result of Defendants' actions.

## COUNT I
## New Jersey Consumer Fraud Act

80.     Plaintiffs repeat the allegations contained above as if the same were here set forth at length.

81.     Defendants' sales and sales practices are subject to the CFA and its implementing regulations.

82.     Defendants are subject to the CFA, N.J.S.A. 56:8-1 *et seq.* and its implementing regulations.

83.     The CFA, at N.J.S.A. 56:8-2, prohibits the use of "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise."

84.     The CFA also states: "It shall be an unlawful practice for a person in connection with a sale of merchandise to require or request the consumer to sign any document as evidence or acknowledgment of the sales transaction, of the existence of the sales contract, or of the discharge by the person of any obligation to the consumer specified in or arising out of the transaction or contract, unless he shall at the same time provide the consumer with a full and accurate copy of the document so presented for signature but this section shall not be applicable to orders placed through the mail by the consumer for merchandise."  N.J.S.A. 56:8-2.22.

85.     The CFA's implementing regulations also prohibit home improvement sellers from failing to furnish the buyer—at the time of execution—a written copy of all guarantees or warranties with respect to labor services, products, or materials furnished in connection with home improvements. N.J.A.C. § 13:45A-16.2(a)(11)(i).

86.     The Contractors' Registration Act provides "that a home improvement contract may be cancelled by a consumer for any reason at any time before midnight of the third business day after the consumer receives a copy of it."  N.J.S.A. § 56:8-151(b).

87.     Vivint Solar Developer, LLC is a licensed as a home improvement contractor with the State of New Jersey.   Vivint Solar Developer, LLC's registration number is 13VHO6589300.

88.     Defendants' conduct stated herein violates the CFA and its implementing regulations, including those pertaining to home improvement practices.

89.     As a result of Defendants' violations of the Consumer Fraud Act and its implementing regulations, Plaintiffs have suffered ascertainable losses, which include Vivint's purported contractual obligation that Plaintiffs purchase solar energy, the costs associated with removing the solar panels from the roof of the house (including any necessary repairs), the costs and potential profits associated with the real estate transaction that fell through due to Vivint's UCC Financing Statement, and the fraudulent PPA.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for:

a.   Actual damages;

b.   Treble damages under the Consumer Fraud Act at N.J.S.A.56:8-19;

c.   Declaratory judgment that the contract involved herein is void, canceled, and unenforceable;

d.   Equitable relief requiring Defendants to remove the solar panels and repair any damage to Plaintiff Baldassano's property;

e.   Reasonable attorneys' fees and costs under the CFA at N.J.S.A.56:8-19 and all other applicable statutes;

f.   Interest; and

g.   Any other relief the Court deems just and proper.

## COUNT II
## Identity Theft/Forgery

90.     Plaintiffs repeat the allegations contained above as if the same were here set forth at length.

91.     Defendants, with the purpose to defraud, or with knowledge that it was facilitating a fraud, forged and used Plaintiffs' signatures on the PPA without their authorization or consent.

92.     Defendants, with the purpose to defraud, or with knowledge that it was facilitating a fraud, forged and used Plaintiff Baldassano's signatures on documents filed with the State of New Jersey without the authorization or consent of Plaintiffs.

93.     The conduct of Defendants violates N.J.S.A. § 2C:21-17.4 (incorporating N.J.S.A. §§ 2C:21-1, 2C:21-17).

94.     As a result of Defendants' conduct, Plaintiffs suffered ascertainable losses, which include Vivint's purported contractual obligation that Plaintiffs purchase solar energy, the costs associated with removing the solar panels from the roof of the house (including any necessary repairs), the costs and potential profits associated with the real estate transaction that fell through due to Vivint's UCC Financing Statement, and the fraudulent PPA.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)     Damages, N.J.S.A. § 2C:21-17.4(a);

(b)     Treble damages, N.J.S.A. § 2C:21-17.4(a);

(c)     Declaratory judgment that the contract involved herein is void, canceled, and unenforceable;

(d)     Equitable relief requiring Defendants to remove the solar panels and repair any damage to Plaintiff Baldassano's property;

(e)     Reasonable attorneys' fees and costs;

(f)     Interest; and,

(g)     Any other relief the Court deems just and proper. N.J.S.A. § 2C:21-17.4(a).

## COUNT III
## Fraudulent Concealment

95.     Plaintiffs repeat the allegations contained above as if the same were here set forth at length.

96.     Defendants had a legal obligation to disclose the 20-year PPA to Plaintiffs, which included many material terms and conditions, including but not limited to the arbitration clause purporting to waive their right to a jury trial in open court.

97.     Defendants had a legal obligation to disclose other documents (bearing Plaintiff Baldassano's forged signature) filed with the State of New Jersey with respect to Defendants' registration with the New Jersey Solar Energy Program.

98.     Defendants intentionally concealed and did not disclose the forged 20-year PPA to Plaintiffs until after the solar panels were installed on their home.

99.     Defendants intentionally concealed and did not disclose that it would forge Plaintiff Baldassano's signature on documents filed with the State of New Jersey with respect to Defendants' registration with the New Jersey Solar Energy Program.

100.    As a result of Defendants' intentional concealment and nondisclosure, Plaintiffs suffered emotional distress, worry, aggravation, and stress, as well as costs and profits relating to the real estate transaction that fell through.

101.    Defendants' concealment and nondisclosure was willful, malicious, wanton, intentional, and reckless.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)     Actual damages;

(b)     Punitive damages;

(c)     Declaratory judgment that the contract involved herein is void, canceled, and
        unenforceable;

(d)     Equitable relief requiring Defendants to remove the solar panels and repair any
        damage to Plaintiff's property;

(e)     Interest; and

(f)     Any other relief the Court deems just and proper.

## V.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

## VI.  CERTIFICATION PURSUANT TO N.J.S.A. 56-8:20

The undersigned hereby certifies that a copy of the Complaint was sent via first class United

States Mail, postage prepaid, to:

Office of the Attorney General
P.O. Box 112
Trenton, NJ 08625-0112

New Jersey Board of Public Utilities
44 South Clinton Avenue
Post Office Box 350
Trenton, NJ 08625-0350

                                        Respectfully submitted:

Date:  April 11, 2022                    */s/ Andrew M. Milz*
                                        CARY L. FLITTER
                                        ANDREW M. MILZ
                                        JODY T. LÓPEZ-JACOBS
                                        **FLITTER MILZ, P.C.**
                                        1814 East Route 70, Suite 350
                                        Cherry Hill, NJ 08003
                                        (856) 396-0600

                                        *Attorneys for Plaintiffs*

# Exhibit A

| | |
|---|---|
| **From:** | Jordan Winder <jordan.winder@vivintsolar.com> |
| **Sent:** | Monday, November 28, 2016 12:25 PM |
| **To:** | support@joinmosaic.com |
| **Cc:** | Ryan Gorman; Salesops |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint |

Who is the Sales Reps?

--
**Jordan Winder**
Director, New Products
**vivint.**Solar
Capital Markets
1800 W Aston Blvd.
Lehi, UT 84043
M:(646) 787-5625
jordan.winder@vivintsolar.com

On Mon, Nov 28, 2016 at 12:06 PM, David Steinbroner <support@joinmosaic.com> wrote:

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

**David Steinbroner** (Mosaic Support Center)

Nov 28, 11:06 AM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Ray Jones. This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

- Salesperson ran credit on salesperson's device (on-screen or via email) without homeowner having full control of the device through collecting info and acknowledging disclosures – without homeowner consent

1

Solar Mosaic_Cardona-Brown 000777

- Salesperson impersonated the customer in some manner or forged/falsified customer signatures

- Salesperson obtained social security number and/or date of birth without expressly stating it was for a credit application, or asserted the credit check was a "soft pull".

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

[ZD ticket 157881]

Best,

David Steinbroner
Mosaic Support

This email is a service from Mosaic Support Center. Delivered by Zendesk.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000778

| | |
|---|---|
| **From:** | Jordan Winder <jordan.winder@vivintsolar.com> |
| **Sent:** | Thursday, December 1, 2016 4:19 PM |
| **To:** | support@joinmosaic.com |
| **Cc:** | Ryan Gorman; salesops |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

Who is the VSLR sales rep?


--
**Jordan Winder**
Director, New Products
**vivint.**Solar
Capital Markets
1800 W Aston Blvd.
Lehi, UT 84043
M:(646) 787-5625
jordan.winder@vivintsolar.com

On Thu, Dec 1, 2016 at 5:09 PM, Daniela Rueda <support@joinmosaic.com> wrote:
##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

### Daniela Rueda (Mosaic Support Center)

Dec 1, 4:09 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Andrew Fankhauser. This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson ran credit on salesperson's device (on-screen or via email) without homeowner having full control of the device through collecting info and acknowledging disclosures – without homeowner consent

- Salesperson impersonated the customer in some manner or forged/falsified customer signatures

1

Solar Mosaic_Cardona-Brown 000779

- Salesperson obtained social security number and/or date of birth without expressly stating it was for a credit application, or asserted the credit check was a "soft pull".

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

ZenDesk Ticket #154407

Best,

Daniela Rueda
Mosaic Support

This email is a service from Mosaic Support Center. Delivered by Zendesk.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000780

| | |
|---|---|
| **From:** | Jordan Winder <jordan.winder@vivintsolar.com> |
| **Sent:** | Tuesday, December 27, 2016 7:50 PM |
| **To:** | support@joinmosaic.com; Steven Burt; Justin Busdicker |
| **Cc:** | Andy McElroy |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

Adding Steve B. and Justin B.

--
**Jordan Winder**
Director, New Products
**vivint**.Solar
Capital Markets
1800 W Aston Blvd.
Lehi, UT 84043
M:(646) 787-5625
jordan.winder@vivintsolar.com

On Mon, Dec 26, 2016 at 5:10 PM, Stuart Adams <support@joinmosaic.com> wrote:

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

### Stuart Adams (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Solar Mosaic_Cardona-Brown 000781

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000782

| | |
|---|---|
| **From:** | Jordan Winder <jordan.winder@vivintsolar.com> |
| **Sent:** | Thursday, December 29, 2016 8:08 PM |
| **To:** | support@joinmosaic.com; Steven Burt; Justin Busdicker |
| **Cc:** | salesops |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

FYI for Steve and Justin


--
**Jordan Winder**
Director, New Products
**vivint.**Solar
Capital Markets
1800 W Aston Blvd.
Lehi, UT 84043
M:(646) 787-5625
jordan.winder@vivintsolar.com

On Thu, Dec 29, 2016 at 8:23 PM, Dana Eckhoff <support@joinmosaic.com> wrote:

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

**Dana Eckhoff** (Mosaic Support Center)

Dec 29, 7:23 PM PST

Hi all,

No contest has been received from Vivint so this is being resolved as a confirmed case of Fraud. If any evidence arises in the near future we are willing to reopen and reevaluate.

Best,

Dana Eckhoff
Mosaic Support

---

**Ryan Gorman** (Mosaic Support Center)

Dec 1, 4:24 PM PST

1

Hi Jordan,

Can we jump on a call today or tomorrow morning to discuss these recent incidents?

Here is the info from the most recent one. Sales rep is Jean-luc V.

Andrew Fankhauser
<https://vivintsolar.financing.joinmosaic.com/opportunity/132065> St Petersburg, FL -- 11/18/16 Jean-luc V.

--
*Ryan Gorman*
Strategic Accounts Director

*C *415 699 2080
1212 Broadway Oakland, CA 94612

On Thu, Dec 1, 2016 at 4:19 PM, Jordan Winder <jordan.winder@vivintsolar.com
> wrote:

> Who is the VSLR sales rep?
>
> --
>
> Jordan Winder
>
> Director, New Products
>
> vivint.Solar
>
> Capital Markets
>
> 1800 W Aston Blvd.
>
> Lehi, UT 84043
>
> M:(646) 787-5625 <646.787.5625>
>
> jordan.winder@vivintsolar.com
>
> On Thu, Dec 1, 2016 at 5:09 PM, Daniela Rueda <support@joinmosaic.com>
> wrote:

Solar Mosaic_Cardona-Brown 000784

> 
>>


## Jordan Winder

Dec 1, 4:19 PM PST

Who is the VSLR sales rep?

--

Jordan Winder

Director, New Products

vivint.Solar

Capital Markets

1800 W Aston Blvd.

Lehi, UT 84043

M:(646) 787-5625

jordan.winder@vivintsolar.com


## Daniela Rueda (Mosaic Support Center)

Dec 1, 4:09 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Andrew Fankhauser. This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson ran credit on salesperson's device (on-screen or via email) without homeowner having full control of the device through collecting info and acknowledging disclosures - without homeowner consent

- Salesperson impersonated the customer in some manner or forged/falsified customer signatures

Solar Mosaic_Cardona-Brown 000785

- Salesperson obtained social security number and/or date of birth without expressly stating it was for a credit application, or asserted the credit check was a "soft pull".

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

ZenDesk Ticket [#154407](#154407)

Best,

Daniela Rueda
Mosaic Support

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000786

**From:**          Steven Burt <steven.burt@vivintsolar.com>
**Sent:**          Monday, January 30, 2017 1:06 PM
**To:**            support@joinmosaic.com
**Cc:**            Justin Busdicker
**Subject:**       Re: MOSAIC COMPLIANCE ALERT to Vivint Solar

Thanks, Winnie.  Can you be sure that these alerts are sent to the group we have designated for intake and processing, including Justin Busdicker (justin.busdicker@vivintsolar.com), who I've copied here?

On Mon, Jan 30, 2017 at 2:03 PM, Winnie Gee <support@joinmosaic.com> wrote:
##- Please type your reply above this line -##

Hi there! We have created a new support ticket for you (#194709). Please see the message below.

---

**Winnie Gee** (Mosaic Support Center)

Jan 30, 1:03 PM PST

Hi,

We are sorry to report that we have uncovered a potential COMPLIANCE incident related to one of our mutual customers, Carlos Soler. The opportunity owner is Yosue Lebron.

This is defined as a violation of consumer lending regulations and/or Mosaic requirements. The following reason(s) led to the need to investigate this compliance claim:

- Salesperson represented the credit check as a "soft pull" or otherwise did not indicate there would be a hard inquiry on the applicant's credit

Please respond to this alert within 72 hours if you wish to dispute this claim. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

ZD# 194319

Best,

Winnie Gee
Mosaic Support

---

This email is a service from Mosaic Support Center. Delivered by Zendesk.

1

Solar Mosaic_Cardona-Brown 000787

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Monday, April 24, 2017 6:21 PM |
| **To:** | support@joinmosaic.com |
| **Cc:** | Steve Burt; Andy McElroy; Justin Busdicker; Jordan Winder |
| **Subject:** | Re: [Mosaic Support Center] Re: MOSAIC COMPLIANCE ALERT to Vivint Solar RE: Opp 191801 |

Melissa, Kenneth - let's stop emailing on this chain, and speak over the phone, please.  Melissa/Andy - can we set up a call?

On Mon, Apr 24, 2017 at 6:50 PM, Melissa Miyara <support@joinmosaic.com> wrote:

##- Please type your reply above this line -##

Here's an update on your ticket (#253617)! To follow up, please reply to this email.

---

**Melissa Miyara** (Mosaic Support Center)

Apr 24, 5:50 PM PDT

Hi,

We are sorry to report that we have uncovered a potential COMPLIANCE incident related to one of our mutual customers, Frank Siu. The opportunity owner is Kenneth Burcham.

The way the incident was described suggests a violation of consumer lending regulations and/or Mosaic requirements. The following claim(s) led to the need to investigate:

- Salesperson represented the credit check as a "soft pull" or otherwise did not indicate there would be a hard inquiry on the applicant's credit

Please respond to this alert within 72 hours if you wish to dispute this claim. Thank you in advance for your attention to this important matter.

[Ticket 253617]

Best,

Melissa Miyara
Mosaic Support

---

**Frank Siu**

1

Apr 24, 1:45 PM PDT

Dear Mosiac,
I have been getting inquires hit on my credit, please stop all inquires ASAP.
I am not sure how my full social got in your hands and did not authorize to run my credit.

That being said I am not interested in getting solar panels at the moment.

Attachment(s)
[image2.png](image2.png)

---

This email is a service from Mosaic Support Center. Delivered by <u>Zendesk</u>.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each
state in which we operate, for information about our licenses please visit
our contractor licenses page.

The information in this email is for the use of the designated recipients only.
This email is considered confidential unless otherwise indicated. If you are not
the intended recipient of this email, you are instructed not to review it or any
attachments, and to immediately delete this email, and are further instructed to
not disseminate, forward or copy any information from this email or its
attachments.

Solar Mosaic_Cardona-Brown 000789

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Tuesday, April 25, 2017 9:14 AM |
| **To:** | Andy McElroy |
| **Cc:** | Melissa Miyara |
| **Subject:** | Re: [Mosaic Support Center] Re: MOSAIC COMPLIANCE ALERT to Vivint Solar RE: Opp 191801 |

How about 1:30PT?

On Mon, Apr 24, 2017 at 10:33 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
Hi Steven,

I can be on a call and report back to Melissa. I am free 9 - 11am and 1:30 - 5:00pm PST. Anything in those blocks work?

Andy

**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Mon, Apr 24, 2017 at 6:21 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
Melissa, Kenneth - let's stop emailing on this chain, and speak over the phone, please.  Melissa/Andy - can we set up a call?

On Mon, Apr 24, 2017 at 6:50 PM, Melissa Miyara <support@joinmosaic.com> wrote:
##- Please type your reply above this line -##

Here's an update on your ticket (#253617)! To follow up, please reply to this email.

---

**Melissa Miyara** (Mosaic Support Center)

Apr 24, 5:50 PM PDT

Hi,

We are sorry to report that we have uncovered a potential COMPLIANCE incident related to one of our mutual customers, Frank Siu. The opportunity owner is Kenneth Burcham.

The way the incident was described suggests a violation of consumer lending regulations and/or Mosaic requirements. The following claim(s) led to the need to investigate:

Solar Mosaic_Cardona-Brown 000790

- Salesperson represented the credit check as a "soft pull" or otherwise did not indicate there would be a hard inquiry on the applicant's credit

Please respond to this alert within 72 hours if you wish to dispute this claim. Thank you in advance for your attention to this important matter.

[Ticket 253617]

Best,

Melissa Miyara
Mosaic Support

## Frank Siu

Apr 24, 1:45 PM PDT

Dear Mosiac,
I have been getting inquires hit on my credit, please stop all inquires ASAP.
I am not sure how my full social got in your hands and did not authorize to run my credit.

That being said I am not interested in getting solar panels at the moment.

Attachment(s)

[image2.png](image2.png)

This email is a service from Mosaic Support Center. Delivered by __Zendesk__.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

2

| | |
|---|---|
| **From:** | Jordan Winder <jordan.winder@vivintsolar.com> |
| **Sent:** | Wednesday, February 6, 2019 8:31 AM |
| **To:** | Ryan Gorman |
| **Cc:** | Josh Evetushick; Sylvia Semper; Sara quinto-seibert |
| **Subject:** | Re: VSLR // Mosaic Escalations |

Thanks Ryan. Appreciate it!

On Wed, Feb 6, 2019 at 9:28 AM Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Jordan proposed 1pm on Friday 2/8 which looks like it works for the Mosaic team.
>
> I'll send out a calendar invite. Please let me know if that time does not work for anyone. Feel free to add others as needed.
>
> Thanks,
>
> --
> **Ryan Gorman**
> Director, Strategic Accounts
>
> **C** 415 699 2080
> 300 Lakeside Drive 24th Floor, Oakland, CA 94612
>
> 
>
>
> On Tue, Feb 5, 2019 at 3:03 PM Josh Evetushick <josh.evetushick@joinmosaic.com> wrote:
>> Hello Sylvia,
>>
>> We missed you on our escalations call today and would like to connect with you this week to discuss a few customer accounts:
>>
>> - Olwen Bursua
>> - Elizabeth Cardona
>> - Jerard Brown
>>
>> Please propose a few time slots that work for you and we will do our best to accommodate.
>>
>> Thanks,
>>
>>
>> **Josh Evetushick**
>> Account Executive
>>
>> **P** 510.904.9835
>> **E** josh.evetushick@joinmosaic.com
>> **A** 300 Lakeside Drive, 24th Floor, Oakland, CA 94612

Solar Mosaic_Cardona-Brown 000792

--

**Jordan Winder**
Director, **vivint.**Solar
M:(646) 787-5625

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000793

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Monday, January 9, 2017 8:02 PM |
| **To:** | Andy McElroy |
| **Cc:** | Jordan Winder; Justin Busdicker; Ryan Gorman; Zachary Cottman |
| **Subject:** | Re: Vivint SRs using their personal emails for borrowers during credit check |

Thanks, Andy.  We have a call scheduled with Ryan tomorrow, and will be sure to address these concerns as well.

As for your questions, it probably makes sense for you to CC others here at Vivint Solar when you send emails to reps.  We'll talk tomorrow about who would be best, and let you know.

We recently sent a company-wide reminder of policies, which reiterated that all customers must have an active, valid email address that they control, and the same reminder is part of the on-boarding process.

When you mention that the problem is "big," can you give us some numbers? I want to have a benchmark against which we can measure our progress.

On Mon, Jan 9, 2017 at 11:58 AM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
> Hi gentlemen,
>
> Long email, sorry. Please see my note to Vivint SR Tanner Sirrine below. I haven't received a response but I have to believe it's the same story it always is, which is that it's a matter of convenience during the initial sale to use one's own personal email for the borrower during the credit check. This is a major compliance violation not only for Mosaic and Vivint but it violates federal and state privacy laws with respect to credit inquiries. With thousand of reps from dozens of companies using the Mosaic portal, I know this will happen occasionally. But I send a lot of these out every week for Vivint. I'm happy to keep doing this but to move the needle more significantly I would like to ask for your help. These are the main points I would like to pursue:
>
>   1. Can I CC one or all of you on each of these I send to the reps so you can follow up with them personally? Who should I include? I'll make sure I don't duplicate Fraud and Compliance emails you are already receiving. The issues I'm discussing are most often in a separate category where Mosaic Support hasn't gotten involved.
>   2. I suggest sending a company wide compliance reminder that using the SR's personal info during credit check and/or doc signing is not only against Mosaic and Vivint policy, it's also against the law and the SR can be held personally liable.
>   3. Commit to including specific training to this effect during onboarding of new reps. Since I often received replies that are good-natured and innocent (e.g. "oh yeah, I was helping the borrower out by using my own email, thanks!") from SRs that are brand new, I have a feeling this is not being discussed much during training.
>
> I can only advise, of course, but this is looking more and more like a systemic issue. It's already big, I'm trying to stop it from getting bigger.
>
> I'll send an example right after this of the reply I send to their reply once I've established that it is the SR's personal email and they are in violation.
>
> Andy McElroy

Solar Mosaic_Cardona-Brown 000794

Strategic Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

---------- Forwarded message ----------
From: **Andy McElroy** <andy.mcelroy@joinmosaic.com>
Date: Fri, Jan 6, 2017 at 9:52 AM
Subject: Borrower ██████████ - flagged email address
To: tanner.sirrine@vivintsolar.com

Hi Tanner,

Can you tell me about this? I see borrower ██████████ has an email address in the portal that I'm guessing is your personal email address. Did you use this as a placeholder for the credit check? Please advise.

**Andy McElroy**
Strategic Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000795

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, January 13, 2017 2:24 PM |
| **To:** | Ryan Gorman |
| **Cc:** | Jordan Winder; Justin Busdicker; Andy McElroy; Ted Fawcett |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

redialing now

On Fri, Jan 13, 2017 at 3:22 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> We're on but can't hear you

> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> C 415 699 2080
> 1212 Broadway Oakland, CA 94612



On Fri, Jan 13, 2017 at 2:22 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> Are you guys on the call?  We can't hear you.

On Fri, Jan 13, 2017 at 3:02 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> Dial in: 716-293-6479 | PIN: 96134

On Fri, Jan 13, 2017 at 2:51 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to all employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.
>
> Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).
>
> Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.
>
> Steve

On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule - I'll do that now and be sure to send you a meeting invite.

Solar Mosaic_Cardona-Brown 000796

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able to make this call today.

Can we reschedule for Thurs or Fri this week?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Solar Mosaic_Cardona-Brown 000797

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

**Stuart Adams** (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Solar Mosaic_Cardona-Brown 000798

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| **Ticket #** | 174132 |
| **Status** | Open |
| **Requester** | Steve Burt |
| **CCs** | Andy McElroy, Jordan Winder, Ryan Gorman |
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |
| **Type** | Question |
| **Channel** | Web Form |

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

Solar Mosaic_Cardona-Brown 000799

**From:**     Steven Burt <steven.burt@vivintsolar.com>
**Sent:**     Friday, January 13, 2017 2:25 PM
**To:**       Andy McElroy
**Cc:**       Ryan Gorman; Jordan Winder; Justin Busdicker; Ted Fawcett
**Subject:**  Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar

We're dialed-in to that number and on hold.

On Fri, Jan 13, 2017 at 3:23 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
  Please dial us directly at 510-346-5287

**Andy McElroy**
Strategic Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Fri, Jan 13, 2017 at 2:22 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
  It went dark, we redialed in a few times with no luck

**Andy McElroy**
Strategic Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Fri, Jan 13, 2017 at 2:22 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
  Are you guys on the call?  We can't hear you.

On Fri, Jan 13, 2017 at 3:02 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
  Dial in: 716-293-6479 | PIN: 96134

On Fri, Jan 13, 2017 at 2:51 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
  Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to <u>all</u> employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.

  Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).

  Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.

Solar Mosaic_Cardona-Brown 000800

Steve


On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can
> reschedule - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Hi Steve,
>
> I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be
> able to make this call today.
>
> Can we reschedule for Thurs or Fri this week?
>
> Thanks,
>
>
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> **C** 415 699 2080
> 1212 Broadway Oakland, CA 94612
>
> 

On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Hi Steve,
>
> 12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right
> group here.
>
> It would be great if you can have the below requested items for that call.
>
> Thanks,
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> **C** 415 699 2080
> 1212 Broadway Oakland, CA 94612
>
> 

On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are
> responding accordingly.

2

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

## Stuart Adams (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

Solar Mosaic_Cardona-Brown 000802

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

[#174016](#)

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| **Ticket #** | 174132 |
| **Status** | Open |
| **Requester** | Steve Burt |
| **CCs** | Andy McElroy, Jordan Winder, Ryan Gorman |
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |
| **Type** | Question |
| **Channel** | Web Form |

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209

Solar Mosaic_Cardona-Brown 000803

**From:** Steven Burt <steven.burt@vivintsolar.com>
**Sent:** Tuesday, January 10, 2017 10:25 AM
**To:** Ryan Gorman
**Cc:** Jordan Winder; Justin Busdicker; Andy McElroy; Ted Fawcett
**Subject:** Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar

We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able to make this call today.

Can we reschedule for Thurs or Fri this week?

Thanks,


--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



Solar Mosaic_Cardona-Brown 000804

On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

## Stuart Adams (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

Solar Mosaic_Cardona-Brown 000805

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| Ticket # | 174132 |
| Status | Open |
| Requester | Steve Burt |
| CCs | Andy McElroy, Jordan Winder, Ryan Gorman |
| Group | Loan Ops |
| Assignee | – |
| Priority | – |
| Type | Question |
| Channel | Web Form |

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

--
Steven Burt

Solar Mosaic_Cardona-Brown 000806

**From:**       Steven Burt <steven.burt@vivintsolar.com>
**Sent:**       Friday, January 13, 2017 2:02 PM
**To:**         Ryan Gorman
**Cc:**         Jordan Winder; Justin Busdicker; Andy McElroy; Ted Fawcett
**Subject:**    Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar

Dial in: 716-293-6479 | PIN: 96134

On Fri, Jan 13, 2017 at 2:51 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to all employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.

Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).

Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.

Steve

On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able to make this call today.

Can we reschedule for Thurs or Fri this week?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612

1

Solar Mosaic_Cardona-Brown 000807



On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>

Solar Mosaic_Cardona-Brown 000808

Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

**Stuart Adams** (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| Ticket # | 174132 |
| Status | Open |
| Requester | Steve Burt |
| CCs | Andy McElroy, Jordan Winder, Ryan Gorman |

3

Solar Mosaic_Cardona-Brown 000809

| | |
|---|---|
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |
| **Type** | Question |
| **Channel** | Web Form |

This email is a service from Mosaic Support Center. Delivered by <u>Zendesk</u>.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our **contractor licenses page.**

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

--
Steven Burt
Senior Regulatory Counsel

Solar Mosaic_Cardona-Brown 000810

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, January 13, 2017 2:22 PM |
| **To:** | Ryan Gorman |
| **Cc:** | Jordan Winder; Justin Busdicker; Andy McElroy; Ted Fawcett |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

Are you guys on the call?  We can't hear you.

On Fri, Jan 13, 2017 at 3:02 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
Dial in: 716-293-6479 | PIN: 96134

On Fri, Jan 13, 2017 at 2:51 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to all employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.

Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).

Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.

Steve

On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able to make this call today.

Can we reschedule for Thurs or Fri this week?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

1

Solar Mosaic_Cardona-Brown 000811

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



2

---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

## #- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

## Stuart Adams (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

Ticket #  174132
Status  Open

3

Solar Mosaic_Cardona-Brown 000813

| | |
|---|---|
| **Requester** | Steve Burt |
| **CCs** | Andy McElroy, Jordan Winder, Ryan Gorman |
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |
| **Type** | Question |
| **Channel** | Web Form |

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Solar Mosaic_Cardona-Brown 000814

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, January 13, 2017 2:26 PM |
| **To:** | Andy McElroy |
| **Cc:** | Ryan Gorman; Jordan Winder; Justin Busdicker; Ted Fawcett |
| **Subject:** | Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar |

Please call me at 385.715.6209

On Fri, Jan 13, 2017 at 3:25 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
 We're dialed-in to that number and on hold.

 On Fri, Jan 13, 2017 at 3:23 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
  Please dial us directly at 510-346-5287

  **Andy McElroy**
  Strategic Account Executive

  **P** 510 356 2841
  **E** andy.mcelroy@joinmosaic.com
  1212 Broadway Oakland Suite 300, CA 94612

  On Fri, Jan 13, 2017 at 2:22 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
   It went dark, we redialed in a few times with no luck

   **Andy McElroy**
   Strategic Account Executive

   **P** 510 356 2841
   **E** andy.mcelroy@joinmosaic.com
   1212 Broadway Oakland Suite 300, CA 94612

   On Fri, Jan 13, 2017 at 2:22 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
    Are you guys on the call?  We can't hear you.

    On Fri, Jan 13, 2017 at 3:02 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
     Dial in:  716-293-6479 | PIN: 96134

     On Fri, Jan 13, 2017 at 2:51 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
      Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to all employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.

      Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).

Solar Mosaic_Cardona-Brown 000815

Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.

Steve

On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able to make this call today.

Can we reschedule for Thurs or Fri this week?

Thanks,

--
Ryan Gorman
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
Ryan Gorman
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Solar Mosaic_Cardona-Brown 000816

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:
Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

**Stuart Adams** (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

3

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| **Ticket #** | 174132 |
| **Status** | Open |
| **Requester** | Steve Burt |
| **CCs** | Andy McElroy, Jordan Winder, Ryan Gorman |
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |
| **Type** | Question |
| **Channel** | Web Form |

This email is a service from Mosaic Support Center. Delivered by **Zendesk**.

--
Steven Burt

Solar Mosaic_Cardona-Brown 000818

**From:**      Steven Burt <steven.burt@vivintsolar.com>
**Sent:**      Friday, January 13, 2017 1:51 PM
**To:**        Ryan Gorman
**Cc:**        Jordan Winder; Justin Busdicker; Andy McElroy; Ted Fawcett
**Subject:**   Re: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
**Attachments:**  VSLR Ethics Standards.pdf

Gents - in anticipation of today's conference call, please see attached.  This document reiterates Vivint Solar policies, and has been distributed to <u>all</u> employees, each of whom is required to acknowledge and recommit to them.  It will also provided to new employees as part of their onboarding process.  Moreover, we are developing separate training modules for all employees based on each of the 10 standards.

Also, Andy, to your question of who you can CC on emails to reps who use suspicious email addresses - please include Justin Busdicker of our legal department (justin.busdicker@vivintsolar.com) along with Amelia Roper in our HR department (amelia.roper@vivintsolar.com).

Finally, we are looking forward to discussing our process for intake, investigation, and action associated with the alerts we receive from Mosaic.

Steve


On Tue, Jan 10, 2017 at 11:25 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> We were planning on it, Ryan, but you're right - I didn't send an invitation across to you.  We can reschedule
> - I'll do that now and be sure to send you a meeting invite.

On Tue, Jan 10, 2017 at 10:20 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Hi Steve,
>
> I didn't seen a calendar invite come across for this, but I'm out with the flu and won't be able
> to make this call today.
>
> Can we reschedule for Thurs or Fri this week?
>
> Thanks,
>
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> C 415 699 2080
> 1212 Broadway Oakland, CA 94612



Solar Mosaic_Cardona-Brown 000819

On Fri, Jan 6, 2017 at 4:03 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

12:30 PT on Tuesday works. Feel free to send a calendar invite and I'll include the right group here.

It would be great if you can have the below requested items for that call.

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 6, 2017 at 9:42 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Ryan - thank you for following up about Mosaic's concerns.  We take them seriously, and are responding accordingly.

Can we set up some time to talk on Tuesday?  We are available at 1:30MT/12:30PT.  Would that work for you and your team?

On Wed, Jan 4, 2017 at 10:10 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Vivint team,

This unauthorized credit pull is a serious issue that has the attention of senior Legal, Credit, and Compliance officers at Mosaic.

Please provide the following:

1. Results of investigation and actions taken
2. Documented process for addressing compliance and fraud alerts
3. Does Vivint have a zero tolerance policy for fraudulent behavior?

Thank you,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



---------- Forwarded message ----------
From: **Stuart Adams** <support@joinmosaic.com>
Date: Mon, Dec 26, 2016 at 4:10 PM
Subject: [Mosaic Support Center] Update: MOSAIC FRAUD ALERT to Vivint Solar
To:

Cc: Ryan Gorman <ryan.gorman@joinmosaic.com>

##- Please type your reply above this line -##

You are registered as a cc on this help desk request and are thus receiving email notifications on all updates to the request.
Reply to this email to add a comment to the request.

---

### Stuart Adams (Mosaic Support Center)

Dec 26, 4:10 PM PST

Hi,

We are sorry to report that we have uncovered a potential FRAUD incident related to one of our mutual customers, Robert Duffy. The opportunity owner is Yhia Kera.

This is defined as a severe violation including falsification, impersonation, and/or deliberate, proven misinformation influencing a homeowner to apply for a loan under false pretenses. The following reason(s) led to the need to investigate this fraud claim:

- Salesperson created email address for homeowner that homeowner did not immediately control exclusively – salesperson used email account to access/sign credit application

Please respond to this alert within 24 hours to prevent disruptions in portal access. Thank you in advance for your attention to this important matter. Your Account Manager will be reaching out to you to discuss this incident shortly.

#174016

Best,

Stuart Adams
Mosaic Support

---

You are an agent. Add a comment by replying to this email or **view ticket in Zendesk Support**.

| | |
|---|---|
| **Ticket #** | 174132 |
| **Status** | Open |
| **Requester** | Steve Burt |
| **CCs** | Andy McElroy, Jordan Winder, Ryan Gorman |
| **Group** | Loan Ops |
| **Assignee** | – |
| **Priority** | – |

3

Solar Mosaic_Cardona-Brown 000821

**Type**   Question

**Channel**   Web Form

This email is a service from Mosaic Support Center. Delivered by <u>Zendesk</u>.

--

Steven Burt

Senior Regulatory Counsel

385.715.6209



1800 W. Ashton Blvd.

Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--

Steven Burt

Senior Regulatory Counsel

385.715.6209



1800 W. Ashton Blvd.

Lehi, Utah 84043

--

Steven Burt

Senior Regulatory Counsel

385.715.6209



Solar Mosaic_Cardona-Brown 000822

# ETHICS STANDARDS

Vivint Solar's reputation and corporate integrity is built upon the honesty, fairness, and personal integrity of its employees. Consequently, Vivint Solar requires that its employees adhere to the following standards: *

## 1 Creating a False Account

We may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign customer agreements, but only if the homeowner also signs. No one who is not a homeowner or homeowner's spouse may sign a customer agreement.

## 2 Notice of Cancellation

We must orally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, we may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

## 3 Misrepresentations Regarding Relationship with Utility Companies

We may not say or do anything that may reasonably cause a customer to believe we are affiliated with a utility company. We do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between Vivint Solar and a utility company.

## 4 Forgery

We may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, we may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

## 5 Running Customer Credit Without Consent

Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by the Legal Department). We must never allow another person -even a spouse- to authorize a credit check on behalf of someone else.

## 6 Providing False Information

We may not provide false or inaccurate information concerning any customer in order to progress an account. This includes providing a false email address, false usage or utility information, or false payment information. In addition, we may not list an employee's own checking account information or a prepaid card of any kind as a customer's payment information.

## 7 Contract Terms

We may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) cost savings; (c) a customer's ability to terminate the agreement after the system is installed; and/or (d) the cost to remove the system temporarily for property repairs. We may not enter into side deals with customers that are not memorialized in written agreements approved by the company. And nothing is free!

## 8 Sharing Confidential Information

We may not share confidential information with anyone outside the company or allow anyone to do work on an employee's behalf that is not an employee of Vivint Solar. This includes allowing anyone to access Vivint Solar's information technology systems using our log-in information.

## 9 Misrepresentations Regarding Competition and Utilities

We may not make untrue or misleading statements about a competitor or a utility company. For example, we may not represent that a utility's or competitor's rates will increase without data to support our claim and appropriate company approval.

## 10 Elderly Customers

We need to treat elderly customers with extra care to ensure they understand our products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

Violation of these standards will result in immediate disciplinary action, which may include termination.

**vivint.**Solar

\* These Standards do not include every principle that should govern employee conduct. All employees should apply common sense, follow all company policies (including the Employee Handbook, Operations Manual, and SEIA Business Code), and abide by the highest personal ethical standards, in making decisions and interacting with customers. If you have any questions, please contact Human Resources (HRsolar@vivintsolar.com) or the Legal Department (solarlegal@vivintsolar.com). As each personally uphold these Standards, and train and require our employees to do the same, we will delight our customers and lead the industry.

Solar Mosaic_Cardona-Brown 000823

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Monday, January 23, 2017 4:06 PM |
| **To:** | Ryan Gorman |
| **Cc:** | Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale |
| **Subject:** | Re: Report on Compliance Concerns |

Ryan - would your team be available on Thursday at 10:00 PT?  Our Chief Revenue Officer would like to join the call, and is available then.

On Mon, Jan 23, 2017 at 2:32 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
We are, tentatively; I'm awaiting schedule confirmation from others, per your request, but I think it makes sense to get it on calendar.  We'll let you know if someone on our side ends up unavailable.

On Mon, Jan 23, 2017 at 11:18 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Hi Steve,

Are we confirmed for tomorrow? Can you send out a calendar invite, or would you like me to?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 20, 2017 at 3:04 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
Sure, does 1:30pm PT on Tuesday work?

Our VP of Ops will be joining as well. Does it make sense to include Vivint senior operations too?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Jan 20, 2017 at 2:10 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

1

I'm tied up all afternoon on Monday - I'm free Tuesday afternoon or Wednesday morning, though.  Would that work for Mosaic legal?

On Fri, Jan 20, 2017 at 3:02 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

Thanks for sending this report and process outline. We've provided this information to our compliance committee.

Mosaic legal has requested a call to discuss the issue of unauthorized credit pulls.

Does 3 or 3:30pm PT on Monday work for the Vivint team?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Thu, Jan 19, 2017 at 6:19 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening,

Per our conversation, we wanted to give you a report of our investigation of Mosaic alerts since we spoke last Friday.  Recall that we intend to provide similar reports each Friday; we will provide our next report **next Friday, January 27, 2017**.

Per your request, we wanted to give you some detail on our process for investigating claims and disciplining sales representatives.

The level of disciplinary action depends on the degree, severity, and frequency of the conduct, but as a general matter we begin with verbal warnings for isolated, first-time incidents.  The focus of such a warning is to educate and reiterate training to ensure representatives clearly understand the violation, and how to avoid it in the future.  If we discover an incident is not isolated, or that a representative is a repeat offender, they will receive a formal written warning, and may be terminated.  If the representative is not terminated, we arrange a meeting with Human Resources and the representative's leaders to discuss the incident and clarify expectations going forward.

As we mentioned on the call, we have recently hired new HR personnel who are tasked, in part, with investigating issues such as those Mosaic has raised.  The Director who is leading this effort and will be making decisions related to discipline is on vacation this week.  However, a member of his team has been interviewing representatives and gathering information, and has prioritized her investigation by starting with representatives who have been the subject of multiple alerts.  We will wait to report some of that information until we can report disciplinary action, if any, taken as a result of the investigation.  For now, we have a few items to report.

**Sales Rep: Brock Morrison**

Solar Mosaic_Cardona-Brown 000825



We look forward to moving this process forward, and will be in touch with more information.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our **contractor licenses page.**

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000826

**From:**          Steven Burt <steven.burt@vivintsolar.com>
**Sent:**          Monday, January 23, 2017 1:33 PM
**To:**            Ryan Gorman
**Cc:**            Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale
**Subject:**       Re: Report on Compliance Concerns

We are, tentatively; I'm awaiting schedule confirmation from others, per your request, but I think it makes sense to get it on calendar.  We'll let you know if someone on our side ends up unavailable.

On Mon, Jan 23, 2017 at 11:18 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Hi Steve,
>
> Are we confirmed for tomorrow? Can you send out a calendar invite, or would you like me to?
>
> Thanks,
>
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> C 415 699 2080
> 1212 Broadway Oakland, CA 94612
>
> 

On Fri, Jan 20, 2017 at 3:04 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
> Sure, does 1:30pm PT on Tuesday work?
>
> Our VP of Ops will be joining as well. Does it make sense to include Vivint senior operations too?
>
> Thanks,
>
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> C 415 699 2080
> 1212 Broadway Oakland, CA 94612
>
> 

On Fri, Jan 20, 2017 at 2:10 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> I'm tied up all afternoon on Monday - I'm free Tuesday afternoon or Wednesday morning, though.  Would that work for Mosaic legal?
>
> On Fri, Jan 20, 2017 at 3:02 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Solar Mosaic_Cardona-Brown 000827

Hi Steve,

Thanks for sending this report and process outline. We've provided this information to our compliance committee.

Mosaic legal has requested a call to discuss the issue of unauthorized credit pulls.

Does 3 or 3:30pm PT on Monday work for the Vivint team?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Thu, Jan 19, 2017 at 6:19 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening,

Per our conversation, we wanted to give you a report of our investigation of Mosaic alerts since we spoke last Friday.  Recall that we intend to provide similar reports each Friday; we will provide our next report **next Friday, January 27, 2017**.

Per your request, we wanted to give you some detail on our process for investigating claims and disciplining sales representatives.

The level of disciplinary action depends on the degree, severity, and frequency of the conduct, but as a general matter we begin with verbal warnings for isolated, first-time incidents.  The focus of such a warning is to educate and reiterate training to ensure representatives clearly understand the violation, and how to avoid it in the future.  If we discover an incident is not isolated, or that a representative is a repeat offender, they will receive a formal written warning, and may be terminated.  If the representative is not terminated, we arrange a meeting with Human Resources and the representative's leaders to discuss the incident and clarify expectations going forward.

As we mentioned on the call, we have recently hired new HR personnel who are tasked, in part, with investigating issues such as those Mosaic has raised.  The Director who is leading this effort and will be making decisions related to discipline is on vacation this week.  However, a member of his team has been interviewing representatives and gathering information, and has prioritized her investigation by starting with representatives who have been the subject of multiple alerts.  We will wait to report some of that information until we can report disciplinary action, if any, taken as a result of the investigation.  For now, we have a few items to report.

Solar Mosaic_Cardona-Brown 000828



We look forward to moving this process forward, and will be in touch with more information.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each
state in which we operate, for information about our licenses please visit
our contractor licenses page.

The information in this email is for the use of the designated recipients only.
This email is considered confidential unless otherwise indicated. If you are not
the intended recipient of this email, you are instructed not to review it or any
attachments, and to immediately delete this email, and are further instructed to
not disseminate, forward or copy any information from this email or its
attachments.

3

Solar Mosaic_Cardona-Brown 000829

**From:**      Steven Burt <steven.burt@vivintsolar.com>
**Sent:**      Friday, January 20, 2017 2:11 PM
**To:**        Ryan Gorman
**Cc:**        Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale
**Subject:**   Re: Report on Compliance Concerns

I'm tied up all afternoon on Monday - I'm free Tuesday afternoon or Wednesday morning, though.  Would that work for Mosaic legal?

On Fri, Jan 20, 2017 at 3:02 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

Thanks for sending this report and process outline. We've provided this information to our compliance committee.

Mosaic legal has requested a call to discuss the issue of unauthorized credit pulls.

Does 3 or 3:30pm PT on Monday work for the Vivint team?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Thu, Jan 19, 2017 at 6:19 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening,

Per our conversation, we wanted to give you a report of our investigation of Mosaic alerts since we spoke last Friday.  Recall that we intend to provide similar reports each Friday; we will provide our next report **next Friday, January 27, 2017**.

Per your request, we wanted to give you some detail on our process for investigating claims and disciplining sales representatives.

The level of disciplinary action depends on the degree, severity, and frequency of the conduct, but as a general matter we begin with verbal warnings for isolated, first-time incidents.  The focus of such a warning is to educate and reiterate training to ensure representatives clearly understand the violation, and how to avoid it in the future.  If we discover an incident is not isolated, or that a representative is a repeat offender, they will receive a formal written warning, and may be terminated.  If the representative is not terminated, we arrange a meeting with Human Resources and the representative's leaders to discuss the incident and clarify expectations going forward.

Solar Mosaic_Cardona-Brown 000830

As we mentioned on the call, we have recently hired new HR personnel who are tasked, in part, with investigating issues such as those Mosaic has raised.  The Director who is leading this effort and will be making decisions related to discipline is on vacation this week.  However, a member of his team has been interviewing representatives and gathering information, and has prioritized her investigation by starting with representatives who have been the subject of multiple alerts.  We will wait to report some of that information until we can report disciplinary action, if any, taken as a result of the investigation.  For now, we have a few items to report.



We look forward to moving this process forward, and will be in touch with more information.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

Solar Mosaic_Cardona-Brown 000831

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, January 27, 2017 5:57 PM |
| **To:** | Ryan Gorman; Andy McElroy |
| **Cc:** | Jordan Winder; Justin Busdicker; Brandon Hale; Ben Harper |
| **Subject:** | 2d Report on Compliance Concerns |

Good Evening,

Here is our second report on Vivint Solar's efforts to address the compliance concerns Mosaic has raised.

We have received information about a total of approximately 152 incidents from Mosaic.  We received that information by way of two spreadsheets, Mosaic Fraud and Compliance Alert emails, and emails forwarded from Andy McElroy.  We evaluated and reported on 5 of these incidents last week, and covered a handful of others with Mosaic before formalizing the process.

This week, we reviewed the backlog and eliminated 48 of these incidents as either false-positives for bogus emails, or lacking sufficient information to investigate.  We would be happy to discuss those incidents lacking sufficient information in order to get what we need to allow us to investigate.

We identified 87 incidents that merited additional investigation.  After eliminating representatives that no longer work for Vivint Solar, along with names we could not find in our systems, we were left with 41 representatives who were involved in one or more of the incidents.  Each of these representatives received a verbal warning in connection with the conduct at issue.  We would be happy to provide additional detail and discuss these communications further.

We believe we are now left with approximately 15 incidents meriting further investigation; we hope to investigate those incidents next week.

Please let us know if you have any additional questions.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000832

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, February 3, 2017 6:37 PM |
| **To:** | Ryan Gorman; Andy McElroy |
| **Cc:** | Jordan Winder; Justin Busdicker; Brandon Hale; Ben Harper |
| **Subject:** | 3d Report on Compliance Concerns |
| **Attachments:** | Mosaic Incident Tracker - No Follow Up.xlsx |

Good Evening,

Here is our third report on Vivint Solar's efforts to address the compliance concerns Mosaic has raised.  As a preliminary matter, are you and your team available for a call **next Friday at 3:00 PM** for a conference call on the unauthorized credit pull issue?  Our CRO and CSO are available then.

I've attached a spreadsheet reflecting incidents I described in last week's email as reflecting false-positive "bogus" emails, or without sufficient information for us to investigate.  Please let us know if you'd like to discuss these items further.

We also reached out and have not heard back from several sales representatives.  We were able to speak with sales representatives about the following incidents:



**Sales Rep:** Yosue Lebron; **Customer:** Carlos Soler; **Date:** 2/1/2017;**Issue:** Misrepresentation - "soft pull"

Yosue reported that he does not recall telling the customer that the credit run was a "soft" pull.  He received additional training and a first warning.

Let us know if you have any questions.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209

1800 w. Ashton Blvd.
Lehi, Utah 84043

1

Solar Mosaic_Cardona-Brown 000833

| Customer Last Name | Customer First Name | State | Sales Rep Last Name | Sales Rep First Name | Mosaic Category | Issue | Date Of Incident |
|---|---|---|---|---|---|---|---|





| Customer Last Name | Customer First Name | State | Sales Rep Last Name | Sales Rep First Name | Mosaic Category | Issue | Date Of Incident |
|---|---|---|---|---|---|---|---|

**From:**          andy.mcelroy@joinmosaic.com
**Sent:**          Wednesday, February 15, 2017 1:57 PM
**To:**            andy.mcelroy@joinmosaic.com
**Subject:**       Accepted: Vivint + Mosaic compliance call @ Thu Feb 16, 2017 3pm - 4pm
                   (andy.mcelroy@joinmosaic.com)

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.



invite.ics

Solar Mosaic_Cardona-Brown 000836

**From:**         Steven Burt <steven.burt@vivintsolar.com>
**Sent:**         Wednesday, February 15, 2017 1:33 PM
**To:**           Ryan Gorman
**Cc:**           Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale; Ben Harper
**Subject:**      Re: 3d Report on Compliance Concerns

3PM PT/4PM MT works for me.  Would you mind sending a calendar item?

On Wed, Feb 15, 2017 at 2:21 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Thanks Steve, tomorrow works but we're tied up until 3pm PT. Can we schedule for 3pm or 4pm?

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Wed, Feb 15, 2017 at 7:35 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Hi Ryan - unfortunately, today won't work.  Any chance we can talk tomorrow?  I'm available for a call after 1:00 PM PT.

On Mon, Feb 13, 2017 at 10:13 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

Can we connect this week to review the remediation process and outstanding individual fraud and compliance alerts?

Do you have time Tuesday after 3pm or Wednesday morning before 12pm PT?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

C 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Feb 3, 2017 at 6:37 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening,

1

Solar Mosaic_Cardona-Brown 000837

Here is our third report on Vivint Solar's efforts to address the compliance concerns Mosaic has raised.  As a preliminary matter, are you and your team available for a call **next Friday at 3:00 PM** for a conference call on the unauthorized credit pull issue?  Our CRO and CSO are available then.

I've attached a spreadsheet reflecting incidents I described in last week's email as reflecting false-positive "bogus" emails, or without sufficient information for us to investigate.  Please let us know if you'd like to discuss these items further.

We also reached out and have not heard back from several sales representatives.  We were able to speak with sales representatives about the following incidents:



**Sales Rep:** Yosue Lebron; **Customer:** Carlos Soler; **Date:** 2/1/2017;**Issue:** Misrepresentation - "soft pull"

Yosue reported that he does not recall telling the customer that the credit run was a "soft" pull.  He received additional training and a first warning.

Let us know if you have any questions.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000838

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Wednesday, February 15, 2017 7:36 AM |
| **To:** | Ryan Gorman |
| **Cc:** | Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale; Ben Harper |
| **Subject:** | Re: 3d Report on Compliance Concerns |

Hi Ryan - unfortunately, today won't work.  Any chance we can talk tomorrow?  I'm available for a call after 1:00 PM PT.

On Mon, Feb 13, 2017 at 10:13 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

Hi Steve,

Can we connect this week to review the remediation process and outstanding individual fraud and compliance alerts?

Do you have time Tuesday after 3pm or Wednesday morning before 12pm PT?

Thanks,

--
**Ryan Gorman**
Strategic Accounts Director

**C** 415 699 2080
1212 Broadway Oakland, CA 94612



On Fri, Feb 3, 2017 at 6:37 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening,

Here is our third report on Vivint Solar's efforts to address the compliance concerns Mosaic has raised.  As a preliminary matter, are you and your team available for a call **next Friday at 3:00 PM** for a conference call on the unauthorized credit pull issue?  Our CRO and CSO are available then.

I've attached a spreadsheet reflecting incidents I described in last week's email as reflecting false-positive "bogus" emails, or without sufficient information for us to investigate.  Please let us know if you'd like to discuss these items further.

We also reached out and have not heard back from several sales representatives.  We were able to speak with sales representatives about the following incidents:

Solar Mosaic_Cardona-Brown 000839

**Sales Rep:** Yosue Lebron; **Customer:** Carlos Soler; **Date:** 2/1/2017;**Issue:** Misrepresentation - "soft pull"

Yosue reported that he does not recall telling the customer that the credit run was a "soft" pull.  He received additional training and a first warning.

Let us know if you have any questions.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000840

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Thursday, February 16, 2017 3:04 PM |
| **To:** | Ryan Gorman |
| **Cc:** | Andy McElroy; Jordan Winder; Justin Busdicker; Brandon Hale; Ben Harper |
| **Subject:** | Re: 3d Report on Compliance Concerns |

Are we doing this via Google Hangouts?  If so, I'm logged in but alone.

On Wed, Feb 15, 2017 at 2:32 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> 3PM PT/4PM MT works for me.  Would you mind sending a calendar item?
>
> On Wed, Feb 15, 2017 at 2:21 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
>> Thanks Steve, tomorrow works but we're tied up until 3pm PT. Can we schedule for 3pm or 4pm?
>>
>>
>> --
>> **Ryan Gorman**
>> Strategic Accounts Director
>>
>> C 415 699 2080
>> 1212 Broadway Oakland, CA 94612
>>
>> 
>>
>> On Wed, Feb 15, 2017 at 7:35 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:
>>> Hi Ryan - unfortunately, today won't work.  Any chance we can talk tomorrow?  I'm available for a call after 1:00 PM PT.
>>>
>>> On Mon, Feb 13, 2017 at 10:13 AM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
>>>> Hi Steve,
>>>>
>>>> Can we connect this week to review the remediation process and outstanding individual fraud and compliance alerts?
>>>>
>>>> Do you have time Tuesday after 3pm or Wednesday morning before 12pm PT?
>>>>
>>>> Thanks,
>>>>
>>>>
>>>> --
>>>> **Ryan Gorman**
>>>> Strategic Accounts Director
>>>>
>>>> C 415 699 2080
>>>> 1212 Broadway Oakland, CA 94612
>>>>
>>>> 
>>>>
>>>> On Fri, Feb 3, 2017 at 6:37 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

1

Solar Mosaic_Cardona-Brown 000841

Good Evening,

Here is our third report on Vivint Solar's efforts to address the compliance concerns Mosaic has raised.   As a preliminary matter, are you and your team available for a call **next Friday at 3:00 PM** for a conference call on the unauthorized credit pull issue?  Our CRO and CSO are available then.

I've attached a spreadsheet reflecting incidents I described in last week's email as reflecting false-positive "bogus" emails, or without sufficient information for us to investigate.  Please let us know if you'd like to discuss these items further.

We also reached out and have not heard back from several sales representatives.   We were able to speak with sales representatives about the following incidents:



**Sales Rep:** Yosue Lebron; **Customer:** Carlos Soler; **Date:** 2/1/2017;**Issue:** Misrepresentation - "soft pull"

Yosue reported that he does not recall telling the customer that the credit run was a "soft" pull.  He received additional training and a first warning.

Let us know if you have any questions.

Steve

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000842

**From:** Steven Burt <steven.burt@vivintsolar.com>
**Sent:** Friday, February 24, 2017 4:35 PM
**To:** Andy McElroy
**Subject:** Re: Resolution tracker for fraud, compliance, flagged emails, flagged phone numbers

Thanks, Andy.  We're circling up on this, and will get back in touch with you and Ryan early next week.  Have a good weekend.

On Tue, Feb 21, 2017 at 4:15 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

I hope you had a good weekend. Here are all 2017 tickets* with resolution tracking like we discussed on Thursday. I'm only sending this to you to start with for fear of "version dysplasia" if I send it to everyone all at once. I haven't gotten it cleared with our legal department yet, but Ryan and I really like the idea of a shared Google Sheet that both entities can edit. For privacy and security reasons we'll have to remove customer info and just leave their Mosaic opp and ticket numbers, the former of which you can use for tracking.

Look the attachment over with other interested parties and let me know what you think. First we can discuss format, then move to a Google Sheet pending our legal department approval, then actual tracking. Hopefully all this week!

*Prior-to-2017 tickets are also on there but without any details. The near term goal will include updating these with resolutions, as well, mostly because I'd like the data for analyzing trends.

**Andy McElroy**
Strategic Account Executive

P 510 356 2841
E andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not

1

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Tuesday, March 28, 2017 5:10 PM |
| **To:** | Andy McElroy; Ryan Gorman |
| **Cc:** | Jordan Winder; Justin Busdicker |
| **Subject:** | Re: Customer Complaint Resolution |

That works for me!

On Tue, Mar 28, 2017 at 6:09 PM Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:
I'll be in the Vivint Solar office this Thursday. Would love to connect in the early afternoon, around 1pm?


Ryan Gorman
Strategic Accounts Director
(415) 699-2080
joinmosaic.com


On Mar 28, 2017, at 4:47 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

My pleasure. I'm always interested in looking at solutions that can help us track issues while maintaining a collaborative environment.



**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Tue, Mar 28, 2017 at 4:36 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
Thanks for speaking with me just now, Andy.  We appreciate Mosaic's approach and partnership mindset.  Let's stay in touch and come up with a game plan that works for everyone.

On Tue, Mar 28, 2017 at 5:22 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
Hi Steven,

I'm happy to be available Thursday at 4pm MDT. I see Ryan might be on travel and Veronica appears to be booked, but maybe we can have a 15-30 minute brainstorm call.

I can understand your pain. Our ticketing system is great for **Mosaic** to track complaint tickets (and fraud/compliance), but the resulting emails that get sent to you are becoming quite numerous given your sales volume and sheer number of existing customers.

Let me know if you want to have a call Thursday or if you'd prefer to also have Ryan and/or Veronica on the line at another time.

Solar Mosaic_Cardona-Brown 000844

**Andy McElroy**
Account Executive

P 510 356 2841
E andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Tue, Mar 28, 2017 at 2:00 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
Good Afternoon - do you have time on Thursday to talk about developing a process for resolving customer complaints?  In short, we've been in touch with our IT folks and believe a shared SmartSheet, rather than email, may be a better way to address the issue.

My afternoon on Thursday is uncharacteristically free at the moment - would that work for you?  Also, would Veronica be available then as well?

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000845

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Tuesday, March 28, 2017 4:37 PM |
| **To:** | Andy McElroy |
| **Cc:** | Ryan Gorman; Justin Busdicker; Jordan Winder |
| **Subject:** | Re: Customer Complaint Resolution |

Thanks for speaking with me just now, Andy.  We appreciate Mosaic's approach and partnership mindset.  Let's stay in touch and come up with a game plan that works for everyone.

On Tue, Mar 28, 2017 at 5:22 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
> Hi Steven,
>
> I'm happy to be available Thursday at 4pm MDT. I see Ryan might be on travel and Veronica appears to be booked, but maybe we can have a 15-30 minute brainstorm call.
>
> I can understand your pain. Our ticketing system is great for **Mosaic** to track complaint tickets (and fraud/compliance), but the resulting emails that get sent to you are becoming quite numerous given your sales volume and sheer number of existing customers.
>
> Let me know if you want to have a call Thursday or if you'd prefer to also have Ryan and/or Veronica on the line at another time.
>
>
>
> **Andy McElroy**
> Account Executive
>
> **P** 510 356 2841
> **E** andy.mcelroy@joinmosaic.com
> 1212 Broadway Oakland Suite 300, CA 94612
>
> On Tue, Mar 28, 2017 at 2:00 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
>> Good Afternoon - do you have time on Thursday to talk about developing a process for resolving customer complaints?  In short, we've been in touch with our IT folks and believe a shared SmartSheet, rather than email, may be a better way to address the issue.
>>
>> My afternoon on Thursday is uncharacteristically free at the moment - would that work for you?  Also, would Veronica be available then as well?
>>
>> --
>> Steven Burt
>> Senior Regulatory Counsel
>> 385.715.6209
>>
>> 
>>
>> 1800 W. Ashton Blvd.
>> Lehi, Utah 84043
>>
>> Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

1

Solar Mosaic_Cardona-Brown 000846

**From:**              Steven Burt <steven.burt@vivintsolar.com>
**Sent:**              Tuesday, March 28, 2017 2:01 PM
**To:**               Ryan Gorman; Andy McElroy
**Cc:**               Justin Busdicker; Jordan Winder
**Subject:**         Customer Complaint Resolution

Good Afternoon - do you have time on Thursday to talk about developing a process for resolving customer complaints?  In short, we've been in touch with our IT folks and believe a shared SmartSheet, rather than email, may be a better way to address the issue.

My afternoon on Thursday is uncharacteristically free at the moment - would that work for you?  Also, would Veronica be available then as well?

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000847

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Thursday, April 6, 2017 9:44 PM |
| **To:** | Ryan Gorman; Andy McElroy |
| **Cc:** | Jordan Winder; Justin Busdicker |
| **Subject:** | Outstanding Compliance Concerns - Report |
| **Attachments:** | Vivint Solar Report to Mosaic - 4.6.2017.xlsx |

Good Evening - I've attached a spreadsheet reflecting the ultimate action taken in connection with 89 Alerts we have received from Mosaic.

Let us know if you have any questions.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000848

| Customer Last Name | Customer First Name | Rep Last Name | Rep First Name | Mosaic Issue Code | Mosaic Zendesk | Action Taken |
|---|---|---|---|---|---|---|
| Rasmussen | Stefanie | Beck | Jordan | Compliance | 113001 | Warning/Retraining |
| Goss | Danny | Beck | Jordan | Fraud | 156326 | Warning/Retraining |
| Jones | Ray | Beck | Jordan | Fraud | 157881 | Warning/Retraining |
| Carlson | Caren | Cuevas | Aureo | Compliance | no zendesk number | Warning/Retraining |
| Aplas | Ewa | Dale | Richard | Compliance | 189644 | Warning/Retraining |
| Duck | Allen | Salgado | Rodner | Compliance | 193934 | Warning/Retraining |
| Adalla | Eshak | Katilus | Briant | Compliance | 227768 | Warning/Retraining |
| Velez | Angelina | Arp | David | Compliance | no zendesk number | Warning/Retraining |
| Fankhauser | Andrew | Luc V | Jean | Fraud | 160671 | Warning/Retraining |
| Tiffani | Dean | Obrien | Justin | Fraud | 202030 | Warning/Retraining |
| Soler | Carlos | Yosue | Lebron | Credit Inquiry Removal | 194709 | Warning/Retraining |
| Aplas | Ewa | Dale | Richard | Compliance | 189644 | Warning/Retraining |
| Duffy | Robert | Kera | Yhia | "Bogus" Email | 174380 | Warning/Retraining |

| Customer Last Name | Customer First Name | Rep Last Name | Rep First Name | Mosaic Issue Code | Mosaic Zendesk | Action Taken |
|---|---|---|---|---|---|---|
| Chenard | Yael | Frankie | Ammons | Fraud | 205247 | Warning/Retraining |

Solar Mosaic_Cardona-Brown 000850

| From: | Steven Burt <steven.burt@vivintsolar.com> |
|---|---|
| Sent: | Friday, April 7, 2017 10:24 AM |
| To: | Andy McElroy |
| Cc: | Ryan Gorman; Jordan Winder; Justin Busdicker |
| Subject: | Re: Outstanding Compliance Concerns - Report |

Makes sense - thanks, Andy.

On Fri, Apr 7, 2017 at 11:15 AM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

Thanks for this. I will update our records with the Action Taken values in our ticketing system and close the tickets where possible. Some could remain open if there are outstanding customer questions that need more attention. I'll advise as necessary.

**Andy McElroy**
Account Executive

P 510 356 2841
E andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Thu, Apr 6, 2017 at 9:44 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Good Evening - I've attached a spreadsheet reflecting the ultimate action taken in connection with 89 Alerts we have received from Mosaic.

Let us know if you have any questions.

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000851

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Wednesday, May 10, 2017 11:55 AM |
| **To:** | Andy McElroy |
| **Cc:** | Rico Jensen; Jordan Winder; Justin Busdicker; derek.evans@vivintsolar.com |
| **Subject:** | Re: Ready to go live with MosaicResolutions@vivintsolar.com? |

Thanks, Andy.  Yes, we approve.  My team works closely with Rico and his team, and look forward to this change in process.  And we in Legal will remain in touch with you and your team at Mosaic, as necessary.


On Wed, May 10, 2017 at 12:06 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

I wanted to get your approval that we can go live today with Rico's team receiving **all** Complaint, Compliance, and Fraud Alerts to MosaicResolutions@vivintsolar.com.

A significant change here will be to remove you, Jordan, and Justin from the recipient lists for these alerts and rely on Rico's team to distribute to you three as needed. I wanted to get your sign-off before we turned things over to the new system and steer 100% of the initial Zendesk emails away from you.



**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612




--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

1

Solar Mosaic_Cardona-Brown 000852

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Sunday, June 18, 2017 9:13 PM |
| **To:** | Andy McElroy |
| **Subject:** | Re: Proposed visit to Vivint HQ Thursday Jun 29 |

Thanks, Andy.  Sounds like a good plan.  I'll work on getting the right folks together for the smaller group meeting.

On Wed, Jun 14, 2017 at 1:26 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
> Great. I should be there from 10:30 until close of business. Are there preferred times for your team to meet? I'd like to have at least one small group session with yourself and other managers to go over some of the more in-the-weeds issues we're seeing, and a larger group training to help Rico's team and anyone else who wants to attend understand how the loans work, welcome calls, and more day to day stuff. All of that's just a few hours, so please let me know anything else you'd like to get out of the day.

**Andy McElroy**
Account Executive

P   510 356 2841
E   andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Wed, Jun 14, 2017 at 12:12 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:
> It's looking good, and I (and others) are planning on it.   Thanks for putting it together!

On Wed, Jun 14, 2017 at 1:01 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
> Hi Steven,
>
> Rico and I have been talking about me coming out there to do some training for his team this month and I was looking at June 29 as a good day trip. I'd love to have some time with you and your team to discuss compliance and any other items that are of interest to you. How's that day look?

**Andy McElroy**
Account Executive

P   510 356 2841
E   andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

--
Steven Burt
Senior Regulatory Counsel
385.715.6209

1

**From:** Steven Burt <steven.burt@vivintsolar.com>
**Sent:** Wednesday, June 14, 2017 12:13 PM
**To:** Andy McElroy
**Subject:** Re: Proposed visit to Vivint HQ Thursday Jun 29

It's looking good, and I (and others) are planning on it.  Thanks for putting it together!

On Wed, Jun 14, 2017 at 1:01 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

Rico and I have been talking about me coming out there to do some training for his team this month and I was looking at June 29 as a good day trip. I'd love to have some time with you and your team to discuss compliance and any other items that are of interest to you. How's that day look?

**Andy McElroy**
Account Executive

P 510 356 2841
E andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

--
Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 W. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000854

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Wednesday, June 28, 2017 3:53 PM |
| **To:** | Rico Jensen |
| **Cc:** | Andy McElroy; Derrek Evans |
| **Subject:** | Re: Thursday schedule |

Sounds good to me as well.  Thanks, Andy.

On Tue, Jun 27, 2017 at 2:44 PM, Rico Jensen <eric.jensen@vivintsolar.com> wrote:
Well, it all sounds splendid to me.  Looking forward to it.  I have adjusted the time for the Big Group gathering to accommodate our start time.  I have also ordered the Kool-Aid, so everyone will be on board.  We will be ready!  Thanks Andy!

On Tue, Jun 27, 2017 at 1:51 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
Hi Rico and Steven,

How's this for the Thursday schedule? The morning is what Rico and I discussed on the phone, put in writing. Steven, let me know if you need a different time for a small group meeting with your team.

- 10 - 10:30:    I arrive, meet with Rico's group, mostly for introductions and getting to know Executive Resolutions face to face.
- 10:30 - 11:30: Presentation to the Big Group on sales process, the new Compliance Guide, and common pitfalls for borrowers during loan origination. All are welcome to attend.
- 12:00 - 1:00:   Lunch with whoever wants to talk about Compliance and customer service (who wouldn't?)
- 1:00 - 2:00 :   Meet with Steven and his team (+ HR rep if that seems appropriate) to discuss a few specific and very egregious instances (eg. sales rep impersonating the homeowner during Welcome Call) and what their broader implications are. Hopefully at least one representative from Rico's team could attend.
- TBD          : Meet with Abigail to go over onboarding and training ideas.

Beyond that I could easily set up shop somewhere for office hours between meetings.  I'm open to ideas for whatever would be most helpful for your stakeholders.

Andy


**Andy McElroy**
Account Executive

P  510 356 2841
E  andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Solar Mosaic_Cardona-Brown 000855

--

**Best Regards,**

**Rico Jensen**

**Manager- Executive Resolutions- vivint.Solar**



**1800 W Ashton Blvd**
**Lehi, UT 84043**
O: **385-236-4328**
**rico.jensen@vivintsolar.com**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use,disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

--

Steven Burt
Senior Regulatory Counsel
385.715.6209



1800 w. Ashton Blvd.
Lehi, Utah 84043

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000856

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Thursday, July 6, 2017 2:26 PM |
| **To:** | Andy McElroy |
| **Subject:** | Re: Thanks for a great visit |

Thanks, Andy.

On Thu, Jul 6, 2017 at 3:03 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:
 Hi Steven

 I have it as an action item to give you more details on the players who are accounting for a spike in email subbing and misrepresenting the credit check. Expect some reporting on this next week.


 **Andy McElroy**
 Account Executive

 **P**  510 356 2841
 **E**  andy.mcelroy@joinmosaic.com
 1212 Broadway Oakland Suite 300, CA 94612


On Thu, Jul 6, 2017 at 1:00 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

 Can you give me more details about the recent uptick in use of a rep's email address instead of the customer's?   In particular, is the uptick attributable to a handful of people, as we suspected it might be when we met?


 Steven Burt

 385.715.6209


 vivint.Solar


**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Friday, June 30, 2017 at 1:24 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>, Rico Jensen <eric.jensen@vivintsolar.com>,
"MosaicResolutions@vivintsolar.com" <MosaicResolutions@vivintsolar.com>, Abigail Hansen
<abigail.hansen@vivintsolar.com>, Jordan Winder <jordan.winder@vivintsolar.com>,
"ben.young@vivintsolar.com" <ben.young@vivintsolar.com>, Jeanette Jensen
<jeanette.jensen@vivintsolar.com>, Derrek Evans <derrek.evans@vivintsolar.com>

Solar Mosaic_Cardona-Brown 000857

**Cc:** Ryan Gorman <ryan.gorman@joinmosaic.com>, Ted Fawcett <ted.fawcett@joinmosaic.com>
**Subject:** Thanks for a great visit

Hello Vivint,

I want to express my gratitude for the time you took yesterday to learn more about Mosaic and the ins and outs of selling our loan products compliantly. The robust partnership between Vivint and Mosaic is largely due to the strong spirit of collaboration and forward focus we share, and the enthusiasm and curiosity on display yesterday by your teams reinforced that notion. I'm also confident that with just a few subtle tweaks on presenting the loan - namely the hard credit inquiry and the 30% Choice Paydown schedule that are not present in lease and PPA products - the amount of tickets Rico's team receives from us would drop to nearly zero. That's more time your sales and operations teams can focus on new customers.

I know I missed a lot of yesterday's attendees in my distribution list above so please pass this along as you see fit.

Thank you again!

Ps. I have a solid action item list from yesterday, so expect some individual follow up shortly if we discussed new ideas and solutions for your particular team.

**Andy McElroy**

Account Executive

P 510 356 2841

E andy.mcelroy@joinmosaic.com

1212 Broadway Oakland Suite 300, CA 94612

Solar Mosaic_Cardona-Brown 000858

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Thursday, July 6, 2017 1:00 PM |
| **To:** | Andy McElroy |
| **Subject:** | Re: Thanks for a great visit |

Can you give me more details about the recent uptick in use of a rep's email address instead of the customer's?  In particular, is the uptick attributable to a handful of people, as we suspected it might be when we met?

Steven Burt
385.715.6209

vivint.Solar

---

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Friday, June 30, 2017 at 1:24 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>, Rico Jensen <eric.jensen@vivintsolar.com>, "MosaicResolutions@vivintsolar.com" <MosaicResolutions@vivintsolar.com>, Abigail Hansen <abigail.hansen@vivintsolar.com>, Jordan Winder <jordan.winder@vivintsolar.com>, "ben.young@vivintsolar.com" <ben.young@vivintsolar.com>, Jeanette Jensen <jeanette.jensen@vivintsolar.com>, Derrek Evans <derrek.evans@vivintsolar.com>
**Cc:** Ryan Gorman <ryan.gorman@joinmosaic.com>, Ted Fawcett <ted.fawcett@joinmosaic.com>
**Subject:** Thanks for a great visit

Hello Vivint,

I want to express my gratitude for the time you took yesterday to learn more about Mosaic and the ins and outs of selling our loan products compliantly. The robust partnership between Vivint and Mosaic is largely due to the strong spirit of collaboration and forward focus we share, and the enthusiasm and curiosity on display yesterday by your teams reinforced that notion. I'm also confident that with just a few subtle tweaks on presenting the loan - namely the hard credit inquiry and the 30% Choice Paydown schedule that are not present in lease and PPA products - the amount of tickets Rico's team receives from us would drop to nearly zero. That's more time your sales and operations teams can focus on new customers.

I know I missed a lot of yesterday's attendees in my distribution list above so please pass this along as you see fit.

Thank you again!


Ps. I have a solid action item list from yesterday, so expect some individual follow up shortly if we discussed new ideas and solutions for your particular team.


Andy McElroy
Account Executive

1

Solar Mosaic_Cardona-Brown 000859

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000860

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Thursday, July 6, 2017 12:58 PM |
| **To:** | Andy McElroy; Rico Jensen; MosaicResolutions@vivintsolar.com; Abigail Hansen; Jordan Winder; ben.young@vivintsolar.com; Jeanette Jensen; Derrek Evans |
| **Cc:** | Ryan Gorman; Ted Fawcett |
| **Subject:** | Re: Thanks for a great visit |

Thanks, Andy, for taking the time.  We're looking forward to continuing our relationship and improving our processes.

Best,

Steve

Steven Burt
385.715.6209

vivint.Solar

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Friday, June 30, 2017 at 1:24 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>, Rico Jensen <eric.jensen@vivintsolar.com>, "MosaicResolutions@vivintsolar.com" <MosaicResolutions@vivintsolar.com>, Abigail Hansen <abigail.hansen@vivintsolar.com>, Jordan Winder <jordan.winder@vivintsolar.com>, "ben.young@vivintsolar.com" <ben.young@vivintsolar.com>, Jeanette Jensen <jeanette.jensen@vivintsolar.com>, Derrek Evans <derrek.evans@vivintsolar.com>
**Cc:** Ryan Gorman <ryan.gorman@joinmosaic.com>, Ted Fawcett <ted.fawcett@joinmosaic.com>
**Subject:** Thanks for a great visit

Hello Vivint,

I want to express my gratitude for the time you took yesterday to learn more about Mosaic and the ins and outs of selling our loan products compliantly. The robust partnership between Vivint and Mosaic is largely due to the strong spirit of collaboration and forward focus we share, and the enthusiasm and curiosity on display yesterday by your teams reinforced that notion. I'm also confident that with just a few subtle tweaks on presenting the loan - namely the hard credit inquiry and the 30% Choice Paydown schedule that are not present in lease and PPA products - the amount of tickets Rico's team receives from us would drop to nearly zero. That's more time your sales and operations teams can focus on new customers.

I know I missed a lot of yesterday's attendees in my distribution list above so please pass this along as you see fit.

Thank you again!


Ps. I have a solid action item list from yesterday, so expect some individual follow up shortly if we discussed new ideas and solutions for your particular team.

Solar Mosaic_Cardona-Brown 000861

**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our **contractor licenses page.**

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000862

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Friday, July 7, 2017 2:32 PM |
| **To:** | Abigail Hansen; Andy McElroy |
| **Subject:** | Re: Briant Katilus |

Thanks, Abigail and Andy.

Steven Burt
385.715.6209

vivint.Solar

**From:** Abigail Hansen <abigail.hansen@vivintsolar.com>
**Date:** Friday, July 7, 2017 at 3:16 PM
**To:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Cc:** Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Re: Briant Katilus

Thanks Andy!!
Steve, Colt has gotten my previous email to Paul/Chance regarding this. I'll be forwarding him this documentation too. Please let me know if efforts are being made on your end too :)

**Abigail Hansen** • Regional Sales Operations Specialist • TRIBE

abigail.hansen@vivintsolar.com  C: 480.332.6048

simply brighter • vivintsolar.com

1800 W. Ashton Blvd Lehi, Utah 84043

The information in this e-mail is for the use of the designated recipients only.  This email is considered confidential unless otherwise indicated and may also constitute an attorney/client communication or attorney work product subject to copyright or constitutes a trade secret, and therefore, is privileged and confidential.  If you are not an identified recipient of this e-mail, you are instructed not to review it or any attachments, to immediately permanently delete this e-mail, and are further directed to not disseminate, forward or copy any information from this email or any attachments.

On Thu, Jul 6, 2017 at 6:49 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Abigail and Steven,

Here's a list of Briant Katilus's 6 compliance issues from the last 5 months. I said there are 2 other complaints but I am still tracking those down. He was not the rep who did the Welcome Call coaching - that was a rep by the name of Dalton Brown. Sorry if I conflated those during our speed lunch, Abigail. Briant's repeating issues are representing the solar as somehow "free", creating logins for credit applications, and signing up Spanish speakers on English docs.

Solar Mosaic_Cardona-Brown 000863

I looked up his total loans and see that Briant does high volume with Mosaic loans, which of course we appreciate. We just want to make sure no one's engaging in highly non-compliant activity in the process, like representing solar as "free," creating email addresses for customers, and signing non-English speakers up on English docs without a translator.

Thank you for looking into this.


**Andy McElroy**
Account Executive

P   510 356 2841
E   andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Thu, Jul 6, 2017 at 3:12 PM, Abigail Hansen <abigail.hansen@vivintsolar.com> wrote:

Thank you Andy!!


**Abigail Hansen**  •  Regional Sales Operations Specialist  •  TRIBE

abigail.hansen@vivintsolar.com   C: 480.332.6048

simply brighter  •  vivintsolar.com

1800 W. Ashton Blvd Lehi, Utah 84043


The information in this e-mail is for the use of the designated recipients only.    This email is considered confidential unless otherwise indicated and may also constitute an attorney/client communication or attorney work product subject to copyright or constitutes a trade secret, and therefore, is privileged and confidential.    If you are not an identified recipient of this e-mail, you are instructed not to review it or any attachments, to immediately permanently delete this e-mail, and are further directed to not disseminate, forward or copy any information from this email or any attachments.


On Thu, Jul 6, 2017 at 4:04 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Abigail,

I'll get a summary of Briant's 2017 compliance tickets over to you in a bit. Thanks for following up.


**Andy McElroy**
Account Executive

P   510 356 2841
E   andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Thu, Jul 6, 2017 at 2:46 PM, Abigail Hansen <abigail.hansen@vivintsolar.com> wrote:

Can you please send me the examples for him (tickets, coaching 90 yr women, etc)?
We're digging in with the Execs on this.

Thanks!

**Abigail Hansen**  •  Regional Sales Operations Specialist  •  TRIBE

abigail.hansen@vivintsolar.com   C: 480.332.6048

simply brighter  •  vivintsolar.com

1800 W. Ashton Blvd Lehi, Utah 84043

The information in this e-mail is for the use of the designated recipients only.    This email is considered confidential unless otherwise indicated and may also constitute an attorney/client communication or attorney work product subject to copyright or constitutes a trade secret, and therefore, is privileged and confidential.    If you are not an identified recipient of this e-mail, you are instructed not to review it or any attachments, to immediately permanently delete this e-mail, and are further directed to not disseminate, forward or copy any information from this email or any attachments.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our  contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our  contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our  contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000865

**From:**          steven.burt@vivintsolar.com
**Sent:**          Sunday, July 16, 2017 3:26 PM
**To:**            Andy McElroy
**Subject:**       Re: Month over month compliance instances


Thanks, Andy.

Steven Burt
Senior Regulatory Counsel
385.715.6209
1800 W. Ashton Blvd.
Lehi, Utah 84043


On Sat, Jul 15, 2017 at 7:48 PM -0600, "Andy McElroy" <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

That's part of what I'm working on. Should have it Monday.

On Jul 15, 2017 6:44 PM, "Steven Burt" <steven.burt@vivintsolar.com> wrote:
Thanks, Andy. The most useful piece of data for me would be who are the main offenders. Is that easy to tease out?

Steven Burt
Senior Regulatory Counsel
385.715.6209
1800 W. Ashton Blvd.
Lehi, Utah 84043



On Fri, Jul 14, 2017 at 5:43 PM -0600, "Andy McElroy" <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

I still owe you the detailed version of email shenanigans and am working on that. I did compile the raw numbers of tickets for all time with Vivint and you can see the monthly trends. March was a spike, then it got better in April and May, but then spiked again in June. And July is on track to equal or surpass June. This is all Fraud/Compliance/Complaint instances, not just email creation.

1

Solar Mosaic_Cardona-Brown 000866

| TOTALS | | | |
|---|---|---|---|
| | created_at | Number of Zd tickets | # of Activities |
| DETAILS | JUL 2017 | 57 | 0 |
| DETAILS | JUN 2017 | 93 | 0 |
| DETAILS | MAY 2017 | 52 | 0 |
| DETAILS | APR 2017 | 61 | 0 |
| DETAILS | MAR 2017 | 99 | 0 |
| DETAILS | FEB 2017 | 54 | 0 |
| DETAILS | JAN 2017 | 53 | 0 |
| DETAILS | DEC 2016 | 35 | 0 |
| DETAILS | NOV 2016 | 24 | 2 |
| DETAILS | OCT 2016 | 15 | 0 |
| DETAILS | SEP 2016 | 17 | 0 |
| DETAILS | AUG 2016 | 5 | 2 |
| DETAILS | JUL 2016 | 3 | 1 |
| DETAILS | JUN 2016 | 2 | 2 |
| DETAILS | MAY 2016 | 3 | 2 |
| DETAILS | APR 2016 | 2 | 0 |
| DETAILS | MAR 2016 | 4 | 0 |
| DETAILS | FEB 2016 | 2 | 0 |
| | Totals (18 groups) | 581 | 9 |

Could be summer volume related but worth digging into, which I'm still doing. Have a good weekend!

**Andy McElroy**
Account Executive

P 510 356 2841
E andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000867

**From:**             Steven Burt <steven.burt@vivintsolar.com>
**Sent:**             Tuesday, July 18, 2017 11:05 AM
**To:**               Andy McElroy
**Subject:**          Re: Questionable Emails since May 1

Thanks. Deleted.

Steven Burt
385.715.6209

vivint.Solar

---

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Tuesday, July 18, 2017 at 12:03 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Re: Questionable Emails since May 1

Steven,

See R1 attached. Please delete the other file.

**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Tue, Jul 18, 2017 at 10:47 AM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Thanks, Andy.  Can you include the questionable email address itself as a column in the sheet?

Steven Burt

385.715.6209

vivint.Solar

1

Solar Mosaic_Cardona-Brown 000868

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Tuesday, July 18, 2017 at 11:44 AM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Questionable Emails since May 1

Hi Steven,

Meant to send this last night. These are all the confirmed "questionable emails" since May 1, with two repeat users on the list. Sunny Mooney has two instances of using his personal email. There was a third instance originally flagged but we found that to be a real email. In turn, each of those three generated an FCC ticket, which made for a total of six call-outs. Thus my incorrect anecdotal feedback while I was visiting. I want to be clear Mr. Mooney is responsible for two, not six, instances of using personal email. Not great, but certainly less egregious than my original reporting. We also confirmed a number of emails that were originally flagged but were removed from this list once the customer reported them as credible.

This is only the list for questionable emails. I'm parsing the FCC tickets by sales rep for the same time period to identify reps who show up repeatedly. I'll have that shortly.

Best,

**Andy McElroy**

Account Executive

**P** 510 356 2841

**E** andy.mcelroy@joinmosaic.com

1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to

Solar Mosaic_Cardona-Brown 000869

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Tuesday, July 18, 2017 10:47 AM |
| **To:** | Andy McElroy |
| **Subject:** | Re: Questionable Emails since May 1 |

Thanks, Andy.  Can you include the questionable email address itself as a column in the sheet?

Steven Burt
385.715.6209

vivint.Solar

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Tuesday, July 18, 2017 at 11:44 AM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Questionable Emails since May 1

Hi Steven,

Meant to send this last night. These are all the confirmed "questionable emails" since May 1, with two repeat users on the list. Sunny Mooney has two instances of using his personal email. There was a third instance originally flagged but we found that to be a real email. In turn, each of those three generated an FCC ticket, which made for a total of six call-outs. Thus my incorrect anecdotal feedback while I was visiting. I want to be clear Mr. Mooney is responsible for two, not six, instances of using personal email. Not great, but certainly less egregious than my original reporting. We also confirmed a number of emails that were originally flagged but were removed from this list once the customer reported them as credible.

This is only the list for questionable emails. I'm parsing the FCC tickets by sales rep for the same time period to identify reps who show up repeatedly. I'll have that shortly.

Best,


Andy McElroy
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000870

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Wednesday, August 2, 2017 7:29 AM |
| **To:** | Andy McElroy; Jordan Winder |
| **Cc:** | Ryan Gorman; Jason Deelstra; Julie Allen |
| **Subject:** | Re: Loan Sales Training Materials |
| **Attachments:** | Ethics Standards Training - For Mosaic Review - 8.2.2017.pdf |

Hi Andy – I've attached a PDF copy of our Ethics Standards training.  All sales representatives are required to complete this training and pass the associated quiz, and their activity associated with the training is tracked (they interact with the training through training software, not through a document like this PDF, as you probably surmised).

To orient you, you'll find the Standards themselves on page 3 of the PDF, and then training on each standard thereafter.  For example, training associated with Standard 5, relating to running customer's credit, begins on page 17 of the PDF.  Correct answers to questions are in bold.

Let us know if you have any questions.

Steven Burt
385.715.6209

vivint.Solar

---

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Monday, July 31, 2017 at 11:21 AM
**To:** Jordan Winder <jordan.winder@vivintsolar.com>
**Cc:** Ryan Gorman <ryan.gorman@joinmosaic.com>, Jason Deelstra <jdeelstra@vivintsolar.com>, Julie Allen <julie.allen@vivintsolar.com>, Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Re: Loan Sales Training Materials

Hi Jordan,

Sounds like a good opportunity, but I would still like to see the previous training materials if that's possible. It will help me identify if there were holes that led to prevalent compliance issues like the ones we went over in June and how to create the focus in the new materials. Is that doable?

**Andy McElroy**
Account Executive

**P**  510 356 2841
**E**  andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Mon, Jul 31, 2017 at 9:16 AM, Jordan Winder <jordan.winder@vivintsolar.com> wrote:

1

Ryan or Andy (while Ryan is OoO),

We are incidentally in the process of completely overhauling our training, so rather than send you stuff that is outdated, could you send us items/content that you'd like us to address as part of that development.   Are there specific current concerns that we can understand and potentially address with more robust training?

Thanks,
Jordan

On Fri, Jul 28, 2017 at 1:33 PM, Ryan Gorman <ryan.gorman@joinmosaic.com> wrote:

> Thanks Jordan,
>
> We're asking in order to get an understanding of how we can best supplement with Mosaic provided materials.
>
> You mentioned this is administered via LMS.   Would it be possible for VSLR to provide the same login/access that a new hire would get?
>
> It would be great to see the material in the same format that trainees do, and hopefully that makes the task of providing this info easy on your side as well.
>
> Thanks,
>
>
> --
> **Ryan Gorman**
> Strategic Accounts Director
>
> C  415 699 2080
> 1212 Broadway Oakland, CA 94612
>
> 
>
> On Fri, Jul 28, 2017 at 11:57 AM, Jordan Winder <jordan.winder@vivintsolar.com> wrote:
>
>> Hi Jason,
>>
>> Would it be possible to provide the Mosaic team (Ryan cc'd) our sales training materials for around all things loan related? They would like to review.
>>
>> Thanks,
>> Jordan
>>
>>
>> --
>>
>> **Jordan Winder**
>> Director, New Products
>> **vivint.**Solar
>> Capital Markets
>> 1800 W Aston Blvd.
>> Lehi, UT 84043
>> M:(646) 787-5625

Solar Mosaic_Cardona-Brown 000872

[jordan.winder@vivintsolar.com](mailto:jordan.winder@vivintsolar.com)

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our   contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

--

**Jordan Winder**
Director, New Products
**vivint.**Solar
Capital Markets
1800 W Aston Blvd.
Lehi, UT 84043
M:(646) 787-5625
[jordan.winder@vivintsolar.com](mailto:jordan.winder@vivintsolar.com)

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our   contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000873

## Course Name: Ethics Standards

## Page Title: Welcome

The following courses are designed to teach you certain ethical standards you are expected to follow while working for Vivint Solar.

Each course will discuss one of the 10 ethics standards, give specific examples of how these standards should be interpreted, and have a story assessment to see if you understand how it works.

The end of this program will have a quiz to make sure you understand the Standards.

Solar Mosaic_Cardona-Brown 000874

Page Name: The Standards

Solar Mosaic_Cardona-Brown 000875

# ETHICS STANDARDS

Vivint Solar's reputation and corporate integrity is built upon the honesty, fairness, and personal integrity of its employees. Consequently, Vivint Solar requires that its employees adhere to the following standards: **\***

## Creating a False Account

We may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign a PPA, Lease or Cash SPA, but only if the homeowner also signs. No one who is not a homeowner or homeowner's spouse may sign a customer agreement.

**1**

## Notice of Cancellation

We must orally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, we may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

**2**

## Misrepresentations Re: Relationships with Utility Companies

We may not say or do anything that may reasonably cause a customer to believe we are affiliated with a utility company. We do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between Vivint Solar and a utility company.

**3**

## Forgery

We may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, we may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

**4**

## Running Customer Credit Without Consent

Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by the Legal Department). We must never allow another person - even a spouse - to authorize a credit check on behalf of someone else.

**5**

## Providing False Information

We may not provide false or inaccurate information concerning any customer in order to progress an account. This includes providing a false email address, false usage or utility information, or false payment information. In addition, we may not list an employee's own checking account information or a prepaid card of any kind as a customer's payment information.

**6**

## Sales Presentation- Contract Terms and English Only

We may not conduct a sales presentation in a language other than English. Also, we may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) cost savings; (c) a customer's ability to terminate the agreement after the system is installed; and/or (d) the cost to remove the system temporarily. We may not enter into side deals with customers that are not memorialized in written agreements approved by the company. And nothing is free!

**7**

## Sharing Confidential Information

We may not share confidential information with anyone outside the company or allow anyone to do work on an employee's behalf that is not an employee of Vivint Solar. This includes allowing anyone to access Vivint Solar's information technology systems using our log-in information.

**8**

## Misrepresentations Regarding Competition and Utilities

We may not make untrue or misleading statements about a competitor or a utility company. For example, we may not represent that a utility's or competitor's rates will increase without data to support our claim and appropriate company approval.

**9**

## Elderly Customers

We need to treat elderly customers with extra care to ensure they understand our products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

**10**

Violation of these standards will result in immediate disciplinary action, which may include termination.

**\*** These Standards do not include every principle that should govern employee conduct. All employees should apply common sense, follow all company policies (including the Employee Handbook, Operations Manual, and SEIA Business Code), and abide by the highest personal ethical standards, in making decisions and interacting with customers. If you have any questions, please contact Human Resources (HRsolar@vivintsolar.com) or the Legal Department (solarlegal@vivintsolar.com). As we each personally uphold these Standards, and train and require our employees to do the same, we will delight our customers and lead the industry.

**vivint.**Solar

Solar Mosaic_Cardona-Brown 000876

# Course Title: Creating a False Account

## Page name: The policy:

You may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign customer agreements, but only if the homeowner also signs. No one who is not a homeowner or homeowner's spouse may sign a customer agreement.

Solar Mosaic_Cardona-Brown 000877

## Page Name: Specific Points to Know.

We cannot install solar panels on a house without the homeowner's permission.  As a result, the homeowner must <u>always</u> be listed on an account and sign all pertinent agreements.

If the homeowner doesn't have good enough credit to qualify for the desired product, you may not create the account under the name of someone with better credit <u>unless</u> that person is the homeowner's spouse or domestic partner.  Even then, the homeowner must still be on the account and sign the agreement.

You also may not circumvent this standard by creating an account in the name of someone who is not the homeowner and then transferring the account to the homeowner after PTO.  Because we promise our investors that the accounts they invest in are credit worthy accounts, any attempt to circumvent the credit requirements puts our company at serious risk.

It is also improper to create an account under a fictitious name, or the name of someone who hasn't give you permission, in order to increase your statistics and obtain commissions that you did not properly earn.

## Page Title: Assessment

Lance is working with the Potters who have have very poor credit. They want to install a system on their house, but neither the husband nor wife pass credit.

Lance really wants to help the Potters because they seem like great people and really want solar.  So, Lance asks his roommate, Barney, if Lance can use Barney's name on the account in order to pass credit.  Barney is hesitant, so Lance offers him $500.   Barney agrees and Lance creates a new account with the Potter's address and Barney as a homeowner.

Barney passes credit and Lance is able to proceed with installation of the solar panels on the Potter's home.  The Potter's are thrilled with the new solar panels.

Which is most true about this situation:

- Lance's conduct is ethical because it creates a win-win situation for everyone involved: the Potters get solar panels, Barney is $500 richer, and Lance gets that warm feeling from helping someone in heed (not to mention a substantial system).
- Lance's conduct is unethical because Barney is not the homeowner and is not the spouse or domestic partner of the homeowner.  Lance's conduct puts the company at risk because the Potters do not have sufficient credit.
- Lance's conduct is unethical because the Potters did not know that Barney was included on the account.  If Lance had told the Potters about his plan and they had agreed to include Barney on the account, Lance's conduct would have been fine.
- As long as the Potters never miss a payment, Lance's conduct is fine.

# Course Title: Notice of Cancellation

## Page name: The policy:

We must verbally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, we may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

Solar Mosaic_Cardona-Brown 000880

# Page Name: Specific Points to Know

Federal and state law requires that we give our customers a period of time to cancel their agreement after they sign it. These laws require us to verbally notify customers of their right to cancel and also provide them with written notice. It is vital that we always provide such notice because the customer's right of cancellation does not begin to run until we provide the notice.

It is insufficient, and also inaccurate, to tell a customer that the agreement they sign is not "enforceable" or "binding."  We must ensure that customers know they are entering into a legally binding contract. If the customer is worried about signing a 20 year agreement we can, and should, remind the customers that they can cancel the agreement for the amount of time identified in the notice of cancellation.

Solar Mosaic_Cardona-Brown 000881

## Page Title: Assessment

Kelly has been meeting with Edward and seems very interested in obtaining more information about solar. Edward explains that the next step will be to arrange a site survey, but that Kelly will need to sign the PPA first. After reviewing the PPA, Kelly tells Edward that she doesn't feel comfortable signing a 20-year agreement before she knows what the system will even look like on her roof. She keeps asking what happens if she doesn't like how it looks or if it doesn't produce enough power.

Edward reassures Kelly that she doesn't have anything to worry about because the agreement isn't valid or enforceable until Vivint Solar actually begins installing the system. If she doesn't want to move forward anytime before then, she doesn't have to.

Relieved, Kelly signs the contract.

Which of the following is true about the interaction:

- Edward's conduct was ethical because telling her that the agreement isn't enforceable is the same thing as telling her she has the right to cancel the contract.
- Edward's conduct wasn't ethical because once the contract is signed it is binding; if Edward wanted to reassure Kelly, he should have explained to her that she could simply cancel the contract using the notice of cancellation if she did not want to move forward after the site survey.
- Edward should have signed Kelly's name on the PPA in order to get the site survey scheduled.  If Kelly agreed to move forward after the site survey, he could have her sign a new PPA and nobody would be the wiser.

Solar Mosaic_Cardona-Brown 000882

# Course Title: Misrepresentations Regarding Relationship with Utility Companies:

## Page name: The policy:

We may not say or do anything that may reasonably cause a customer to believe we are affiliated with a utility company. We do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between Vivint Solar and a utility company.

## Page Name: Specific Points to Know

As a sales representative, you may be tempted to tell a prospective customer that you "work with" the local utility company. After all, a customer is unlikely to slam the door in the face of the company that controls the power to their house. Although making a customer think you are affiliated with the utility company may buy you a few extra seconds at the door, we promise that it won't be worth it in the long run.

As an initial matter, what will the customer think when he/she discovers that you don't actually work for the utility company? Who in their right mind would want to continue doing business with someone who began the relationship with a lie?

Even if the customer never finds out, it is deceptive and wrong. We do not work or partner with any utility company and it is unethical to say or do anything that might cause a customer to believe you do. Doing so exposes both you and the company to liability.

To avoid any potential confusion, you must begin every sales pitch you make by identifying yourself and the company you work with. You should also avoid wearing apparel or accessories or carry equipment that contains branding elements, including a logo, that suggests you work for a utility company. You will eventually need to explain to customers that the solar panels will be connected to the utility's grid and how interconnection works. But in doing so, you must always make sure to be clear that you do not work for or with the utility company.

## Page Title: Assessment

Mark is selling around the neighborhood. He knocks on the Bell's door and a young girl opens the door. Mark asks if her parents are home and she says yes. She asks him what he wants and Marks responds with "I just want to talk to your parents about their power."

The little girl leaves and her mom, Sandy, comes back to the door and says, "Hi, so you're with the power company, is there a problem?"

Mark responds with, "No problem, we are actually here to discuss a net metering program and we are just curious if we could see your utility bill so we can try to save you money."

Was this interaction ethical?

- Mark's conduct was ethical because he didn't lie at any point, it is just to get in the door, and there is no harm for her to not know at the start.
- Mark's conduct was unethical. Although he didn't technically lie, he knew that the customer thought he worked for the utility company and did nothing to correct the misunderstanding.
- Mark's conduct was ethical because never said he was with the power company; he can clear up any misunderstanding once he gets in the house.
- Mark's conduct was unethical because he talked to a child without the child's parent present.

Solar Mosaic_Cardona-Brown 000885

# Course Title: Forgery

## Page name: The policy:

We may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, we may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

Solar Mosaic_Cardona-Brown 000886

## Page Name: Specific Points to Know

At this point you should know that you can't sign someone else's name on a contract. That's forgery and it's not only unethical, it's illegal. However, you need to also remember that the term "forgery" is much broader than just signing someone else's name.  Our contracts have several boxes that customers must click to acknowledge specific provisions in the contract.  Checking one of these boxes for a customer is the same as signing their name and, consequently, also prohibited.  When asking a customer to sign an agreement of any kind, you should always hand the tablet to the customer and allow customers  to check any boxes themselves. It might take a little more time, but you need to make sure they are the ones to hold and touch the tablet.

It's also important to remember that misrepresenting what a document says in order to get someone to sign it is just as unethical and illegal as forging their name.  You cannot, for example, get a customer to sign a PPA by telling them it is just a document to get the process started.

Solar Mosaic_Cardona-Brown 000887

## Page Title: Assessment

Brent has all but sold a PPA to Sandy and her family. Sandy is very busy and during her presentation she has three kids who are running around. Brent is about to give her the iPad and explain what the document entails, when one of her children throws up in the other room.

She politely excuses herself and says that she will sign the contract once she cleans her kid up. Brent can see that she is very short on time, so he starts checking boxes so that all Sandy has to do when she gets back is just sign her name. At this point she knows everything, so he figures he isn't trying to deceive her.

Once she gets back he explains what the boxes were that he checked, now Sandy just needs to sign. She is grateful for the time he saved and signs the documents needed.

Which of the following is most true about the interaction:

- One finger is just as good as another finger.  As long as Brent described everything and Sandy is fine with it, Brent didn't do anything unethical.
- Brent didn't do anything wrong because Sandy voluntarily signed the agreement and the signature meant she understood and accepted the terms in the boxes; the signature is all that matters.
- **Brent violated company policy by checking the boxes for Sandy. He doesn't have to write her signature to commit forgery. Checking an acknowledgement box is the same as signing someone's name.**
- Brent forged the documents because Sandy was in the other room. If Sandy was in the same room and Brent checked the boxes while explaining it to Sandy, Brent would be okay.

After Brent submits the signed contract, he receives an email that there is a small problem with the contract and that he needs the customer to sign a new agreement. Brent does not want to drive out to the customer's house again and the revision in the agreement is so small that he is certain the customer won't have any problem with it. In order to save time, Brent electronically copies the customer's signature and pastes it into the new agreement.

Which of the following is most true about the interaction:

- Brent didn't forge Sandy's signature because he didn't write her signature himself, he used her actual signature from the prior contract.
- Brent committed forgery by pasting Sandy's signature into an agreement without her authorization -- even if the agreement is nearly identical to the one she previously signed.

- It is okay for Brent to paste Sandy's signature into the new agreement as long as he uses the time he saved to create another account and increase the Company's profitability.

# Course Title: Running Customer Credit Without Consent

## Page name: The policy

Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by the Legal Department). We must never allow another person -even a spouse- to authorize a credit check on behalf of someone else.

Solar Mosaic_Cardona-Brown 000890

## Page Name: Specific Points to Know

Obtaining a consumer report can negatively affect a customer's credit score.  Moreover, federal law prohibits us from obtaining a consumer report without their permission. In order to comply with the law, we must always obtain a customer's permission before we run their credit.  We typically obtain such permission by having the customer sign a PCCF or Credit Authorization form.

However, in order for the Authorization to be effective, the customer must know what they are signing.  As such, you must always verbally explain to the customer that by signing the form, they are granting us permission to run their credit. And you should not tell a customer who signs a PCCF or credit authorization form that we are only running a "soft" credit check -- if a customer signs a form, then we will obtain their credit report, which may affect their score (sometimes called a "hard" credit check).

Keep in mind that if the customer does not pass credit, we are also required by law to notify them that we cannot proceed due to the credit check, and explain why. This means that a customer who fails a credit check will receive written notification from the company that their credit was run. In addition, many people use credit monitoring services that notify them of credit checks.  If the customer was not aware that we were running their credit, the customer will likely be upset, whether they meet our requirements or not.  Apart from creating legal problems for both you and the company, you may lose a sale.

The application "Doors" provides the option to pre screen a potential customer's credit. You are free to use this check to see if a customer is likely to qualify. If, however, the customer progresses and signs a PCCF or Credit Authorization form, a full credit check will be required.

# Page Title: Assessment

James has knocked every door on Union Ave. and has talked to everyone on the street except the house on the corner. He really wants to stop coming to this street, but the corner house would be perfect for a PPA. The back of the house is south-facing with enough room for a great system. He has information about the house from Doors, and knows that the homeowner is Lester Sims.

Even though the Sims family never seems to be home, he wants to know if it will be worth his time to return. He decides to prescreen the Sims' credit score in Doors and finds out they have a very good credit score.

Which is most true about this scenario:

- James violated Vivint Solar's policy by prescreening Lester Sim's credit through Doors without obtaining Lester's approval.
- Once the prescreen came back positive, James should run a full credit check to verify the results. Since it likely wouldn't fail, Lester wouldn't ever find out.
- James did not violate company policy.  James didn't run a full credit check through NEO, so he didn't need Lester's approval.
- James did not violate Company policy because the prescreen came back positive. If the credit had been poor it would have been a violation.

James returns to the house the following week and meets a woman named Samantha. James asks if Lester is available and finds out that Lester no longer lives in the house. James ends up giving his sales pitch to Samantha and she tells James that she is the current homeowner and is interested in learning more.

Although Samantha agreed to learn more, Samantha doesn't seem overly interested and James does not want to scare her away by asking to run her credit.  But he also doesn't want to waste his time if she isn't going to qualify.  In order to get Samantha to sign the PCCF, James tells her that she needs to sign a document in order to proceed with the next steps. James pulls up the PCCF on his ipad and zooms into the signature line so that Samantha can't see the rest of the document. James holds the ipad while Samantha signs her name.  With the signature in hand, James runs Samantha's credit.

Which is most true about this scenario:

- James should not have given the sales pitch to Samantha because she is not the homeowner listed on Doors.
- It was okay for James to run Samantha's credit because she signed the PCCF.

- James should have explained to Samantha that he needed to run her credit and given her the ipad to review and sign the PCCF.

Unfortunately, Samantha does not pass credit because she missed several credit card payments while in college. James comes clean and tells Samantha that in order to proceed further, someone on the account will need to pass credit. Samantha tells James that her husband, Ben, is meticulous with his finances and will almost certainly have better credit than her.  With Samantha's permission, James creates a new account under the husband's name and has Samantha sign the PCCF on her husband's behalf. James then initiates a credit inquiry for Ben.

Which is most true about this scenario:

- James did not violate company policy because Samantha, Ben's wife, gave permission to check Ben's credit.
- James violated company policy by allowing someone other than Ben to sign the PCCF on his behalf.
- It would have been okay to let Samantha sign the PCCF for Ben if James was absolutely sure that Samantha had Ben's permission.

It turns out that Ben is a degenerate gambler and, unbeknownst to Samantha, has even worse credit than her. Desperate to save the sale, James asks Samantha if anyone else lives with her and learns that Samantha's nephew, Eddie, is staying with them while he finishes college. Fortunately, Eddie is home and agrees to act as co-signer on the account. James creates an account in Eddie's name and has Eddie sign a PCCF. Eddie passes credit and James proceeds with the account under Eddie and Samantha's name. James promises Eddie that after the system is installed, he will have Eddie's name removed from the account without any difficulty.

Which is most true about this scenario:

- It is okay for James to use Eddie's credit to qualify the account as long as Eddie lives in the house and agrees to co-sign the account.
- James should have avoided the entire mess by creating the account under Lester Sim's name because he knew that Lester Sim's had good credit.
- It is not okay for James to use Eddie's credit to qualify the account because he is not the homeowner or the homeowner's spouse or domestic partner.

# Course Title: Providing False Information

## Page name: The Policy:

We may not provide false or inaccurate information concerning any customer in order to progress an account. This includes providing a false email address, false usage or utility information, or false payment information. In addition, we may not list an employee's own checking account information or a prepaid card of any kind as a customer's payment information.

## Page Name: Specific Points to Know

You may not, under any circumstances, provide false information about a customer or account. There are many different ways a sales representative can violate this standard, but one of the most common problems involves a sales representatives using false email addresses on a customer's account.

It is essential that we have an active and valid email address that belongs to each customer. This means an email address that the customer has set up without the assistance of a sales representative.  An active, valid email address is important for multiple reasons. First, by signing our agreement, the customer is expressly agreeing that we can send information to them at that email address, including the agreement itself. If we do not have a valid email address, the customer may not receive the agreement or other important communications,.

Second, federal and state law require us to provide customers with notice that they have the right to cancel the agreement within a certain period of time. The cancellation period begins to run when the customer receives a copy of the agreement and attached notices of the right to cancel. This means that if the customer does not receive a copy of the agreement because we send it to the wrong email address, the cancellation period does not begin to run and the customer may be able to cancel the agreement after we have spent considerable money installing solar panels on their house.

Finally, our loan partners also rely on the email addresses we provide to communicate with our mutual customers. By providing an email address that you know to be inaccurate, you put yourself at risk, along with the company and its relationship with these important partners.

If a potential customer does not have an email account, you may not set one up for the customer.  You may encourage the customer to create an account for herself, and suggest that she ask a friend or family member to help, but the customer - not you - must do the work.

There are countless other ways in which you may be tempted to provide false information about a customer, usually when the customer wants to proceed with solar but does not meet one of our requirements (i.e., insufficient utility information, no broadband internet connection, etc.). No matter how much the customer wants to proceed, or how much you think you need the sale, you should never try to circumvent these requirements by providing false information. The requirements are there for important reasons and sidestepping those requirements puts your job and the company at risk.

## Page Title: Assessment

John is an older gentleman. He really likes the idea of solar and wants to proceed with a PPA. When Julia asks John for his email, John explains that he does not have an email address and doesn't really want one.

How should Julia proceed?

- Julia shouldn't waste any more of her time with John; he needs to get with the times.
- Julia should put down her own email; as long as she prints off any communications she gets for John's account and gives them to John, there won't be any problems.
- Julia should quickly create an email for John and use that one.
- Julia should explain to John the reason we require customers to have an email address, and inform him that we cannot proceed without one.  If John wants to proceed, Julia may suggest that John ask for a family member's help in setting up an email address.

After Julia helps John set up an email account, she notifies John that she will also need copies of his utility bills.  Unfortunately, John tells her that he generally throws them away.  After searching his files, John He finds two utility bills. They are a few months apart, but very similar in range.

John's neighbor previously worked with Julia to obtain solar panels on his house and Julia believes the houses are similar in size. Julia didn't want to lose a sale she had worked so hard to close and so she uses her friend's computer to photoshop the neighbor's utility bills, which she submitted for John.

Which of the following is most true about the interaction:

- It was okay for Julia to estimate John's utility information because he honestly did not have utility information available.
- It is okay for Julia to estimate John's utility information as long as she is reasonably certain that the information is accurate.
- It was unethical for Julia to submit information about a customer that she knew was not accurate.
- Julia's conduct was unethical because she did not have a software license to use photoshop.

# Course Title: Contract Terms

## Page name: The Policy:

We may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) cost savings; (c) a customer's ability to terminate the agreement after the system is installed; and/or (d) the cost to remove the system temporarily for property repairs. We may not enter into side deals with customers that are not memorialized in written agreements approved by the company. And nothing is free.

## Page Name: Specific Points to Know

The agreements that we require our customers to sign contain various disclaimers and warranties.  You must familiarize yourself with the terms of the contract and avoid telling the customer anything that contradicts those terms.  For example, our PPA expressly states that we do not guarantee production or savings.  As a result, it is unethical and dishonest to promise a customer that they will save money if they proceed with a PPA.  You may tell a customer that they can potentially save money or that many customers save money, but you must avoid statements that the customer could interpret as promised savings or a guarantee.

Similarly, you should avoid telling customers that the solar panels are "free."  Customers might misinterpret statements like this to mean that they will not be required to ever pay anything and get upset when they receive their first bill.  The proper phrase to use is that we install the panels at "no upfront cost."

Finally, if a customer has a question about a term of the agreement that you do not understand, DON'T GUESS.  Review the training materials and if you cannot find the answer, ask your manager.  Responding by telling the customer that they've raised a good question and that you will get back to them is better than getting it wrong.

## Page Title: Assessment

While knocking doors in a promising new area, Eric meets a sophisticated businessman named Harry.  Harry is very interested in solar but is worried about the length of the agreement. Specifically, Harry knows that he will likely need to replace his roof in 15 years and asks Eric what he will happen when that occurs.  Eric doesn't want to lose the sale so he vaguely tells Harry that Vivint Solar will remove the system if he needs to do any repairs to the house.  Eric doesn't tell Harry about much it will cost to remove the system or that there are other limitations governing the removal of the system.

Which is most true about this situation:

- It was okay for Eric not to tell Harry about the cost to remove the system because that information is in the agreement and Harry will probably review the agreement carefully before signing.
- It is unethical for Eric not to tell Harry about the limitations and costs of removing the system because Harry specifically asked about it.  Withholding information from a customer is just a bad as deliberately misleading a customer.
- Eric doesn't need to worry about it because the issue won't even come up for at least 15 years and he will probably be long gone by then.

Solar Mosaic_Cardona-Brown 000899

# Course Title: Sharing Confidential Information

## Page name: The Policy:

We may not share confidential information with anyone outside the company or allow anyone to do work on employee's behalf that is not an employee of Vivint Solar. This includes allowing anyone to access Vivint Solar's information technology systems using our log-in information.

## Page Name: Specific Points to Know

Every sales representative working for Vivint Solar is required to sign a Direct Seller Agreement before they begin working for Vivint Solar. If you haven't read the Direct Seller Agreement, you should. By signing the Direct Seller Agreement, you agreed, among other things, that you will use reasonable and diligent efforts to protect Vivint Solar's confidential information, including information about Vivint Solar's customers.

You also agreed that you will only use the confidential information to fulfill the duties of your employment. This means that you should not share information about Vivint Solar's customers with people outside of the company or try to use such information for your own personal gain. If you decide to leave Vivint Solar, you must return any confidential information you have in your possession and may not use any such information for you or your new employer's benefit.

Solar Mosaic_Cardona-Brown 000901

## Page Title: Assessment

Peter is working with a client, Jack, who wants a specific type of system. After signing the contracts and going through the site survey he says the CAD isn't what he wants. He asks for changes to add more panels because he wants some extra power for his garage that he's going to turn into a movie theater.

Peter sends the request back to CAD, but after several changes, nothing CAD does appeases Jack. Jack cancels the install.

Peter contacts his friend, Gary, at a smaller solar company and offers to sell him the lead. Gary agrees and pays Peter $500 for information about Jack, including copies of the CAD designs that Jack had rejected.

Despite Gary's best efforts, Jack is not satisfied with Gary's company either and declines their business.

Which of the following is most true about this sale?

- Peter's conduct wasn't ethical because he provided confidential information to a third party, even though nothing came of it.
- Peter's conduct was ethical because he was trying to help Jack out and because Jack didn't end up purchasing a system from Gary.
- Peter's conduct wasn't ethical because Peter didn't obtain Jack's permission to share his information. If Peter had obtained Jack's permission, his conduct would have been fine.
- Peter's conduct was ethical because Peter is an independent contractor and doesn't actually work for Vivint Solar. He can do this to earn money on the side.

# Course Title: Misrepresentations Regarding Competition and Utilities

## Page name: The Policy:

We may not make untrue or misleading statements about a competition or utility company. For example, we may not represent that a utility's or competitor's rates will increase without data to support our claim and appropriate company approval.

Solar Mosaic_Cardona-Brown 000903

## Page Name: Specific Points to Know

At Vivint Solar, we believe in competing on a level playing field.  We believe the products and services we offer stand on their own merit.  Consequently, there is no need to make false statements about our competitors.

A simple rule of thumb is that if you are going to say anything about a competitor, the statement should be factual and supported by actual data.  Don't use rumor and hearsay.  Even if a coworker has "inside information" about competing solar companies, you should avoid repeating that information to customers unless you have concrete facts that can be researched and backed up.

This rule of thumb applies to statements about utility companies as well.  You must refrain from making statements about utility rates, especially future utility rates, without data to support the claim.

## Page Title: Assessment

After listening to Ted's sales pitch, Martha invites Ted into her home to learn more about solar. During the discussion, Martha expresses frustration about her utility company constantly raises its rates. His sales training kicks in and he immediately tells her about the savings she can generate by switching to solar.

Martha tells Ted and she would like to own her own system and Ted begins explaining her options, including system sales and available financing. Martha is worried about the cost of taking out a large loan.  To appease her concerns, Ted shows Martha a chart that he has prepared comparing her monthly payment to her future utility bills.

Although Ted knows that Martha's utility company has never raised its utility rates more than 5% in a given year, the figures that Ted uses in his savings chart assume that utility rates will escalate 10% each year. Amazed by the enormous savings, Martha agrees to proceed with the loan.

Which of the following is the most true:

- Ted's behavior wasn't unethical because he didn't expressly tell Martha that her utility rates would increase.
- Ted's behavior wasn't ethical because he knew that the utility rates have never risen by more than 5%; if he didn't have that information, it would have been okay to assume a 10% escalation rate.
- Ted's behavior wasn't ethical because he did not have any basis to assume utility rates would increase 10% and he did not disclose the assumption to Martha. Ted's conduct was also unethical because employees may not use their own marketing materials, including savings calculators.  Ted should have used the approved price comparison tool.
- Ted should have assumed an even higher escalation rate to make Martha's savings look even bigger.

# Course Title: Elderly Customers

## Page name: The Policy:

We need to treat elderly customers with extra care to ensure they understand our products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

Solar Mosaic_Cardona-Brown 000906

## Page Name: Specific Points to Know

In 2010, a non-profit organization called Investor Protection Trust published a survey projecting that 1 in 5 senior citizens had been taken advantage of financially.  The Federal Trade Commission recently stated that fraud complaints to its offices by individuals 60 and older rose at least 47 percent between 2012 and 2014.

In an effort to stop this alarming trend, several states have enacted laws that make it illegal to cause a senior citizen to purchase goods or services through any form of coercion or deceit.

We should never refuse to do business with, or otherwise discriminate against, someone because they are elderly.  We must, however, be extra careful to ensure that they are capable of entering into an agreement and fully understand the terms of any agreement we present to them. Speak slowly and be patient in answering any questions they may have concerning our products and services.  And be sure that they have an active and valid email address.

It is also important to double-check their utility information. Some states have programs that offer senior citizens discounted utility rates.  You should make sure they understand how that rate compares to the rates they will be paying us if they are considering a PPA or lease, or how the rate affects assumptions if they are purchasing a system, as you discuss potential savings with an elderly customer.

## Page Title: Assessment

Mildred is a sweet, seventy-six year old woman who is always interested in saving a buck.  Her husband of 53 years pass away two months ago and so she is also very lonely.  Not surprisingly, when Edward knocked on her door and told her she might be able to save money by going solar, she immediately invited him in and offered him snickerdoodles and diet lemonade, her late husband's favorites.

After Edward explained the power purchase agreement to Mildred in painstaking detail, she informed him that she was interested in learning more.  She gave Edward her most recent utility bills and Edward immediately noticed she participates in California's Alternative Rates for Energy Program (CARE) and, consequently, pays less for her energy than the current PPA rate.

While Edward is reviewing Mildred's utility bill, her son, Andrew, stops by to check on her.  When Edward introduces himself, Andrew tells Edward that he doesn't like the idea of Mildred signing anything without him reading it first. She seems to brush him off and he leaves after dropping off groceries that she needs.

After Andrew leaves, Mildred tells Edward that says that she is a grown woman and doesn't need Andrew's permission to move forward.

How should Edward proceed?

- Edward should politely inform Mildred that she doesn't qualify for solar.  Her husband just died and she can't possibly be in her right mind.  Moreover, there is no way that she will be alive for a 20-year contract.
- Edward should send the agreements to Andrew to look over before Edward proceeds any further with Mildred.
- Edward should explain to Mildred that she actually pays less than what she would be required to pay under the PPA, but that she can still proceed with a PPA if saving money isn't the only reason she is interested in solar.
- Edward doesn't need to point out the reduced energy rate that Mildred pays under the CARE Program.  As long as Edward explains to Mildred the terms of the PPA, it is Mildred's responsibility to determine whether it makes sense to proceed with the PPA.

# Course Title: Language of Sales Presentation

## Page name: The Policy:

We may not give a sales presentation in any language other than English.

Solar Mosaic_Cardona-Brown 000909

# Page Name: Specific Points to Know

Presenting a customer with a copy of a contract in a language other than the language used in the sales presentation is <u>illegal</u> as an unfair and deceptive practice under federal laws. Numerous states have enacted statutes that provide additional protections to customers who are presented with contracts in a language other than the one used during a sales presentation.

Because Vivint Solar's contracts currently exist in English only, employees may <u>never</u> give a sales presentation in a language other than <u>English</u>. Employees may not attempt to circumvent this standard by translating the contracts themselves, or using any other contract that is not expressly authorized by Vivint Solar.

This does not mean that you can never communicate with a customer in a language other than English. You can speak another language with a potential customer in order to introduce yourself and provide other introductory information. However, when it comes time to give the sales presentation, it must always be given in English. Failing to follow this policy can put you and the Company at <u>serious risk</u> and will result in disciplinary action, up to and including termination.

Page Title: Assessment

Sam knocks on Hector's door one afternoon while canvassing a new neighborhood. Hector does not speak English particularly well and tells Sam that, although he can read and write in English, he prefers to communicate in Spanish. Fortunately for Sam, Sam took three years of Spanish in high school. In addition, he just learned about a new app available on his iPhone that will help him translate any words he doesn't know or understand.

Using the app, Sam is able to explain how solar works in broken Spanish. Hector is interested and tells Sam he wants to move forward. Sam pulls up the Power Purchase Agreement on his iPad and hands it to Hector for him to sign. Hector reviews the agreement and does not appear to have any trouble reading it in English.

Several weeks later, solar panels are installed on Hector's house. Hector is thrilled with how the panels looks and invites Sam over for a celebratory dinner.

Which of the following is most true about this sale?

- Sam's conduct violates Vivint Solar's ethics standards because he gave the sales presentation in a different language than the contract provided to the customer.
- Sam conduct violates Vivint Solar's ethics standards because he is not fluent in Spanish. Sales representatives are allowed to give sales presentations in Spanish only if they are certified to do so.
- Sam's conduct does not violate any ethics standard because Hector told Sam he could read English. Hector read the agreement and didn't have any questions, so he was clearly understood it.
- Sam's conduct does not violate any ethics standard because Hector was happy with the solar panels.

Erica speaks Italian fluently and regularly eats at a small Italian restaurant near her home.  Erica stops by the restaurant one evening after a long day of work and, while waiting for her meal, strikes up a conversation with the restaurant's owner, Anthony.  When Erica tells Anthony that she comes from a large Italian family, Anthony asks if she speaks Italian.  Erica tells him that she does and the two immediately switch their conversation to Italian.

After a few minutes of small talk, Anthony asks Erica about her uniform.  In perfect Italian, Erica tells to Anthony that she works as a sales representative for a solar company and proceeds to explain the benefits of going solar with Vivint Solar.  Anthony tells Erica that he is interested in learning more and invites Erica to come by his house later that weekend.

When Erica arrives, Anthony informs her that he invited several of his family members to learn about solar as well.  Anthony tells his family members that Erica is Italian and speaks perfect Italian. After introducing herself in Italian, Erica informs Anthony and his family that Vivint Solar does not have any contracts in Italian and, as a result, she is required to give her sales presentation in English.  Anthony is clearly disappointed, but states that he can translate for his family members who only speak Italian.

Erica proceeds with the sales presentation in English and ends up creating accounts for several members of the family who wish to move forward.

Which of the following is most true about Erica's conduct?

- Erica's conduct violates Vivint Solar's ethics standards because she spoke to potential customers about solar in a different language than the contract provided to the customer.
- Erica's conduct violates Vivint Solar's ethics standards because she allowed Anthony to translate for her to his family.
- Erica's conduct does not violate any ethics standard because, even though she engaged in small talk with the potential customers in another language, she made sure to give the sales presentation in English.
- Sam's conduct does not violate any ethics standard because she speaks Italian so well.

Solar Mosaic_Cardona-Brown 000912

(This will just be a list of questions to make sure they know all of these matter on separate quiz pages. It will be an individual course that will be at the end and not available in the library, only the program.)

## Creating False Account:

Which of the following violates the Ethics Standards:

Creating an account after knocking on a door and leaving without requiring the customer to sign a contract, but with a time to return.
Allowing a spouse who isn't on the house title to sign a customer agreement along with his/her spouse that owns the home in order to pass credit.
Telling the customer that they cannot use their father to pass credit because he doesn't own the house.
Allowing a homeowner's neighbor to co-sign a customer agreement.

I understand that it is unethical to create a false account or progress an account with a person who is not a homeowner.

Yes
No

## Consent for Credit

Which of the following is most ethical as it pertains to running credit:

Making sure a prospective customer signs a Credit Authorization form after letting them know that that form grants us permission to run credit.
Performing a full credit check in NEO without a homeowner's permission.
Allowing someone who does not own the house associated with an account to co-sign on that account so that it passess credit.
Performing a full credit check on as many individuals as you can so that you don't waste your time talking to people who won't qualify.

I understand that it is unethical to run a full credit check in NEO, or any other application, without explicit consent.

Yes
No

## Contract Terms:

Which of the following violates the Ethics Standards:

Telling customers that we can't promise how much they will save over the course of their contract.
Telling customers that we can put their agreement under someone's name if they do not pass credit and then transfer the agreement to them once we receive permission to operate the system.
Telling customers that they have the right to cancel their agreement according to the terms set forth in the customer agreement.
Telling customers that if they sell their house, they are allowed to transfer the agreement to the new homeowners.

I understand that it is unethical to make promises contrary to the terms of the agreement about production, cost saving, a customer's ability to late termination or removal of the system for property repair.

Yes
No

## Notice of Cancellation:

Which of the following does not violate the Ethics Standards:

Showing a customer where the notice of cancellation is located in the agreement and and letting them know that they can cancel the agreement according to its terms.
Including an email address on an account that you know is not accurate.
Telling a customer that once they sign the agreement, there is no way to cancel the agreement.
Reassuring a customer that their contract is not binding until the power is turned on and we begin charging the customer.

I understand that it is unethical to tell or infer to our that contracts aren't binding upon signature or that a contract can be cancelled once installation begins.

Yes
No

## Elderly Customers:

Which of the following is most ethical as it pertains to working with elderly customers:

Avoiding contact with anyone over the age of 60 because they might not know what they are doing.
Taking extra time with an elderly customer to ensure that they know what they are agreeing to.
Requiring elderly customers to meet with their kids before they sign an agreement to make sure that they all agree to the terms.
Asking an elderly customer to sign a customer agreement without explaining to them what they are signing.


I understand that it is unethical to take advantage of elderly customers.

Yes
No


## Forgery:

Which of the following is most ethical:

Explaining everything on a form while checking the boxes, but allowing the customer to sign the document for themselves.
Handing the customer the tablet and having them check boxes as they read and you explain, then they sign.
Handing the customer the tablet after checking the boxes so the customer can read what you checked, then have them sign.
Explain everything on the form while checking the boxes, then ask for permission to start the process and sign for them.

I understand that it is unethical to check boxes on a contract and that it is equal to signing a contract for a customer.

Yes
No

## Misrepresent other companies:

Which of the following does <u>not</u> violate the Ethics Standards:

Telling a customer that their utility rates are likely to rise substantially over the next several years.
Telling a customer about a rumor you recently heard that one of our competitors is financially struggling.
Providing a customer with accurate data regarding increases in their utility rates over the past  ten years.
Telling a customer that our competitor uses inferior solar panels when you really don't know what kind of panels they use.

I understand that it is unethical to misrepresent other utility companies.

Yes
No

## Misrep Utility Companies:

Which of the following violates the Ethics Standards:

Asking a customer if they are familiar with the products and services that Vivint Solar offers.
Explaining to a customer that you don't work for the power company, but that the customer will likely continue to receive bills from the power company in the future.
Wearing a pin from the local utility company on your backpack next to a name tag.
Explaining to a customer that the solar panels will remain connected to the grid through interconnection.

I understand that it is unethical to give the impression that you work for or with a power company.

Yes
No

## Providing False Information:

Which of the following does not violate the Ethics Standards:

Using your own email address on an account to get the ball rolling since the customer doesn't have an email account.
Estimating a customer's utility usage based on information the customer provides rather than submitting actual utility bills.
Using a pre-paid credit card as the customer's payment information.
None of the above.

I understand that it is unethical to provide false email addresses, utility information or payment information.

Yes
No

## Sharing Confidential Information:

Which of the following violates the Ethics Standards:

Providing a customer's information to another solar company to see if you can get them a better deal.
Providing a customer's information to another solar company after their house fails site survey.
Asking a customer who does not like Vivint Solar's CAD if it is okay if you sell their information to another company to get a better design.
All of the above.

I understand that I am a Vivint Solar employee and it is unethical to share confidential information with anyone else including another solar company.

Yes
No

Solar Mosaic_Cardona-Brown 000917

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Tuesday, August 22, 2017 2:43 PM |
| **To:** | Andy McElroy |
| **Subject:** | Re: Mosaic Compliance Guide and training idea |

Hi Andy – certain items in the Guide appear inconsistent with my understanding of our arrangement with Mosaic.  In any event, we are working with Mosaic to finalize an amendment to the program agreement.  We should wait until that amendment is finalized and circle back.

Steven Burt
385.715.6209

vivint.Solar

---

**From:** Andy McElroy <andy.mcelroy@joinmosaic.com>
**Date:** Wednesday, August 16, 2017 at 2:25 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Subject:** Re: Mosaic Compliance Guide and training idea

Hi Steven,

Any word on this? Looking to get the Compliance Guide in wide distribution.

**Andy McElroy**
Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

On Tue, Aug 8, 2017 at 12:00 PM, Andy McElroy <andy.mcelroy@joinmosaic.com> wrote:

Hi Steven,

I hope all is well. Did you ever get a chance to review and distribute the Compliance Guide we released in June? I know you are revamping training - could this be a part of updated training materials?

On the topic of training, can you help me get Vivint Sales on board with a monthly training call I'd run? We discussed this a bit and you were amenable to the idea, but we both agreed getting Sales to agree to required time spent would be the challenge. Obviously I need your help, Jordan's help, and buy in from a lot of other players before I can toss out a Ring Central webinar invitation. Ideally this could start this month or next and run at the beginning of each month thereafter. Thoughts?

**Andy McElroy**

1

Account Executive

**P** 510 356 2841
**E** andy.mcelroy@joinmosaic.com
1212 Broadway Oakland Suite 300, CA 94612

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

The information in this email is for the use of the designated recipients only. This email is considered confidential unless otherwise indicated. If you are not the intended recipient of this email, you are instructed not to review it or any attachments, and to immediately delete this email, and are further instructed to not disseminate, forward or copy any information from this email or its attachments.

Solar Mosaic_Cardona-Brown 000919

| | |
|---|---|
| **From:** | Steven Burt <steven.burt@vivintsolar.com> |
| **Sent:** | Monday, October 30, 2017 8:19 PM |
| **To:** | Sara quinto-seibert |
| **Cc:** | Eric Watson; Ryan Gorman |
| **Subject:** | Re: Florida State Attorney General |

Hi Sara - I'm traveling tomorrow morning- would mid-Afternoon work?

Steven Burt
Senior Regulatory Counsel
385.715.6209
1800 W. Ashton Blvd.
Lehi, Utah 84043

---

**From:** Sara quinto-seibert <sara.quinto-seibert@joinmosaic.com>
**Sent:** Monday, October 30, 2017 2:53:56 PM
**To:** Steven Burt
**Cc:** Eric Watson; Ryan Gorman
**Subject:** Re: Florida State Attorney General

Steve:

I don't recall seeing an email response from you to see if today works for a discussion regarding this matter.  Please let me know if you have time today or tomorrow.

Thank you,
Sara

**Sara J. Quinto-Seibert**
Assistant General Counsel

D: (510) 319-9598
C: (415) 235-4562
E: sara.quinto-seibert@joinmosaic.com

300 Lakeside Drive, 24th Floor, Oakland, CA 94612

This email may contain CONFIDENTIAL information subject to non-disclosure and/or confidentiality agreement(s).  Please consider the contents of this email and any such agreements you have with Solar Mosaic, Inc. before forwarding or reproducing, in any manner, the contents of this email.  The information contained herein does not constitute an offer to sell securities or a solicitation of an offer to buy securities, an offer of credit, or tax or financial advice.

On Thu, Oct 26, 2017 at 5:24 PM, Sara quinto-seibert <sara.quinto-seibert@joinmosaic.com> wrote:
Hi Steve:

I am attaching the inquiry we received.

I can jump on an initial call tomorrow anytime after 2pm PST.  Otherwise, my calendar is flexible on Monday and I can join a call anytime after 11:30AM PST.

1

Solar Mosaic_Cardona-Brown 000920

Please let me know if you have a preference.

Thank you,
Sara

**Sara J. Quinto-Seibert**
Assistant General Counsel

D: (510) 319-9598
C: (415) 235-4562
E: sara.quinto-seibert@joinmosaic.com



300 Lakeside Drive, 24th Floor, Oakland, CA 94612

This email may contain CONFIDENTIAL information subject to non-disclosure and/or confidentiality agreement(s).  Please consider the contents of this email and any such agreements you have with Solar Mosaic, Inc. before forwarding or reproducing, in any manner, the contents of this email.  The information contained herein does not constitute an offer to sell securities or a solicitation of an offer to buy securities, an offer of credit, or tax or financial advice.

On Thu, Oct 26, 2017 at 4:39 PM, Steven Burt <steven.burt@vivintsolar.com> wrote:

Also, if you received something in writing, will you send it over?

Steven Burt

385.715.6209



---

**From:** Steven Burt <steven.burt@vivintsolar.com>
**Date:** Thursday, October 26, 2017 at 5:31 PM
**To:** Sara quinto-seibert <sara.quinto-seibert@joinmosaic.com>
**Cc:** Eric Watson <eric.watson@joinmosaic.com>, Ryan Gorman <ryan.gorman@joinmosaic.com>
**Subject:** Re: Florida State Attorney General

Hi Sara – Monday morning would probably work.  I'll be on East coast time as I'm traveling.  I could also talk tomorrow.

Steven Burt

Solar Mosaic_Cardona-Brown 000921

385.715.6209



**From:** Sara quinto-seibert <sara.quinto-seibert@joinmosaic.com>
**Date:** Thursday, October 26, 2017 at 4:15 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Cc:** Eric Watson <eric.watson@joinmosaic.com>, Ryan Gorman <ryan.gorman@joinmosaic.com>
**Subject:** Florida State Attorney General

Hi Steve:

We have received a Florida State Attorney General inquiry involving Vivint (specifically your representative Briant Katilus).  The customer involved is Emmanuel Alexis.

Would you be available to have a quick discussion regarding this matter on Monday, October 30, 2017? If so, please let me know if there is a good time so we can coordinate.

Thank you so much.

Sara

**Sara J. Quinto-Seibert**
Assistant General Counsel

D: (510) 319-9598

C: (415) 235-4562

E: sara.quinto-seibert@joinmosaic.com



300 Lakeside Drive, 24th Floor, Oakland, CA 94612

Solar Mosaic_Cardona-Brown 000922

**From:** Steven Burt <steven.burt@vivintsolar.com>
**Sent:** Thursday, October 26, 2017 4:31 PM
**To:** Sara quinto-seibert
**Cc:** Eric Watson; Ryan Gorman
**Subject:** Re: Florida State Attorney General


Hi Sara – Monday morning would probably work.  I'll be on East coast time as I'm traveling.  I could also talk tomorrow.

Steven Burt
385.715.6209



---

**From:** Sara quinto-seibert <sara.quinto-seibert@joinmosaic.com>
**Date:** Thursday, October 26, 2017 at 4:15 PM
**To:** Steven Burt <steven.burt@vivintsolar.com>
**Cc:** Eric Watson <eric.watson@joinmosaic.com>, Ryan Gorman <ryan.gorman@joinmosaic.com>
**Subject:** Florida State Attorney General

Hi Steve:

We have received a Florida State Attorney General inquiry involving Vivint (specifically your representative Briant Katilus).  The customer involved is Emmanuel Alexis.

Would you be available to have a quick discussion regarding this matter on Monday, October 30, 2017? If so, please let me know if there is a good time so we can coordinate.

Thank you so much.
Sara

**Sara J. Quinto-Seibert**
Assistant General Counsel

D: (510) 319-9598
C: (415) 235-4562
E: sara.quinto-seibert@joinmosaic.com




300 Lakeside Drive, 24th Floor, Oakland, CA 94612

This email may contain CONFIDENTIAL information subject to non-disclosure and/or confidentiality agreement(s).  Please consider the contents of this email and any such agreements you have with Solar Mosaic, Inc. before forwarding or reproducing, in any manner, the contents of this email.  The information contained herein does not constitute an offer to sell securities or a solicitation of an offer to buy securities, an offer of credit, or tax or financial advice.

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, for information about our licenses please visit our contractor licenses page.

Solar Mosaic_Cardona-Brown 000923

# Exhibit B

Page 1

```
 1

 2          IN THE UNITED STATES DISTRICT COURT

 3            FOR THE DISTRICT OF NEW JERSEY

 4

 5  JAMES REILLY,            :

 6         Plaintiff,       : No. 18-cv-12356-NLH-JS

 7    -v-                    :

 8  VIVINT SOLAR,            : Videotaped Deposition of:
                               TANNER BAUMGARTEN
 9        Defendant.        :

10

11

                Place:      BALLARD SPAHR STILLMAN &
12                          FRIEDMAN
                            201 South Main Street
13                          Suite 800
                            Salt Lake City, Utah 84111
14
                Date:       April 10, 2019
15                          1:05 p.m.

16              Reporter:   Vickie Larsen, CSR/RMR

17

18

19

20

21

22

23

24

25
```

Tanner Baumgarten
April 10, 2019

Page 2

```
 1          A P P E A R A N C E S
 2
    For the Plaintiff:
 3
            Andrew M. Milz
 4          FLITTER MILZ, P.C.
            450 North Narberth Avenue, Suite 101
 5          Narberth, PA 19072
            610.668.0018
 6          Amilz@consumerslaw.com
 7  For the Defendant:
 8          Jenny N. Perkins
            BALLARD SPAHR LLP
 9          1735 Market Street, 51st Floor
            Philadelphia, PA 19103
10          215.665.8500
            Perkinsj@ballardspahr.com
11
12  Also Present:
13          Tyler Larsen, videographer
14
15              -oOo-
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          to TransUnion
 2  Exhibit 5    Vivint letter to          34
 3               Christine, undated
 4  Exhibit 6    Vivint Solar complaint    36
 5               dated 1-22-2016 (Bates
 6               No. Droney-Vivint
 7               0026-28)
 8  Exhibit 7    Vivint Solar Prospective  40
 9               Customer Consent Form
10               dated 1-21-2016 (Bates
11               No. Droney-Vivint 0002)
12  Exhibit 8    Vivint Solar Residential  42
13               Solar Power Purchase
14               Agreement dated
15               1-21-2016 (Bates No.
16               Droney-Vivint 0003-25)
17  Exhibit 9    Solar 2014 Annual         45
18               Performance Review for
19               Tanner P. Baumgarten
20               (Bates No.
21               VS001831-1833)
22
23              -oOo-
24
25
```

Page 3

```
 1
 2              I N D E X
 3
 4  TANNER BAUMGARTEN              Page
 5  MR. MILZ                         6
 6  MS. PERKINS                     62
 7
 8
 9              -oOo-
10
11
12          E X H I B I T S
13
14  No.     Description        Page
15  Exhibit 1    Vivint letter dated    21
16               January 22, 2016 to
17               Experian
18  Exhibit 2    Vivint letter dated    22
19               January 22, 2016, to
20               Equifax
21  Exhibit 3    Vivint letter dated    22
22               January 22, 2016, to
23               TransUnion
24  Exhibit 4    Vivint Solar letter    27
25               dated February 5, 2016
```

Page 5

```
 1  April 10, 2019               1:05 p.m.
 2          P R O C E E D I N G S
 3
 4          THE VIDEOGRAPHER:  This is the
 5  videotaped deposition of Tanner
 6  Baumgarten, taken in the matter of
 7  Christine and Timothy Droney v. Vivint
 8  Solar, in the U.S. District Court for
 9  the District of New Jersey, Case
10  No. 18-cv-00849-RBK-KMW.
11          This deposition is being held
12  at Ballard Spahr on April 10, 2019.
13  My name is Tyler Larsen, the certified
14  legal videographer from U.S. Legal
15  Support.  The court reporter is Vickie
16  Larsen, also from U.S. Legal Support.
17          We are going on the record at
18  1:05.
19          Counselors, please state your
20  appearances for the record, and then
21  the witness will be sworn.
22          MR. MILZ:  Andy Milz for the
23  Plaintiffs Christine and Timothy
24  Droney.
25          MS. PERKINS:  Jenny Perkins for
```

Page 6

1        Defendant Vivint Solar.
2
3            TANNER BAUMGARTEN,
4    called as a witness, having been duly sworn,
5       was examined and testified as follows:
6
7            EXAMINATION
8    BY MR. MILZ:
9        Q.    Good afternoon, sir.  Can you
10   state and spell your full, entire, complete
11   name for the court reporter, please.
12       A.    Yep.  Tanner Pierce Baumgarten;
13   T-A-N-N-E-R, P-I-E-R-C-E,
14   B-A-U-M-G-A-R-T-E-N.
15       Q.    And could you give your address
16   for the court reporter, please.
17       A.    Yeah, current address is 1011
18   North 50 West, Orem, Utah 84057.
19            THE VIDEOGRAPHER:  I apologize,
20       Mr. Baumgarten, can you -- that little
21       microphone to your right, if you could
22       clip that onto your shirt.  Perfect.
23       Q.    BY MR. MILZ:  And, sir, what is
24   your phone number?
25       A.    It's 801.318.2458.

Page 7

1        Q.    Okay.  And do you have an email
2    address that you use --
3        A.    Yes.
4        Q.    -- in case we need to contact
5    you?
6        A.    Tannerpierce7 -- Number 7 -- at
7    icloud.com.
8        Q.    Thank you.
9            My name is Andy Milz, I'm here
10   in a case from New Jersey related to
11   consumers by the name of Timothy and
12   Christine Droney who are suing Vivint Solar
13   because they allege that Vivint Solar
14   obtained their consumer credit report without
15   their consent.
16       A.    Okay.
17       Q.    And your name's on some
18   documents, which makes you a material witness
19   in this case.
20            Do you understand that?
21       A.    Uh-huh.
22       Q.    Okay.  Have you ever been
23   deposed before?
24       A.    No.
25       Q.    Okay.  Let me give you a few

Page 8

1    ground rules.
2            It's an ask and answer session;
3    I'll ask the questions, you provide the
4    answers.
5            Do you understand that?
6        A.    Yep.
7        Q.    I'll ask you to wait until I
8    finish asking my question before you provide
9    your answer.
10            Do you understand that?
11       A.    Yes.
12       Q.    Okay.  That way the court
13   reporter and the videographer can keep up
14   with us and make sure we have a nice, clean
15   record.
16       A.    Okay.
17       Q.    I'll ask you to articulate a
18   verbal response.  A nod of the head or a
19   shake of the head isn't something that would
20   work, because she can't take that down, of
21   course.
22            Do you understand?
23       A.    Roger.
24       Q.    Okay.  Do you understand you're
25   under oath?

Page 9

1        A.    Yes.
2        Q.    And what does that mean to you?
3        A.    It means that I have to tell
4    the truth in this situation, and everything
5    that I say is going to be used in this
6    hearing if it's...
7        Q.    And if you don't tell the
8    truth, you understand there's consequences?
9        A.    Yes.
10       Q.    Truth or consequences.
11       A.    Yes.
12       Q.    A game.
13            Sir, I'll ask you questions,
14   and I'll -- if -- if you find that my
15   question is unclear or vague, feel free to
16   have me ask it again in a more clear way.
17            Do you understand that?
18       A.    Yes.
19       Q.    I'll assume that you understand
20   my question, unless you tell me otherwise.
21            Do you understand that?
22       A.    Yes.
23       Q.    Okay.  Is there any reason why
24   you might not be able to testify truthfully
25   and to the best of your knowledge today?

Page 10

1      A.    No.
2      Q.    Okay.  Are you on any
3  medications that would affect your memory?
4      A.    No.
5      Q.    Okay.  Have you consumed any
6  alcohol or drugs within the past 24 hours?
7      A.    No.
8      Q.    Okay.  So can you tell us the
9  period of time you worked at Vivint Solar?
10     A.    Yes.  I believe I started there
11 in July of 2013, and then I stopped working
12 there in I believe either the end of January
13 or beginning of February of 2016, I think.
14     Q.    And what was your position at
15 Vivint Solar?
16
17
18
19
20
21
22     Q.    What did you start at -- what
23 position did you start at?
24     A.    I was just an inbound call
25 representative when I first started there.

Page 11

1  And then I, after that, worked for the
2  retention department.  I was the team lead
3  for their retention department, and then
4  after that moved up to resolution management.
5      Q.    So you started as inbound call
6  rep in the customer service department?
7      A.    Yes.
8      Q.    And what kind of calls would
9  you field?
10     A.    So that was just any incoming
11 calls.  That was customers that needed to be
12 routed to other departments, or customers
13 that were interested and getting a solar
14 system, and things like that.  So just your
15 basic when you call their main number, it
16 would go to inbound call reps.
17     Q.    At times, would that be
18 customers calling with complaints?
19     A.    Yes.  If they called in with a
20 complaint to there then they would be
21 transferred to the retention department,
22 usually.
23     Q.    Okay.  Do you recall what those
24 type of complaints were, generally?
25     A.    There was a very large volume

Page 12

1  of different types of complaints.  So...
2      Q.    And how long were you in that
3  position as an inbound call rep in the
4  customer service department?
5      A.    I don't recall exactly.  It
6  wasn't very long.  Maybe six months.
7      Q.    During that six-month period,
8  do you recall folks calling in and
9  complaining about having their credit report
10 pulled without their consent?
11     A.    Yes, that was a common
12 complaint there.
13     Q.    Do you know why that is?
14     A.    So, I mean, generally speaking,
15 we did have consent in some way, but it
16 was -- it was up to the -- the sales
17 representatives in the field to obtain that
18 consent and to run it.
19           And so, I mean, there were a
20 lot of rogue agents that worked as sales
21 representatives for Vivint Solar that were
22 running credit that shouldn't have that
23 doesn't have consent.  So...
24     Q.    And how do you know there were
25 a lot of rogue agents that were pulling

Page 13

1  consumer credit?
2      A.    When I worked for retention, I
3  dealt a lot with customers that had issues
4  directly with their sales representatives,
5  and I knew some of them personally and I -- I
6  would trust that they would do something like
7  that, run credit without consent.
8            So a lot of credit was run and
9  then consent was obtained afterwards, things
10 like that.
11     Q.    And did you recognize the names
12 over the phone?  You knew them personally
13 as --
14     A.    Just as work associates, I
15 knew -- I had -- you know, a lot of the same
16 names would come up.  I can't remember any of
17 them specifically now, it's been so long
18 but...
19     Q.    And would you get complaints
20 just from Utah or from around -- from around
21 the country?
22     A.    So when I was working there, we
23 actually weren't installing in Utah yet.  So
24 it was mostly East Coast and California
25 accounts that I was working with.

Page 14

1     Q.    Okay.
2     A.    Some Hawaii accounts.
3     Q.    Okay.  And these agents that
4  you would know personally, did you have
5  face-to-face interactions with them --
6     A.    No, just over the phone.
7     Q.    You spoke with them on the
8  phone?
9     A.    Yeah, because these were agents
10 that were working -- you know, sales
11 representatives that were working on site in
12 those different states outside of Utah.
13    Q.    And would your interactions
14 with them be them explaining their side of
15 the story?
16    A.    Sometimes.
17    Q.    Okay.  Can you tell me a little
18 more about how you would get to know these
19 sales representatives to lead you to the
20 conclusion that there were rogue agents out
21 there pulling credit reports?
22    A.    I -- I don't -- like I said, I
23 don't recall specifics, because it's been so
24 long.  But I do remember getting some emails
25 asking me, you know, what -- what can we do

Page 15

1  in this situation to I guess make it so that
2  they're not as liable.  Because when I was on
3  resolution management, I did work directly
4  with the legal department there.
5        I'm sure that's changed.  It
6  was a new department.  They needed another
7  place to send really escalated customers, and
8  so I kind of assembled a team of, like, three
9  or four people at that time that were good
10 with dealing with those sorts of customers,
11 and then we dealt directly with the legal
12 department.  So...
13         MS. PERKINS:  Could we just
14    give the attorney-client privilege
15    instruction just so that he knows?
16    I'm happy to do it.
17         MR. MILZ:  I mean, I think if
18    it comes up.  No, I mean, I don't
19    think it's necessary until, you know,
20    that question would come up.
21         MS. PERKINS:  Okay.  Well, I'm
22    just going to put it on the record.
23         So there's -- to the extent any
24    information that you learned was
25    through Vivint Solar in-house or out

Page 16

1  house -- outside counsel --
2         MR. MILZ:  Let me -- let me
3    just stop you there, Jenny.  I think
4    this is completely unnecessary.  I
5    mean, the gentleman worked in customer
6    service.
7         So any -- I don't know -- even
8    if there were interactions with
9    counsel, I don't think they'd be
10   subject to the privilege.  So I don't
11   see any point in this instruction at
12   all, other than to -- to cloud this
13   testimony somehow.
14         MS. PERKINS:  I'm not trying to
15   cloud testimony.
16         MR. MILZ:  Well, then why don't
17   you wait until the particular question
18   comes up.
19         MS. PERKINS:  The gentleman
20   just -- the gentleman just mentioned
21   that he worked with legal, and I'm
22   just putting it on the table so that
23   he has a fair basis to know what
24   privilege is.
25         THE WITNESS:  Okay.  I

Page 17

1  understand that.
2         Can I -- can I rephrase that?
3    I was more of a catalyst between
4    customer service and legal.  I didn't
5    work for legal, if that's more clear.
6     Q.    BY MR. MILZ:  And by a catalyst
7  between customer service and legal --
8     A.    It was just I was somebody who
9  was able to get in touch with legal if I
10 needed to, instead of having to go through a
11 different channel.
12        So I -- I could communicate
13 with them directly without having to go
14 through a manager or something like that.
15    Q.    Were you ever involved in any
16 litigation involving Vivint Solar?
17    A.    No litigation.  A lot of PR,
18 public relations.  So...
19    Q.    How about decision-making
20 related to, you know, whether the consumer
21 should be allowed out of the contract or not,
22 anything like that?
23    A.    Only as a messenger.  So they
24 would tell me, you know, if a customer wanted
25 out of a contract, this is the situation

Page 18

6    Q.    So your entire time worked at
7  Vivint Solar, would you characterize it as a
8  customer service role?
9    A.    Yes, absolutely.
10    Q.    So I want to get back to -- to
11  my question.  What type of interaction did
12  you have with these sales agents that led you
13  to the understanding that there were a lot of
14  rogue agents at Vivint Solar pulling credit
15  reports without consent?
16    A.    I don't know.  There's just --
17  I mean, I don't know if it was just more of a
18  vibe or, you know, there was correspondence
19  that I received that just was suspicious.  It
20  wasn't anything very direct.
21      And like I said, it's been so
22  long that I can't remember the specifics.
23  But I mean, there's -- there are so many
24  sales representatives that work for Vivint
25  Solar it -- you can't expect all of them to

Page 19

1  be honest people, you know.  They're working
2  on commission.
3    Q.    Do you know why they would pull
4  credit without a consumer's consent?
5    A.    Because in order for the
6  customer to move forward in the process and
7  for them to know whether or not they can
8  actually qualify for the solar system, we
9  need to know what their credit score is.
10      There's a minimum credit score
11  that they have to qualify to be able to move
12  forward.  And so it's in their best interest
13  fiscally as a sales rep to know whether or
14  not this customer is worth their time.





Page 24

1  different?
2       A.    No.
3       Q.    Okay.  Have you ever heard a
4  consumer complain that they said that the --
5  they thought that the salesman was from a --
6  an electric company?
7       A.    No.
8       Q.    Do you ever hear of a consumer
9  complaining that their signature was forged
10 on a document?
11      A.    No.
12      Q.    You mentioned that there was
13 a -- this was a common complaint about credit
14 being pulled without consent.  By "common,"
15 could you articulate, you know, what
16 percentage of -- of the complaints you
17 received had to do with credit report pulls?
18      A.    I mean, the volume of
19 complaints, like I said before, was so large
20 and broad as far as the different types of
21 complaints, it would be hard to quantify what
22 percentage exactly was credit.
23            But I -- if I had to put a
24 number on it, I'd say less than 5 percent.  I
25 mean, it wasn't the most common.

Page 23

23      Q.    Are you aware of consumers
24 complaining that they were told their
25 signature was needed for something completely

Page 25

1       Q.    Okay.  Did you ever deal with
2  any Better Business Bureau complaints?
3       A.    Yes.

April 10, 2019

Page 26

```
 1      A.    No.
 2      Q.    -- about removal or following
 3   up with it, or anything like that?
 4      A.    Not directly.
 5      Q.    How about indirectly?
 6      A.    This was the only method that
 7   we -- that I personally communicated with
 8   them, and so I was under the impression that
 9   this was the proper way to have the credit
10   inquiry removed.
11      Q.    I'll represent to you that
12   my -- and I think I have the documents
13   here -- that my client Christine Droney
14   called the Linwood, New Jersey Police
15   Department to complain about a Vivint Solar
16   sales representative fraudulently obtaining
17   her credit report.  Do you remember anything
18   about that?
19      A.    I don't.
20      Q.    Okay.  In speaking with
21   consumers in the customer service department,
22   do you recall any consumer ever mentioning
23   that they got the police involved?
24      A.    Not to my knowledge.
25      Q.    Okay.  And how long has it been
```

Page 27

```
 1   since you've been in that role?
 2      A.    It's been over three years.  I
 3   believe this must have been one of the last
 4   cases that I dealt with given the case,
 5   because I -- I -- like I said, I left either
 6   at the end of January or beginning of
 7   February of 2016.
 8      Q.    I'm going to hand you another
 9   one here.  This one's Baumgarten 4.
10   (Exhibit 4 was marked for identification.)
11      Q.    BY MR. MILZ:  And that's one
12   from a couple days later in the case of a
13   gentleman from California named Vasudev
14   Pulipati.
15           You see that?
16      A.    Oh, yes, I do.
17      Q.    Okay.  And I'll represent that
18   Mr. Pulipati also alleges that Vivint Solar
19   pulled his credit report without his consent.
20           Would you agree this is the
21   same form of letter that was sent in the case
22   of the Droneys?
23      A.    Yes.
24      Q.    Okay.  All you did was change
25   the name, change the date, change the
```

Page 28

```
 1   addressee, and send it out?
 2      A.    Yes.
 3      Q.    Okay.  How many customer
 4   service representatives were there in Vivint
 5   Solar doing what you did at the time that
 6   these were sent out?
 7      A.    In resolution management, I
 8   believe there were four of us.
 9      Q.    Okay.  And you say --
10      A.    So there were -- there were
11   three that spoke with the customers directly,
12   and then we had kind of a secretarial
13   position to help manage a lot of our
14   paperwork.
15      Q.    Did these letters go out over
16   somebody else's name while you were there?
17      A.    It's possible.  I know that a
18   lot of the supervisors that were working,
19   because this could have been handled if it
20   was just a credit thing, it could have been
21   handled before it got to resolution
22   management.  I think in a lot of the cases it
23   did.
24           So supervisors were able to
25   send that that were, you know, just over the
```

Page 29

```
 1   main inbound call.  And then this -- we would
 2   send these out if it was -- if there was a
 3   larger issue that we were dealing with and
 4   they also wanted us to remove the inquiry as
 5   well.
 6           Does that make sense?
 7      Q.    I think.
 8           Can you explain further?  What
 9   do you mean by a larger issue?
10      A.    So if I was dealing with, you
11   know, say there was something wrong with the
12   way that the solar system was installed and
13   it got to us and the customer also wanted us
14   to remove the inquiry as kind of a side note,
15   then our department would take care of that.
16           But, generally, if this was
17   their only issue, it would just go to a
18   lower-end supervisor.
19      Q.    Did you ever hear a consumer
20   complaint that they never got a copy of their
21   Power Purchase Agreement?
22      A.    Not that I can recall right
23   now, but I'm sure that that has happened.
24      Q.    Do you ever recall a consumer
25   complaining that the email address on
```

Page 30

1  documents was inaccurate?
2       A.    Not that I can recall, no.  Do
3  you mean just like the email that they were
4  given to -- to contact Vivint Solar --
5       Q.    No.
6       A.    -- via email or --
7       Q.    We understand Vivint Solar is a
8  paperless company?
9       A.    Yes.
10      Q.    Okay.  And when a consumer
11 would be placed into a contract, a copy of
12 that contract is supposed to get emailed to
13 the consumer.
14            Do you understand that?
15      A.    Yes.
16      Q.    Okay.  If the email address is
17 inaccurate, you know, would you understand
18 that to mean that could result in the
19 consumer never getting a copy of that
20 contract?
21      A.    Yeah, you mean if the -- if the
22 consumer's email was inaccurate?
23      Q.    Correct.
24      A.    Yes, yes.
25      Q.    Are you aware of that happening

Page 31

1  at Vivint Solar?
2       A.    Not that I can recall, no.
3       Q.    Have you ever heard of sales
4  agents fudging a consumer's email address to
5  hide a contract?
6       A.    Not that I can recall.
7  And -- and with the -- with that end of
8  things, the sales representative was entirely
9  responsible for making sure that the customer
10 received that paperwork, and so that wasn't
11 something that was sent from corporate to the
12 customer.  That would be directly from the
13 sales representative.
14      Q.    So just to circle around on
15 what you were saying.  If the complaint
16 was -- made its way to resolution management,
17 that would indicate to you that this is an
18 angry consumer and it's escalated to that
19 point; correct?
20      A.    Yes, yes.
21      Q.    And you would assume that other
22 complaints that did not reach that level of
23 anger with the consumer were handled by
24 customer service?
25      A.    Yes.

Page 32

1       Q.    Do you know if customer service
2  sent out these form letters?
3       A.    Their -- their supervisors,
4  yeah.  So not just any agent could, but the
5  supervisors that were working over customer
6  service did have the authority to send these
7  if they needed to.
8       Q.    Who was your supervisor at
9  resolution management?
10      A.    Her name was Lisa.
11      Q.    Xochimitl?
12      A.    Yes.  So she was my direct
13 manager.  So...
14            MR. MILZ:  And we'll spell that
15      one later.
16      Q.    And was she your management --
17 manager the entire time you were in
18 resolutions management?
19      A.    Yes, in resolution management,
20 and as well as when I was the team lead over
21 the retention department.
22      Q.    Okay.  What did you do in the
23 retention department?
24      A.    So I was their team lead, and
25 so I was kind of the second in command over

Page 33

1  the leadership over that department.
2       Q.    And what did your job duties
3  entail there?
4       A.    A lot of it was just making
5  sure that my reps were on the phone, you
6  know, making sure that they weren't taking
7  long breaks.
8            It was more so just being
9  responsible for the team itself.
10      Q.    Like a management role?
11      A.    Yeah.
12      Q.    Okay.  What does a retention
13 department do?
14      A.    So their job is to, if a
15 customer wants to cancel, to try to retain
16 them.  So, you know.
17      Q.    Were you taking calls from
18 customers, then?
19      A.    If -- if they needed to speak
20 with somebody higher up, yes, I would -- I
21 would kind of act supervisor, you know, calls
22 and things like that.  So...
23      Q.    So if it got escalated beyond
24 the representative in that retention
25 department --



Page 34

```
 6      Q.      Do you recall consumers looking
 7  to get out of their contracts by saying I
 8  never saw a copy of the contract?
 9      A.      Not that I can recall directly,
10  but I'm sure that that has happened.
11      Q.      What reasons would consumers
12  give to get out of contracts, if you can
13  remember?
14      A.      I can't.  It's been such a long
15  time, I can't remember specifics.
16      Q.      Okay.
17      A.      I could guess, but I don't want
18  to, you know, say something that's not
19  factual.
20      Q.      I just want to finish up with
21  these letters here.
22  (Exhibit 5 was marked for identification.)
23      Q.      BY MR. MILZ:  I'm handing you
24  Baumgarten 5.  And I'll -- this is -- do you
25  recognize this letter?
```

Page 36

```
23  (Exhibit 6 was marked for identification.)
24      Q.      BY MR. MILZ:  I'm handing you
25  Baumgarten 6.
```

Page 35

```
 1      A.      Yes.
 2      Q.      And what is the purpose of this
 3  letter?
 4      A.      So this one would be if we were
 5  going to send one to the credit bureaus, we
 6  would also send one to the customer letting
 7  them know that we did formally request that
 8  inquiry to be removed.
 9      Q.      Would you send this to the
10  consumer every time you sent the letters to
11  the credit bureaus?
12      A.      Generally, yes.
13      Q.      Would you speak with the
14  consumers on the phone before sending these
15  letters?
16      A.      Yes, most of the time.
```

Page 37

```
 1      A.      Okay.
 2      Q.      I want you to have a look at
 3  that.  Read through this, please.
 4      A.      This last page, is this the --
 5  what am I looking at here on this last one?
 6      Q.      Oh.
 7      A.      Is this just a screenshot or
 8  something of the customer account?
 9      Q.      Oh, something must have got
10  stuck to that.  Let me see that.
11              Yeah, it doesn't belong on
12  there.  Let me just pull that off.
13              So this should just be
14  Droney-Vivint 26 through 28.
15              So did you look through that?
16      A.      I did, yes.
17      Q.      Okay.  Have you seen that
18  before?
19      A.      It looks like a series of email
20  exchanges between Lisa and the Droneys.
21      Q.      Just because Lisa's email
22  address is on there, does that necessarily
23  mean it was her communicating with them or --
24      A.      Yes.
25      Q.      It does?  Okay.
```

Page 38

1  A.   Yes.
2  Q.   And Lisa would communicate
3  through the Better Business Bureau portal;
4  correct?
5  A.   Yeah, so she would -- she would
6  contact our liaison there, whomever it was
7  that she was speaking with at the Better
8  Business Bureau and then work things out with
9  them.
10  Q.   Do you recall whether you
11  worked on this Better Business Bureau
12  complaint?
13  A.   I mean, there's a good chance
14  that I did.  Like I said, there were only
15  three of us, and I handled a lot of the
16  Better Business Bureau complaints.  And if
17  there's this correspondence with the Droneys,
18  then it probably was my account.  So...
19  Q.   Does anything said here refresh
20  your recollection about any interactions you
21  might have had with the Droneys?
22  A.   It doesn't, and I -- I'm trying
23  to remember the -- her mentioning that she
24  filed a report with the police, but I just
25  can't recall.

Page 39

1  It's -- like I said, I had such
2  a large volume of customers that I dealt with
3  every single day that had fairly large
4  issues, relatively speaking.
5  Q.   Do you ever recall consumers
6  complaining that the salesmen said that the
7  panels were free?
8  A.   Yes.  More so that the
9  installation was free and that, you know,
10  the -- the customers would pay per the Power
11  Purchase Agreement.
12  And so -- and when I was
13  working there, they had just began doing the
14  lease -- the leases, the lease contracts, and
15  so there weren't too many customers that got
16  escalated to me that were involved with the
17  lease contracts, it was mostly just the Power
18  Purchase Agreements.
19  In which case, yes, the
20  installation of the solar system did not cost
21  them anything out-of-pocket.
22  Q.   Do you recall consumers
23  complaining that the sales representative
24  pretended he was with the electric company?
25  A.   Not necessarily pretended to be

Page 40

1  with the electric company, but there were
2  customers that stated that their sales
3  representative said that they were partnered
4  with the electric company, which was not a
5  factual statement.
6  Q.   Did you hear that commonly?
7  A.   Yes.  That was one that I often
8  had to clarify with customers.
9  Q.   What number are we at there?  I
10  think --
11  A.   6.
12  Q.   6 or 7?
13  A.   Yeah, I've got 6.
14  Q.   You have 6?
15  A.   Yeah.
16  Q.   Okay.
17  (Exhibit 7 was marked for identification.)
18  Q.   BY MR. MILZ:  All right.  I'm
19  handing you what's marked Exhibit 7.
20  Do you recognize that document?
21  A.   I don't, but I'm assuming that
22  this is what the reps had on their little
23  devices.  Is that what this is?
24  Q.   I -- what's your understanding
25  of what the reps have on their devices?

Page 41

1  A.   I just know that they had,
2  like -- I don't know if it was like a little
3  iPad or something that they would use that
4  the customers could sign the Power Purchase
5  Agreement and everything, but I'm assuming
6  that this is a screenshot from that, because
7  it doesn't look familiar to me.
8  Q.   Would you ever -- you've never
9  seen a document like this Prospective
10  Customer Consent Form?
11  A.   No.  I mean, I was very
12  familiar with the Power Purchase Agreement.
13  I'm not sure what this is, though.
14  Q.   You stated earlier that Vivint
15  would have some form of authorization on file
16  that the consumer allowed their consumer
17  credit report to be pulled.
18  Do you remember testifying to
19  that?
20  A.   Yes.  So this is that form?
21  Q.   Well, I don't know.  What did
22  you mean by that when you said we had
23  something?
24  A.   I just knew that there was a
25  consent form that existed, but I never saw

Daniel Baumgarten
April 10, 2019

Page 42

1   it.  That was something that the sales
2   representatives dealt with exclusively.
3   So...
4        Q.    Okay.  You've never seen a form
5   like this before?
6        A.    No.
7        Q.    I'm going to hand you
8   Baumgarten 8.
9   (Exhibit 8 was marked for identification.)
10       Q.    BY MR. MILZ:  Did you ever see
11  that before?
12            MS. PERKINS:  Thank you.
13            THE WITNESS:  Yes.  Minus the
14        first page, but I've seen the rest of
15        it.
16       Q.    BY MR. MILZ:  What do you mean
17  by "minus the first page"?
18       A.    Just this -- this first page
19  that has the -- show it to the camera -- the
20  zero upfront cost --
21       Q.    You can hold it up.
22       A.    -- twenty years.  I don't
23  recognize this specifically, but the rest of
24  it from the Residential Solar Power Purchase
25  Agreement onward, yes, I do.

Page 43

1        Q.    Looking at the first page,
2   there's a blank where it says "email."  Do
3   you know if the consumer can get a copy of
4   this if -- if there's no email address listed
5   there?
6        A.    Yes.  So the -- the sales
7   representatives would send us the Power
8   Purchase Agreement, and then we would file
9   that in their account.  And if they needed a
10  copy of it, then we could send it to them via
11  email, if they contacted corporate.
12       Q.    What if the consumer never knew
13  that the Power Purchase Agreement existed?
14       A.    If they didn't know it existed,
15  then they wouldn't know to request a copy of
16  it from us.
17       Q.    Okay.  Is it your understanding
18  that when a Power Purchase Agreement is
19  executed, the consumer gets a copy of it by
20  email immediately?
21       A.    As far as I'm aware, yes,
22  that's how it should go.
23       Q.    And if Vivint doesn't have an
24  email address for them or has an incorrect
25  email address for them, would you expect the

Page 44

1   consumer not to get the contract?
2        A.    I would expect so.
3        Q.    I want you to turn to the last
4   page, Droney-Vivint 19.
5        A.    19?
6        Q.    19.
7        A.    Okay.
8        Q.    I'll represent to you that
9   Ms. Droney says she never saw or signed this
10  Power Purchase Agreement.  Do you know how
11  her signature could have appeared on this?
12       A.    I don't.
13       Q.    Are you aware of consumers
14  stating that they only saw a signature box on
15  an iPad?
16       A.    No, I'm not aware of that.
17       Q.    Are you aware of a consumer
18  saying that the sales agent filled out all
19  the information on a document?
20       A.    No.  And just to clarify, I
21  only -- I only know what it looks like on --
22  on our end at the -- the cust- -- at
23  corporate.  So when we get a copy of it from
24  the sales representative, it's just a scanned
25  copy of this.

Page 45

1        Q.    And when I say are you aware, I
2   mean do you recall from your time there?  Do
3   you remember?
4        A.    No.
5        Q.    So is it possible that somebody
6   might have complained about that, you don't
7   remember?
8        A.    Yes.
9        Q.    Okay.
10  (Exhibit 9 was marked for identification.)
11       Q.    BY MR. MILZ:  Handing you
12  Baumgarten 9.  Did you ever see this before?
13       A.    It looks like an evaluation
14  form.
15       Q.    And so 2014, that was after a
16  year at the company, about?
17       A.    Yes.
18       Q.    Do you remember what department
19  you were in at this point in time?
20       A.    This would be solar solutions,
21  which is retention.
22       Q.    I want you to turn to the
23  second page.  And you will agree with me it
24  says, "I think that there is a large
25  disconnect between almost all corporate

Page 46

1  departments which has created a strange and
2  tedious dynamic between all level of
3  employees."
4          Do you see that?
5      A.    Yes.
6      Q.    "The result is a lot of
7  stepping on toes, ineffective communication,
8  lack of knowledge, department unfamiliarity,
9  et cetera, all of which directly affect my
10  role as someone who acts as a bridge between
11  so many departments and levels of
12  management."
13          You see that?
14      A.    Yes.
15      Q.    What did you mean by that?
16      A.    At the time there was a lot
17  of -- I mean, Vivint Solar was a fairly young
18  company when I was working there, and so they
19  were still growing really fast, so much so to
20  the point that they were becoming kind of top
21  heavy and there were a lot of disconnects
22  between each department that worked within
23  corporate.
24          Didn't seem like each of the
25  defendants were on the same page, you know,

Page 47

1  if that makes sense.
2      Q.    Okay.  Did you at any time ever
3  raise with your manager, or anyone above her,
4  concerns about sales representatives
5  obtaining credit reports without consent?
6      A.    I'm sure I did, but I don't
7  remember specifically --
8      Q.    Do you know --
9      A.    -- which sales representatives.
10      Q.    Do you know if anybody above
11  your manager was alerted to this complaint?
12      A.    Above Lisa?  I'm not sure.  If
13  it was a legal issue, that I'm sure that the
14  legal department was aware of it.
15      Q.    Do you remember speaking with
16  anybody at legal about this type of complaint
17  from consumers?
18      A.    Yes.  Not specifically the
19  Droneys, but, yes.
20      Q.    Who did you speak with at
21  legal?
22      A.    I usually talked directly to
23  Jim L.  I can't remember his full last name.
24      Q.    L -- "L" as in the first
25  initial of his last name?

Page 48

1      A.    Yes.  I know Dan was the lead
2  counsel at the time, but I never spoke with
3  him directly.  Jim was always easier to get
4  ahold of.
5      Q.    And what specifically did you
6  tell Jim about consumers complaining about
7  credit pulls?
8      A.    I would usually just contact
9  him if the -- the customer was threatening
10  litigation of some sort, just so that he was
11  aware, and I would just forward him the
12  information that was pertinent to that
13  particular situation.
14          But if -- if it wasn't
15  something that had the possibility of going
16  to litigation, I usually didn't involve him.
17      Q.    Related to credit pulls, did
18  you have to call him on more than one
19  occasion and -- and raise that issue with
20  him?
21      A.    For the credit pulls, no, I
22  don't remember going to him, at least not
23  often.  There might have been one or two, but
24  that wasn't a huge deal.  Usually we were
25  able to resolve it just by sending these

Page 49

1  letters.
2      Q.    You ever hear of the Fair
3  Credit Reporting Act?
4      A.    Yes.
5      Q.    What's your understanding of
6  the Fair Credit Reporting Act?
7      A.    As far as I'm aware, that if
8  credit is pulled on a consumer, then the
9  consumer must be fully aware of that.
10      Q.    And were you trained on that at
11  Vivint at all?
12      A.    No.  That's just knowledge that
13  I am aware of outside of working for Vivint
14  Solar.
15          But that's also not to state
16  that the sales representatives were not
17  familiar with that.
18      Q.    Just bear with me here a
19  moment.
20      A.    You're fine.
21      Q.    Did you ever hear the name
22  Jeremy O'Dell?
23      A.    Yes, that sounds familiar.  I
24  believe he was one of the sales
25  representatives.

Page 50

1    Q.      Okay.  Do you recall hearing
2  consumer complaints about him on more than
3  one occasion?
4    A.      Not that I can recall.
5    Q.      How about the name Phillip PJ
6  Chamberlain?
7    A.      Also sounds familiar, but I
8  don't recall any specific complaints against
9  him.
10   Q.      What would cause a salesman's
11  name to sound familiar to you?
12   A.      So when I worked in -- just as
13  an inbound customer service representative,
14  we were in charge of doing the pre-survey is
15  what they called it, which is where you
16  contact -- or the -- the sales representative
17  actually calls in with the customer on the
18  phone, and then we at corporate will ask them
19  a series of questions.
20            Basically just, you know,
21  making sure that the customer understands the
22  Power Purchase Agreement, confirming with
23  them whether or not they've signed the Power
24  Purchase Agreement, et cetera.
25            And so because of that, I did

Page 51

1  speak with a lot of different sales
2  representatives, and those two names do sound
3  familiar.
4    Q.      Do you recollect a coworker by
5  the name of Juan Lopez?
6    A.      No.
7    Q.      How about Leslie Brisuela?
8    A.      No.
9    Q.      Are you familiar with the name
10  Forest Flesch?
11   A.      Yes.
12   Q.      And how are you familiar with
13  that name?
14   A.      I believe he was one of the
15  sales representatives as well.
16   Q.      Okay.  Do you recognize -- any
17  of those three names I just mentioned, Jeremy
18  O'Dell, Phillip Chamberlain, Forest Flesch,
19  do you recognize them as being an individual
20  for whom you received multiple complaints?
21   A.      For -- I think for Forest, I --
22  I think I remember receiving a couple against
23  him.  And then not specifically for Jeremy or
24  the other one, Chamberlain.
25   Q.      Just bear with me here two

Page 52

1  seconds, see if we can't finish up.
2            Are you aware of Vivint Solar
3  at all keeping track of salesmen for whom
4  consumers had made complaints?
5    A.      Not that I'm aware of, no.
6    Q.      Did you folks in your
7  departments in resolution management, inbound
8  customer service, did you keep track of those
9  sales agents that the callers would complain
10  about?
11   A.      No.
12   Q.      So how about Matt Lestarge, are
13  you familiar with his name?
14   A.      That one doesn't sound as
15  familiar.
16   Q.      Jordan Beck?
17   A.      Yes, that one sounds familiar.
18   Q.      Okay.  And do you recall
19  anything about Jordan Beck?
20   A.      No.
21   Q.      Ricardo Martins?
22   A.      No.
23   Q.      Tyler Williams?
24   A.      Yes.
25   Q.      What do you recall about Tyler

Page 53

1  Williams?
2    A.      I think Tyler was one of the
3  regional managers, as far as I remember.  I'm
4  not sure which area he was over, but his name
5  does sound familiar.
6    Q.      And do you recall any specific
7  complaints about him?
8    A.      Not specifically, no.
9    Q.      Melissa Lawson?
10   A.      No.
11   Q.      Vic Marion?
12   A.      Huh-uh.
13   Q.      Kimo Smith?
14   A.      No.
15   Q.      Kevin Bliss?
16   A.      That one sounds familiar.
17   Q.      Eric Grijalva?
18   A.      Eric.  No, I don't think so.
19   Q.      Joel Perez?
20   A.      Yes.
21   Q.      Do you remember anything
22  specific?
23   A.      No.
24   Q.      Just -- just to be clear, if
25  you recognized these people's names, would it

Page 54

1 be because a complaint had been escalated to
2 your department?
3         A.     No.  I'm just recognizing their
4 name just based solely off of familiarity
5 with the names itself.
6         Q.     Okay.  Any of those names I
7 mentioned, do you recall any of them coming
8 through as complaints?
9         A.     It's possible.  It's possible.
10 Like I said, I mean, it's -- it's Vivint
11 Solar's a very large company with a lot of
12 customers, and a lot of customers complain.
13 And so you can imagine that a lot of those
14 complaints were about the sales
15 representatives themselves, I can't recall
16 anything specific, though.
17
18
19
20
21
22
23
24
25

Page 56

1 situations that -- that put me in a position
2 where I felt like I needed to resign.
3         Q.     And what made you feel that
4 way?
5         A.     I mean, Vivint Solar is a large
6 Blackstone-owned corporation.  There's a lot
7 of shadiness that goes on.  And I'm not
8 saying it's because of Vivint Solar as a
9 whole.  I'm not saying it's their intention.
10         I think that their intention is
11 good.  I think it is to go green.  But
12 there's a lot of moving pieces within the
13 company, there's a lot of different
14 departments, a lot of different departments
15 that kind of operate independently of the
16 company, so to speak, and because of that
17 you're going to have shadiness, you're going
18 to have corruption.
19         It's just -- it's inevitable.
20 And so I just didn't like the corporate life
21 and I wanted to get out of it.
22
23
24
25

Page 55

1
2
3
4
5
6
7
8
9
10
11
12
13         Q.     Did you personally feel at any
14 point that, you know, I should tell somebody
15 about this, you know, we're getting a lot of
16 these certain kind of complaints?
17         A.     Well, I'll be honest, I quit
18 because I was tired of dealing with customer
19 complaints that did seem very valid and, you
20 know, I felt like I was in a position to be
21 deceptive myself by trying to resolve
22 something or sweep it under the rug, so to
23 speak, when it was a valid complaint.
24         And not specifically with these
25 situations here, but there were other

Page 57

Page 58

1  department wasn't -- by the time that I left
2  it was still a very young department.  I bet
3  it doesn't even exist anymore.
4          It was more so me and a few
5  other people were really good at resolving
6  escalated situations, and we approached Lisa
7  and said, hey, we'd like to just create a
8  team of just the three or four of us and be
9  kind of your firewall for these escalated
10 customers, and so they agreed to let us do
11 it.
12     Q.     Do you know Lisa as someone
13 with a shoddy memory?
14     A.     No, but she's -- I mean, she's
15 done so much for Vivint Solar and been in so
16 many different roles there and dealt with so
17 many different customers and employees that
18 I'm sure that her knowledge is so much more
19 spread out than mine about situations.  So...
20     Q.     How was she as a manager?
21     A.     She was a good manager, but she
22 did -- I think she was a little overeager in
23 trying to move her way up in the company, and
24 so I think she did take more onto her plate
25 than she should have.  And I think a lot of

Page 59

1  that ended up getting delegated back down to
2  resolution management.
3          So that was one of the things
4  that kind of backfired about us creating that
5  department, was that it just became a place
6  for her to re-delegate her
7  responsibilities -- not to speak ill against
8  her -- but she did bite off more than she
9  could chew, I think.
10     Q.     When you mentioned this
11 disconnect between almost all corporate
12 departments, did part of that involve folks
13 not being receptive to the kind of complaints
14 and concerns that you were hearing from
15 consumers?
16     A.     In a sense, yeah.
17     Q.     Do you feel as if management
18 took consumer complaints seriously?
19     A.     I guess it just depended on the
20 size of the complaint.  But, again, with the
21 company like that, the complaints are more so
22 taken as, you know, how can we protect the
23 company from this information being exposed?
24 How can we -- you know, it was never in the
25 customer's best interest, but that's just --

Page 60

1  that's capitalism.  So...
2     Q.     You recalled hearing most of
3  the inbound calls coming from California and
4  the East Coast; correct?
5     A.     Yes.
6     Q.     Okay.
7     A.     When I was working there, yes.
8  I think that at the tail end of my
9  employment, we opened up sales in Utah and a
10 couple of other states.
11          But when I first started
12 working there it was mostly just East Coast
13 states.  California was our largest market.
14 Hawaii was a very large market, but there was
15 an issue with the -- with the local utility
16 monopoly out there that was making it hard
17 for us to continue installing, so that slowed
18 down.
19     Q.     Do you remember New Jersey
20 being a state where there were a significant
21 amount of complaints?
22     A.     No more than other states.  It
23 wasn't something that I noticed as there
24 being a specific problem with New Jersey
25 accounts, no.

Page 61

1     Q.     Well, California's four times
2  more populous --
3     A.     Yes.
4     Q.     -- than New Jersey, so I would
5  imagine.  Okay.
6          But do you -- do you recall
7  complaints coming in from New Jersey?
8     A.     Yes.
9     Q.     How about Florida?
10     A.     We weren't doing Florida at the
11 time.
12     Q.     No.
13          Are you familiar in any way
14 with training or instruction given to sales
15 agents?
16     A.     No, that was completely outside
17 of my department.  All that was handled
18 locally and the individual local branches
19 where the sales reps were dispatched from, I
20 believe.
21     Q.     Are you aware of any sales
22 agents complaining to the company about shady
23 sales tactics?
24     A.     Not that I'm aware of, no.
25     Q.     Are you aware of ever getting

Page 62

1  any calls from government agencies, police
2  departments, AG's offices, anything like that
3  related to complaints?
4           A.    No, not specifically.  I mean,
5  I think the most that we got -- I think I
6  remember, like, one fire department
7  contacting us.  I think that was due to an
8  electrical issue.  But, yeah, no police, no
9  law enforcement, as far as I remember.  Not
10 saying it's not possible, I just can't
11 remember at this time.
12          MR. MILZ:  I don't have any
13      further questions for the witness.
14          MS. PERKINS:  All right.
15          MR. MILZ:  Do you have any
16      questions?
17          MS. PERKINS:  I just have a
18      few.
19
20               EXAMINATION
21 BY MS. PERKINS:
22          Q.    Mr. Baumgarten, where are you
23 currently employed?
24          A.    So I work for Provo Canyon
25 Behavioral Hospital.  I'm a psychiatric

Page 63

1  technician and I'm in school to be a
2  registered nurse.
3           Q.    Okay.  And what are your duties
4  in your current position?
5           A.    Just -- I'm a caregiver, I care
6  for psychiatrically ill patients, so
7  inpatient.
8           Q.    And have you been in that
9  employ since leaving Vivint Solar?
10          A.    Shortly thereafter.  I took a
11 little time off to get some medical things
12 taken care of.  I had a few surgeries, and
13 then after I was able to work I started
14 working there.
15          Q.    Apart from this position at --
16 I'm sorry -- did you say is it a hospital
17 or...
18          A.    Yes.
19          Q.    Have you had any other sources
20 of income or any jobs since leaving Vivint
21 Solar?
22          A.    No.
23          Q.    Have you ever, prior to today,
24 did you -- have you spoken to Mr. Milz?
25          A.    No.  I -- well, was -- I'm not

Page 64

1  sure if it was you that I spoke to on the
2  phone just to clarify what the subpoena was
3  for.
4           MR. MILZ:  Yes, you spoke to
5      me.
6           THE WITNESS:  Yeah, I just -- I
7      called him to let him know that I
8      probably wasn't going to be very much
9      help because of how long it's been
10     since I worked there, but that was it.
11     And then just confirmed the time and
12     place.
13          BY MS. PERKINS:  And is that
14 the only contact you've had with Mr. Milz --
15          A.    Yes.
16          Q.    -- since today?
17          A.    Yes.
18          Q.    Did you speak to anybody else
19 in his office?
20          A.    No.  Somebody that I think runs
21 the desk in the Pennsylvania office just for
22 the location change.
23          Q.    For his office?
24          MR. MILZ:  No, for this depo.
25          MS. PERKINS:  For this

Page 65

1  deposition, oh, okay.
2           All right.  I have no further
3  questions.  Thank you so much.
4           MR. MILZ:  Yes, thank you for
5  coming out, Mr. Baumgarten.
6           THE VIDEOGRAPHER:  We are going
7      off the record.  The time is 2:03.
8           (Off the video record.)
9           THE REPORTER:  Jenny, do you
10     need copies of these?
11          MS. PERKINS:  Yes.
12          THE REPORTER:  Okay.  How do
13     you need -- do you need electronic?
14          MS. PERKINS:  Electronic would
15     be great.
16          MR. MILZ:  Yes, and I'll take
17     mine as a TXT document, too.
18 (The deposition was concluded at 2:03 p.m.)
19     (Mr. Baumgarten waived signature.)
20              -oOo-
21
22
23
24
25

Tanner Baumgarten
April 10, 2019

Page 66

```
 1              Reporter's Certificate
 2    State of Utah        )
      County of Salt Lake )
 3
 4         I, Vickie Larsen, Certified Shorthand
 5    Reporter and Registered Merit Reporter, in
 6    the State of Utah, do hereby certify:
 7         THAT the foregoing proceedings were
 8    taken before me at the time and place set
 9    forth herein; that the witness was duly sworn
10    to tell the truth, the whole truth, and
11    nothing but the truth; and that the
12    proceedings were taken down by me in
13    shorthand and thereafter transcribed into
14    typewriting under my direction and
15    supervision;
16         THAT the foregoing pages contain a true
17    and correct transcription of my said
18    shorthand notes so taken.
19         IN WITNESS WHEREOF, I have subscribed
20    my name this 22nd day of April, 2019.
21
22
23              Vickie Larsen, CSR/RMR
24
25
```

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE VIVINT SOLAR, INC. SECURITIES LITIGATION | Master File No. 1:19-cv-05777-FB-JO |
| | **<u>JURY TRIAL DEMANDED</u>** |

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiffs Billy Wallace ("Wallace") and Kyu S. Jang ("Jang," and together with Wallace, "Lead Plaintiffs"), bring this action on behalf of themselves and a class consisting of all persons or entities that purchased or otherwise acquired the securities of Vivint Solar, Inc. ("Vivint" or the "Company") between March 5, 2019 and September 26, 2019, inclusive (the "Class Period"), subject to certain exclusions as described in ¶ 151 below (the "Class"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, and are brought against: Vivint; Vivint's Chief Executive Officer ("CEO"), David Bywater ("Bywater"); and the Company's Chief Financial Officer ("CFO"), Dana Russell ("Russell") (collectively, "Defendants").

Lead Plaintiffs' information and belief is based upon the investigation conducted by and through Lead Plaintiffs' counsel, which included, among other things, a review and analysis of: (i) Vivint's public filings with the SEC; (ii) press releases, news articles, and other public statements issued by or concerning Vivint and the Individual Defendants (defined below); (iii) transcripts of investor calls with Vivint senior management; (iv) analysts' reports and advisories about the Company; (v) interviews with former employees of the Company; and (vi) other publicly available information. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to Defendants and are exclusively within their custody or control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.    INTRODUCTION

1.    Vivint is a residential solar energy provider that designs, installs, and maintains solar energy systems. The majority of the Company's solar energy systems are sold to customers

using twenty year power purchase agreements ("PPAs") wherein Vivint retains ownership of the installed solar energy system in order to receive various local, state, and federal incentives and the customer pays little to no money upfront. The customer then pays the Company for the solar energy system electricity production with annual price escalators built into most of Vivint's contracts. Vivint claims that the average estimated nominal contract is approximately $29,600.

2. The Company primarily sells residential customers the solar energy systems and energy contracts through direct-to-home sales, *i.e.*, door-to-door sales. Unbeknownst to investors, Defendants encouraged a corporate culture of sales at all costs – including deceptive, fraudulent, and unethical sales practices – going as far as to move top-selling sales representatives to new locations when they were caught using such practices instead of firing them.

3. These deceptive, fraudulent, and unethical sales practices were rampant at Vivint with "at least one half" of the sales staff practicing them, and tellingly in the same manner across the country. Vivint sales representatives would, *inter alia*, prey on the elderly, disabled, and non-English speaking, forge customers signatures on the contracts, perform unauthorized credit checks, purposefully prevent customers from reading and understanding the contracts, impersonate local energy providers, and promise large energy cost savings that would never appear while failing to inform customers of the contract price escalators.

4. These tactics resulted in a large number of lawsuits, both individual actions and class actions. In addition, the prevalence of Vivint's deceptive sales tactics led to numerous regulatory investigations. And yet, Defendants only disclosed to investors that the Company was involved in a handful of cases, and at most ***three*** [1] deceptive sales practices cases during the Class Period. While only disclosing three actions in the Company's annual report for 2018, issued on

---

[1] Unless otherwise noted, all emphasis is added.

the first day of the Class Period, in reality, Vivint was named in a minimum of seventeen deceptive sales practices actions in 2018 alone (and likely many more), and was being investigated by at least three state attorneys general.

5.      As a result of the widespread fraudulent sales practices and undisclosed actions and investigations, Vivint issued materially false and/or misleading public statements and failed to disclose material facts regarding the Company's legal battles and resulting effects on Vivint, including, but not limited to, overstatements of reported sales and megawatts installed as the Company would be forced to exit the contracts in some instances and/or reimburse customers, misstatements of reported customer credit scores, understatements of legal expenses, increased regulatory scrutiny, and as a result of the foregoing, earnings misstatements.  Notably, on January 6, 2020, Vivint entered into a settlement with the Office of the Attorney General of the State of New York ("NYAG"), agreeing to pay almost $2 million in penalties, costs, and restitution, in addition to implementing costly remedial and protective measures such as issuing customer refunds and permitting contract cancellations and providing the NYAG with a detailed "Compliance Report" every year for the next five years.

6.      Investors were kept in the dark regarding Vivint's culture of deceptive sales practices and resulting harm until September 27, 2019, when *Marcus Aurelius Value* ("Marcus Aurelius") issued a report titled "VSLR:  Fiddler on the Roof" revealing the prevalent fraud and "28 undisclosed lawsuits" (the "Marcus Aurelius Report").  The Marcus Aurelius Report summarized the allegations of the lawsuits, including documents from a number of the "28 undisclosed lawsuits" showing "malfeasance at Vivint" and labelling it a "classic story of perverse incentives" and asking, "[w]e wonder if Vivint's investors could simply walk away if they were to determine the solar contracts are polluted by fraud."

7.      On this news, Vivint's share price dropped by over 2%, and over the next two days by a total of 4.6%, from a closing price per share of $6.69 on September 26, 2019, to a closing price per share of $6.38 on October 1, 2019.

8.      Not only is it inconceivable that Vivint's CEO and CFO did not know about state attorneys general investigations and a plethora of individual and class action lawsuits, as the Marcus Aurelius Report questions:  "We struggle to understand how Vivint employees across the country could resort to virtually identical corrupt practices, during multiple years, without senior management either directing or, at minimum, being aware of such activities?"  And indeed, former Vivint employees have confirmed that the Individual Defendants knew, or were reckless in not knowing, that "at least half" of the Company's sales staff engaged in deceptive and unethical sales practices and yet "[f]arcically, Vivint's financials appear to anticipate *nearly zero customer defaults*, with the company having set aside only a mere $6.9 million in provisions against $2.1 Billion in gross contractual value."

9.      The Individual Defendants were motivated to hide these practices and allegations with the Company missing revenues and earnings per share ("EPS") estimates in six of the seven quarters before the corrective disclosure, carrying more than $1.2 billion in total debt as of December 31, 2018, and sustaining viability through massive financings.  The Individual Defendants also reaped over $2 million in stock sales during the Class Period.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in substantial part in this District.

13.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     THE PARTIES

### A.     Lead Plaintiffs

14.     Lead Plaintiff Wallace acquired Vivint securities at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court (ECF No. 15-1) and incorporated by reference herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Lead Plaintiff Jang acquired Vivint securities at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court (ECF No. 15-1) and incorporated by reference herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.     Defendants

16.     Defendant Vivint is incorporated under the laws of the state of Delaware and headquartered in Lehi, Utah.  The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "VSLR."

17.     Defendant Bywater has served as CEO of Vivint since December 2016 and as a director since 2017.  From May 2016 to December 2016, he served as the Company's interim

president and CEO.  Bywater served as the Company's Chief Operating Officer from July 2013 until May 2016.

18.     Defendant Russell has served as Vivint's CFO and executive vice president since November 2013.

19.     Bywater and Russell are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Vivint's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.     BACKGROUND AND NATURE OF THE FRAUD

### A.     The Company and Its Business

21.     Vivint was incorporated in 2011 and its shares began publicly trading on the NYSE in 2014.  The Company offers distributed solar energy, electricity generated by solar energy systems installed at residential customers' locations.  Through investment funds, the Company owns a substantial majority of the solar energy systems it installs pursuant to long-term contracts with its customers.  Vivint also wholly owns a number of solar energy systems outside of those owned by the investment funds.  The solar energy systems are also sold outright to some customers.

22.     More specifically, to offer customers little to no upfront costs on the installation of the solar energy systems, Vivint must "partner with various investors to form investment funds that monetize the recurring customer payments under [the Company's] long-term customer contracts, as well ITCs [investment tax credits], accelerated tax depreciation and other incentives associated with residential solar energy systems" that Vivint receives as it retains ownership of the solar energy systems under the majority of its customer contracts.  As stated by the Company, "[o]ur business model requires substantial outside financing arrangements to grow the business and facilitate the deployment of additional solar energy systems."  As of December 31, 2018, Vivint's total outstanding debt was $1.2 billion.

23.     Vivint is also a licensed contractor in the markets it serves, installing each of the solar energy systems.  The Company monitors the performance of its solar energy systems and provides ongoing maintenance services.

24.     The Company manages its inventory through local warehouses, maintaining a fleet of over 900 trucks and other vehicles for installation and continuing operations.  As of December 31, 2019, the Company had 2,998 employees, not including direct sellers.  Vivint's business has a large concentration in California, with 36% of its installed megawatts located there as of December 31, 2019.

25.     Vivint's products are primarily purchased by customers through long-term contracts with little to no money paid upfront.  Indeed, the Company markets the solar energy system design, installation, and maintenance as "free" despite that customers then are locked into the long-term contract for the purchase of the power produced by the solar energy system, even requiring customers to purchase the solar energy system if they move and the new homeowner does not wish to assume the contract.  As mentioned above, retaining ownership of the solar energy

systems allows Vivint and other fund investors to benefit from various local, state, and federal incentives, and the Company obtains financing based on the cash flows from the contracts and the incentives.

26.     Vivint primarily uses PPAs with its customers.  Under the PPA, the customer is charged a fee per kilowatt hour based on the electricity production of the solar energy system and billed monthly.  During the Class Period, most of Vivint's PPAs had a term of 20 years and were subject to an annual price escalator of 2.9%.  Vivint utilizes UCC-1 Financing Statements along with the PPAs.  For 2019, 67% of Vivint's installed solar energy systems were purchased using PPAs.

27.     The Company also uses legal-form leases, or "Solar Leases."  Under these Solar Leases, the customer is charged a fixed monthly payment to lease the solar energy system, which is based on a calculation that accounts for expected solar energy generation.  Like the PPAs, the Solar Lease term is typically 20 years with a 2.9% annual price escalator, although some markets have Solar Leases with no price escalator.  For 2019, 16% of Vivint's installed solar energy systems were purchased under Solar Leases.

28.     Vivint also sells its solar energy systems outright to customers for cash or through third-party financing ("System Sales").  Prices on System Sales are determined as a function of the market rate and the size of the solar energy system.  A customer can then also contract for certain additional products.  For 2019, 17% of the Company's installed solar energy systems were System Sales.

29.     Vivint primarily sells its product through a direct-to-home sales model.  In addition, the Company sells to customers using an inside sales team, through various sales dealers, and through homebuilder and retail distribution channels.

30. Prior to, and with the Company's fourth quarter 2018 report on the first day of the Class Period, Vivint had missed revenues estimates for five consecutive quarters, with revenues declining from $80.8 million for the second quarter of 2018, to $77.8 million and $63.5 million for the third and fourth quarters of 2018, respectively, and total debt increasing from $956 million as of December 31, 2017 to over $1.2 billion as of December 31, 2018.

**B.    Vivint's Rampant Sales Misconduct**

31. As stated above, Vivint heavily relies on its sales force, primarily selling its products through direct-to-home sales. According to confidential witness ("CW") 1, a District Sales Manager at Vivint from April 2017 to August 2018 in Maryland and Virginia, "100%" of the sales staff income is based on sales with no guaranteed salary. The sales staff receive commissions per kilowatt sold and "back-end bonus[es]" at the end of each quarter based on their total sales numbers, ranging from $10,000 to $40,000 per quarter.

32. CW1 stated that sales staff could qualify for the Company's management program by completing 21 deals per quarter for at least two consecutive quarters, but "you've got to bust your hump to do 21 [deals] in a quarter." Overall, according to CW1, Vivint's philosophy is all about increasing the total number of sales, and the Company's three "tenants of leadership" are "recruit, train, and personal production."

33. According to CW1, "There's always corruption when there's incentives based on money." And, with the commission and incentive-based pay, deceptive sales tactics were rampant at Vivint. CW1 explained that Vivint employees used a number of fraudulent and unethical sales tactics. "A lot of [sales staff] would zoom in on the signature so [customers] couldn't read the documents they were signing, and they would say, 'Hey, press this button.'" Sales staff also

presented deals to customers as "a county paid for sort thing.  Hey we're going to put solar on your roof – it's not going to cost you anything.  We're partners with the utility company."

34.    According to CW1, the most common fraudulent sales practice was deceiving customers about the offset they would purportedly receive from installing a solar energy system. CW1 explained that a sales representative would tell a customer that they could save 20% with an installation, when in reality, the solar energy system would only cover 80% of the customer's total energy needs and the customer would be receiving two bills – Vivint's and one from another energy provider for the remaining 20% of energy usage.

35.    CW1 stated that "dozens" of sales staff engaged in fraudulent or unethical sales practices, estimating that about one-third of the sales staff in CW1's region used a fraudulent or unethical sales practices at least once, and that it often came up in office conversations.  The "corruption" and unethical practices is the "one of the reasons [CW1] left the company. . . . [CW1] didn't like the idea that there were people that had to be doing things that weren't necessarily above board, and those people being celebrated for those results."

36.    Numerous other CWs confirmed CW1's descriptions of Vivint's deceptive and fraudulent sales practices.  For example, according to CW2, who worked for Vivint at various periods of time between April 2013 and May 2019 as Sales Manager, District Sales Manager, and Director of Sales[2] at various locations, including New Jersey and Hawaii, sales staff would sign documents for customers by clicking a button on a tablet for the signature, forging signatures, or "assisting" older customers in signing.  CW2 stated that sales representatives would also rotate tablets so customers could not view the entire document they were signing or showed them the

---

[2] CW2 joined Vivint in April 2013 as Sales Manager.  From April 2015 to August 2016, CW2 served in the role of District Sales Manager.  CW2 rejoined Vivint in May 2017 as Director of Sales for Vivint Smart Home until May 2019 and was involved in a new program focused on solar.

document on a smartphone so they could not see the entire document. CW2 estimated that "at least half" of the sales staff engaged in fraudulent or unethical sales practices.

37.     CW2 also described "bribes" from sales representatives to customers, giving the customers money or gift cards to earn their business. CW2 recounted hearing about a sales representative paying $13,000 to have a customer's roof fixed so the solar energy system could be installed in order to receive a commission on the sale of $15,000.

38.     These deceptive and fraudulent sales practices were "the Vivint culture" according to CW2, and senior management "just kind of look[ed] the other way." Although some sales staff did get fired when subject to complaints about unethical practices, according to CW2, if the sales representative was a top-performer, Vivint would "try to protect" the sales representative, "mov[ing] guys out of states because they got in too much trouble [in one location]" and "mov[ing] them to a different market." CW2 said this occurred a "couple of different times" and recalled a top-performing sales representative who was "kicked out of Florida and one other state" and shifted to another market by the Company due to complaints about forgery and credit checks.

39.     CW2 was copied on emails regarding customer complaints and stated that if serious allegations were made, such as forgery, Vivint senior management was copied on the emails, including regional vice presidents, vice presidents overseeing sales on the West and East Coasts, and Chief Sales Officer Chance Allred ("Allred") and Chief Revenue Officer Paul Dickson who both reported directly to defendant Bywater. CW2 stated that "those [emails] are absolutely getting sent over to David [Bywater]," recalling "several dozen" with serious allegations such as forgery.

40.     CW3, a Senior Program Manager, Employee Experience from January 2015 to February 2020 based at Vivint's headquarters office in Lehi, Utah and who worked on putting

together employee incentives and communications regarding safety and policy changes, stated that during weekly Sales Correlation meetings, the sales staff talked openly about various strategies they used to close deals, such as paying customers out of their own pockets for home structural upgrades needed to install the solar energy system and giving customers cash as "referral money" to initiate contacts with their friends.  CW3 often heard rumors of sales staff accused of deceptive sales practices, but "stayed away from that."

41.    There are also numerous posts by current and former employees on job site boards confirming the Company's deceptive sales practices.  For example, on June 29, 2017, a former North East Regional Operations Manager posted on indeed.com that "if you don't agree with management you will be laid off.  Sales stronghold of operations in the NE is a crime.  Sales ethics garbage cheating customers into systems."  A former sales representative from Nevada stated on April 19, 2018 on indeed.com, that "[t]hey call themselves 'professionals' yet teach; deceptive verbiage; ignore 'No Soliciting' signs, and Vivint has poor customer service ratings and response."

42.    A former "Solar service Tech" from California stated on June 9, 2020, on indeed.com that "[t]he company is not telling the truth to the customer to rope them into 20 year contracts[.]  The sales people will tell customers they need a blank check for I.D. verification purposes then turn around and use the check to initiate auto bill pay where they start billing without even starting the system.  It's about numbers for these shysters.  If you love getting yelled at on a daily basis by upset customers or have your heart broken by elderly folks who been straight-up taken advantage of by sales people then this company is for you.  The devil has gotten into the solar business and the name of the company is Vivint Solar."

43.    Numerous postings on GlassDoor also echo the CWs' statements.  For example, on September 6, 2017, a former employee posted, "They teach you to get 20 year contracts signed

without explaining it to the customer." On August 13, 2018, a former employee stated: "All this company cares about is money and that's about it. Company has a new pay scale that incentivized sales reps to take advantage of customers and overcharge them so they can make more money."

44. On October 14, 2018, a former Sales Manager stated, "You'll essentially be asked to prey on the elderly and take advantage of the naïve." A former Solar Consultant from New Jersey commented on May 4, 2019 that there is "[n]othing ethical about [Vivint]."

45. On December 6, 2019, a former Sales Manager posted, "Commission only and extremely shady sales style. Management only cares about profit hence ridiculous turnover and bad press." And, on April 27, 2020, a former Sales Representative in Rhode Island stated on GlassDoor, "company is built on false promises and deception. – most DMS are world class liars and force you to practice unethical and illegal sales tactics such as prying [sic] on the elderly."

46. An internal training video has also been discovered where a Vivint sales representative, Jed Wintle ("Wintle"), teaches unethical and deceptive sales practices. A November 28, 2019 article by *The Capital Forum* published on prospect.org titled "Vivint Solar Internal Training Video Promotes Practices Alleged as Deceptive," discusses the video and contains a link to the nearly hour and a half video on youtube.com.[3] In the undated video,[4] "Wintle emphasizes the 'bags of cash' associated with solar tax credits, making the pitch 'stupid simple,' and that it's a 'no cost program' with 'a flat rate that's fixed forever and it'll never go up again' – methods that a separate Vivint Solar ethics video warns can be deceptive and misleading."

47. Wintle further states, in relevant part:

[E]very time we install a loan account, in the immediate, it's a lot more valuable than a [PPA] or a lease . . . the company realized a little while back that it would

---

[3] https://prospect.org/power/vivint-solar-internal-training-video-promotes-practices-alle/.

[4] https://www.youtube.com/watch?v=IQl28CHpgWo&feature=youtu.be (posted Nov. 20, 2019).

round us out and hopefully our stock price would go up and investors would love us and the Street would love us if we started doing a bunch of loan . . .

*      *      *

Who knows why the loan's important to the company first of all?  Cashflow, Straight cash only.  So, the PPA, the lease accounts, they provide for ongoing revenue of the company.  And that is one way that Wall Street . . . values our company.  The other way they do is cash now.  Right?

48.     Vivint has confirmed Wintle's sentiments in public filings, stating for example in its annual report on Form 10-K for the year ended December 31, 2018, filed with the SEC on March 5, 2019 (the "2018 Form 10-K"), that "[w]e believe System Sales are advantageous to us as they provide immediate access to cash."

49.     Wintle also describes the "four pillars" that "will literally [get customers to] just sign anything" – no cost, flat rate, tax credits, and equity/ownership.  He advises the sales representatives to cut out "all these little details and crap. . . .  Customers don't need to know everything you think they need to know."

50.     Wintle further explains:

Once you [start] getting better [at the four pillars approach] and [the customers] got what the program is conceptually, then they would go with like any fine print.  They wouldn't even look at the fine print, right?  So, the first 50 [loan accounts] I closed, two-hour . . . closes . . . The next 50 I had people, and still do, don't even ask what the total loan amount is.  Don't even ask.  And it sounds stupid.  I don't know if people in Utah are just stupid.  Interest rate – don't ask.  Warranty specifics – don't ask.  'What happens if my roof leaks?'  Stopped getting all those questions.  Because if they understand [the four pillars], I know that sounds weird, but trust me that's what happened.

51.     Wintle also suggests that the sales representatives "walk away from" any customer that "is asking really specific" questions such as "how much more will my house be worth in 10 years."

52.     Wintle states that customers are "not reading the documents.  They're not reading anything," and adds:

I could slide in anything I want. I could. I could slide anything I want. You just bought a freaking used car and it's not warranted anymore. I just slid it in. You signed it. You bought it. Because they're sold so well theoretically . . . that they will literally just sign anything. And when you're doing docs, then you're talking about is your son in the military? Sign this one. Have you guys, oh man, that's sweet. What year is your truck? Sign this one. And you guys are done. That's how they get closed if you've done it correctly up to that point.

53.     Wintle also advises the sales representatives to tell customers, "I don't need to run your credit"; that the loan rates are "locked-in, "fixed," and "flat"; and, that the purported tax benefits are "free money" and "bags of cash."

54.     The Individual Defendants were clearly aware of these deceptive sales practices. CW4, who worked for the Company in various positions between 2012 and 2018,[5] confirmed the Individual Defendants' knowledge of the rampant fraudulent sales practices at Vivint. CW4 stated that senior management held weekly telephone conference calls with all of the Company's sales managers where deceptive sales practices, including forgery, where discussed. Allred was on the telephone calls, and Bywater was occasionally on the calls as well. CW4 also recalled occasional emails from Bywater to Vivint's entire sales team urging them to "pick it up" when sales numbers were down. Although no longer with the Company in 2019, CW4 learned from then-current Vivint employees that "dozens" of sales staff were fired in late 2019, primarily for forgery. Tellingly, these "firings" happened *after* the truth of Vivint's culture of deceptive sales practices and failure to inform shareholders of the multitude of related lawsuits was exposed by the Marcus Aurelius Report.

---

[5]  CW4 joined Vivint in February 2012 as a Sales Representative before advancing to positions as Sales Manager (August 2012 to January 2014), District Manager (January 2014 to July 2015), Divisional Sales Manager (July 2015 to March 2016), and Regional District Manager (April 2016 to January 2018). CW4 worked out of offices in New Jersey and San Diego, California and reported to Regional Sales VP Nicholas Hansen, who reported to Chief of Sales, Allred, who report to defendant Bywater.

55.     CW3 stated that Chief Human Resource Officer Jeremy Sabin, who reported directly to defendant Bywater, led the investigations when a sales representative was accused of forgery or some other deceptive sales practice.

56.     CW5 was a Fleet Performance Specialist, a Fleet Performance Team Lead, and then a Customer Service Supervisor from September 2016[6] until being promoted to Executive Resolutions ("ER") Specialist in September 2018, shifting to Default Manager -Risk Management in April 2019, and leaving the Company in December 2019.  Based out of Vivint's Lehi, Utah headquarters, as ER Specialist, CW5 managed customer complaints escalated beyond the Company's Customer Service department and all forgery complaints.  According to CW5, Vivint's ER team was created because the Customer Service department had "too much on their plate."

57.     CW5 reported to Senior Manager of ER, Tyler Anderson ("Anderson"), who communicated regularly with senior management, including defendant Bywater.  CW5 stated that the ER team logged the complaints in a Google Spreadsheet which included labels for complaints sent directly to Bywater's email address and those sent to Bywater via the "CEO Promise Page" on Vivint's website.  The spreadsheet included where the complaint came from, with those made through the Better Business Bureau and Attorneys' General offices prioritized, the type of complaint, a description, the name of the Vivint sales representative involved, the sales representative's location, and the installation date.  CW5 stated that forgery complaints were "quite common" and that Bywater had access to the spreadsheet, being listed as one of the Google users with access.

---

[6]  CW5 joined Vivint in September 2016 as a Fleet Performance Specialist and within three months was promoted to Fleet Performance Team Lead and later became a Customer Service Supervisor.  CW5 was promoted to ER Specialist in September 2018 and in April 2019 shifted to a new position as Default Manager – Risk Management until December 2019.

58.     This customer complaint Google Spreadsheet was also mentioned the Marcus Aurelius Report.  The Marcus Aurelius Report contains excerpts of a transcript from *Reilly v. Vivint Solar*, No. 18-cv-12356-NLH-JS (D.N.J. Aug. 2, 2018), where it was stated that Vivint's "HR person, Maureen Brown, testified in Littlejohn that [instances of forgery, false accounts, unauthorized credit checks are] in a Google Excel spreadsheet."

59.     CW5 also described weekly meetings with Bywater and other senior management where Anderson provided updates on the escalated complaints.  The meetings occurred at the Company's headquarters, typically in the early morning before most employees arrived at the office.

60.     CW5 stated that the team did not produce formal reports about their forgery investigations, and instead emailed summaries of the investigation and findings to Anderson who would then send the emails to Bywater and/or reference them in weekly meetings.

### C.     The Repeated Deceptive Sales Practices Lead to a Multitude of Undisclosed Lawsuits and Investigations

61.     Unsurprisingly, the Company-wide culture stressing sales at all costs and turning a blind-eye to fraudulent practices and the repeated country-wide occurrences of deceptive and unethical sales practices resulted in a slew of lawsuits by customers and investigations by state officials.  And yet, Defendants failed to inform investors of the growing number of lawsuits and investigations, mentioning for example, ***only three*** sales practices lawsuits in the 2018 Form 10-K.  In reality, during 2018 alone, there were at least seventeen actions filed against Vivint by customers alleging fraudulent or deceptive sales practices, three state attorney general investigations, and likely many more.

The New Mexico Attorney General Lawsuit

62.    On March 8, 2018, the New Mexico Attorney General Hector Balderas ("New Mexico AG") filed a lawsuit captioned, *State of New Mexico v. Vivint Solar Developer, LLC*[7], *et al.*, Case No. D-202-CV-201801936 (N.M. 2d Jud. Dist. Ct.).  Vivint was forced to report this lawsuit because the plaintiff issued a press release.  The New Mexico AG stated, among other things, that Vivint and its related companies were "engaging in unfair and unconscionable business practices including clouding titles to consumers' homes, fraud, and racketeering," through "high pressure and illegal door-to-door sales; making false, misleading and fraudulent statements."

63.    The New Mexico AG complaint alleges, *inter alia*, that Vivint "has skillfully crafted, baited and set a 'free' trap.  Vivint's 'free' trap, in truth, is not free at all; rather, it hooks consumers into paying more for energy, entangles consumers' property rights, and ensnares consumers with a twenty-year contract."  The complaint states that "multiple ploys" are used "to lure consumers into [Vivint's] 'free' trap" such as:

> high pressure and illegal door-to-door sales; making false, misleading and fraudulent statements; willfully omitting material facts; falsely assuring that consumers will save 10%-30%, 20%-40%, or even more, on their utility bills compared to their prior utility rates when, in fact, they will likely pay more; failing to properly inform consumers of their right to cancel the PPA; failing to provide consumers with a copy of the PPA; and attempting to contractually force consumers to waive rights guaranteed by New Mexico law.  Once caught in its "free" PPA trap, Vivint further ensures that consumers will remain obligated for the full 20-year term by filing erroneous UCC financing statements on their homes.
>
> *          *          *
>
> Beyond the above misrepresentations, Vivint engages in a host of business practices that violate New Mexico law, including failing to provide consumers with a paper copy of their PPA contracts, instead utilizing electronic devices that do not provide consumers with an adequate opportunity to review the lengthy, complex and detailed contracts.  Vivint also fails to provide consumers with two separate paper copies of the notice of their right to cancel the PPA contract.  Here, again, Vivint

---

[7] Vivint Solar Developer, LLC is Vivint related entity.

utilizes electronic devices that do not provide consumers with an adequate opportunity to review the notice of consumers' right to cancel the contract.

64. The New Mexico AG complaint further alleges that that the Individual Defendants and other Vivint senior management direct, control, approve, ratify, and actively participate in the Company's fraud, citing to public statements by Bywater and Russell regarding the Company's sales force and PPAs.

65. More specifically, as the New Mexico AG alleges, during a May 9, 2017 earnings conference call, defendant Bywater stated "we have invested heavily in the management, oversight, compensation incentives, and processes . . . ." Bywater further stated that the "integrated process allows us to carefully control the customers' experience from the beginning to the end" and that management had "been able to standardize best practices across all the markets we service, while maintaining the capability to meet the unique needs of each local market." Bywater also stated that Vivint's organic growth was improving as sales managers "become more productive and proficient in selling . . . ."

66. As for the PPAs, during the same call, Bywater noted that "we've also migrated to, more and more of our sales force, in markets that have higher PPA pricing," adding "we love PPAs," and stating that "as long as you continue to sell PPAs in the right markets, they're both a good thing." Bywater essentially admitted that PPAs have a special appeal because of the price escalator built into them when he admitted that Vivint had "done a nice price increase in those markets" where Vivint focused on PPA sales.

67. Defendant Russell also discussed Vivint's markets and PPAs during the same earnings conference call, stating that Vivint "doubled down in our key markets" and that "[t]he key markets that we're in, we've actually seen some price increases and price increases in several

utilities that we felt were marginal. And we've been able to hold volumes in those price, in those markets, as we've raised some prices."

68. A few months earlier, during a March 16, 2017 conference call, defendant Russell had similarly highlighted the Company's PPAs, stating, "[d]uring the second half of the year our average PPA rates increased by approximately 7%. This was a combination of emphasizing markets with more favorable rates as well as price increases in select markets . . . ."

69. The New Mexico AG litigation is ongoing as of the filing of this Complaint.

<u>Individual Consumer Lawsuits</u>

70. Between October 2015 and December 2018, a ***minimum of nineteen individual consumer actions for deceptive sales practices were filed against Vivint***, with sixteen of those filed in 2018 alone. An ***additional minimum of seven individual consumer actions for deceptive practices were filed in 2019***. Vivint did not disclose these lawsuits. It was not until Marcus Aurelius reported on the large number of lawsuits that investors became aware of the wide-spread misconduct by Vivint sales staff and resulting legal actions taken against the Company. *See also* Section VI. and Appendix A.

71. As reported by Marcus Aurelius, these individual consumer lawsuits (collectively, the "Consumer Actions") include "[v]arious victims . . . including elderly, handicapped, and non-English speaking families" and allege:

> ***"Vivint, as a pattern and practice, regularly forges signatures"*** on customer contracts in states including California (which accounts for approximately 34% of Vivint's business). Lawsuits identify senior sales employees currently at the company as being involved in the alleged fraud and "*It is a corporate policy and culture at Vivint Solar to look the other way and dismiss these numerous complaints and to overtly or tacitly encourage their sales agents to hide important sales details from consumers, forge and falsify authorization documents . . . . Vivint promotes its employees for this conduct.*" One of the attorneys suing Vivint told a judge earlier this year that, according to his investigation, the percentage of Vivint representatives "doing these fraudulent acts", such as "***forging contracts, opening***

*bogus accounts, using bogus email addresses to hide this from the unsuspecting consumer", is "high".* (Emphasis in original).

72.     The Consumer Actions allege a variety of fraudulent, deceptive, and unethical sales practices.  One such practice is forgery.  For example, in *Reilly v. Vivint Solar*, No. 18-cv-12356-NLH-JS (D.N.J. Aug. 2, 2018), it was alleged, among other things, that "Vivint Solar, as a pattern and practice, regularly forges signatures on consumer contracts."

73.     In *Ritter v. Vivint Solar Developer, LLC, et al.*, No. 37-2018-00039688-CL-FR-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 9, 2018), Susann Ritter ("Ritter"), an 87 year-old woman, alleged that Vivint forged her husband's signature on a contract purportedly signed on January 1, 2018.  Ritter's husband *had passed away more than two years prior* to his purported signing of the contract, on August 28, 2015.  The contract was signed by Tyler Williams ("Williams"), whom, according to Marcus Aurelius was "a high-profile Vivint Regional VP of Sales, who appeared in a podcast" and "was featured in a company sponsored TV spot, and is identified as leading sales training sessions in a different podcast." (Emphasis in original).  Ritter's complaint alleged as causes of action fraud and deceit, trespass, and elder abuse.  Unfortunately for Ritter, her property also suffered damage because Vivint employees had begun installing the solar panels and then removed what they had started on, "leaving the roof unsightly and vulnerable to adverse weather."

74.     In *Fisher v. Vivint Solar, Inc., et al.*, No. 37-2018-00039688-CL-FR-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 6, 2018), it was alleged that the same Vivint sales representative, Williams, forged 86 year-old Florence Fisher's ("Fisher") signature and "added Ms. Fisher's daughter's name to the 20 Year Agreement and forged the daughter's signature without the daughter's knowledge or consent."

75. In *Alvarado, et al. v. Vivint Solar, Inc., et al.*, No. RG18914129 (Cal Super. Ct., Cty. of Alameda, July 25, 2018), it was alleged that a Spanish-speaking elderly woman's daughter's signature was forged on a home she neither lived in nor owned. Another high-ranking Vivint sales representative, Forrest Flesch, a Director of Sales, signed on behalf of Vivint.

76. In total, as illustrated in Appendix A, seventeen of the Consumer Actions allege forgery.

77. The Consumer Actions also allege impersonations of local electric company employees with the Vivint sales representative claiming that the customer would receive free solar panels. For example, in *Hewapathirana v. Vivint Solar, Inc. et al.*, No. RG18915535 (Cal. Super. Ct, Cty. of Alameda, Apr. 3, 2018), the plaintiff stated that Vivint's "agent misrepresented and told me he is from SDG&E and SDG&E is installing solar panels for free." Vivint employee Williams was the signatory for Vivint on the contract.

78. Similarly, in *Pulipati v. Vivint Solar, Inc. et al.*, No. R18891702 (Cal. Super Ct., Cty. of Alameda, Feb. 2, 2018), a Vivint District Sales Manager, Matt LeStarge, allegedly told the plaintiff that he "was doing a survey for Plaintiff's utility provider, Pacific Gas and Electric ("PG&E"), for PG&E SmartMeter customers for a 'potential payback of $50-$100 a month by PG&E'" and that "he was there to schedule an appointment for the 'survey.'" And, in *Cormier v. Vivint Solar, Inc. et al.*, 37-2019-00012511-CU-BT-CTL (Cal. Super. Ct., Cty. of San Diego, Mar. 6, 2019), a Vivint agent purportedly told a 79 year-old deaf couple renting a home from the plaintiffs that "the local utility company, San Diego Gas & Electric ("SDGE"), now required the installation of solar panels on all homes."

79. The impersonation of local utility companies even led to a lawsuit against Vivint by the utility company itself. In 2018, Southern California Edison obtained a permanent injunction

against Vivint, stating, among other things, that Vivint has "gone so far as to use counterfeit Edison logos and trademarks on their clothing and other materials to falsely imply a connection to Edison" and that the company "has received numerous complaints from customers who have been confused and, in some cases, intimated and frightened by [Vivint's] aggressive and misleading sales tactics."

80.    The Marcus Aurelius Report stated that complaints against Vivint have included "five other utilities in addition to Edison," including PG&E, Baltimore Gas & Electric, SDG&E, and Atlantic City Energy.

81.    The Consumer Actions also allege, *inter alia*, unauthorized credit checks, exploitation of vulnerable populations, and the opening of "bogus" accounts.  In *Davenport v. Vivint Solar Developer, LLC*, No. 2017-CP-38-01689 (South Carolina Court of Common Pleas, First Jud. Cir., Dec. 31, 2017) a 94 year-old South Carolina woman with Alzheimer's disease was allegedly preyed on by Vivint and coerced into signing a 20-year contract although she "would be recognized as incompetent to enter into any significant business transaction."

82.    In *August v. Vivint Solar, Inc., et al.*, No. 37-2018-00042289-CU-BT-CTL (Cal. Super. Ct., Cty. of San Diego, Aug. 22, 2018), it was alleged that due to the fact that a customer "did not have the credit to qualify for a 20 Year" PPA, the Vivint agent "put the contract in the name of Freeman's 77-year-old neighbor, Plaintiff Ivelisse August instead."  But, neither Vivint nor its agent got "permission from August or even tell August that VIVINT was signing up her neighbor, with whom she had not spoken in years, for a contract in her name.  VIVINT and [the agent] simply pulled August's credit, forged her signature, and did not even bother sending her a copy of the forged contract."

83.    An action filed in the U.S. District Court for the District of New Jersey, *Droney v. Vivint Solar*, Case No. 1:18-cv-00849 (D.N.J. Jan. 20, 2018), alleged violations of the Fair Credit

Reporting Act, stating that not only did a Vivint sales representative claim to be with Atlantic City Energy, Vivint pulled both Ms. and Mr. Droney's credit reports without authorization.  In fact, Mr. Droney was not even home when the Vivint employee was there.  *See also* Appendix A.

84.     In the wake of the multitude of these Consumer Actions and other online complaints and media reports, nonprofit watchdog, Campaign for Accountability ("CfA") "called for Nevada's Attorney General [to] investigate Vivint" in October 2018.  In fact, after a "year-long investigation," CfA issued a report on December 7, 2017, stating that Vivint and another company were the solar "industry's leading bad actors" and that:

> Unscrupulous actors have exploited vulnerable populations, preying on the elderly and those on fixed-incomes.  Companies have misled consumers about the true costs of installing solar panels, provided shoddy craftsmanship, and left homeowners with higher utility costs, all while forcing them to sign unconscionable contracts that leave little possibility of recourse.

85.     Other state Attorneys General seem to have heard CfA's call for action, embroiling Vivint in further litigation.

<u>Additional Class Actions and Actions and Investigations by State Attorneys General</u>

86.     One of the few reported cases by Vivint was a putative class action filed in the U.S. District Court for the District of Columbia, *Rogers v. Vivint Solar, Inc., et al.*, Case No. 1:18-cv-01567-TNM (D.D.C. July 1, 2018).  The action alleged violations of the Telephone Consumer Protection Act by using "robo calls" to promote Vivint without prior consent.  The court granted final approval of a settlement in the action with Vivint agreeing to pay $975,000 on June 2, 2020.

87.     On October 24, 2019, New Jersey Attorney General Gurbir S. Grewal ("New Jersey AG") and the New Jersey Division of Consumer Affairs announced that Vivint Solar Developer, LLC, a Vivint entity, had agreed to pay $122,000 "and significantly change its business practices to resolve allegations that it engaged in deceptive sales practices, failed to deliver promised energy savings, and otherwise violated consumer protection laws in its sales of home solar energy panels

in the state." It was also agreed that Vivint Solar Developer, LLC would "uninstall and remove" more than a dozen solar energy systems and "resolve additional consumer complaints" through arbitration "if the consumer chooses that option." As reported by Marcus Aurelias, the New Jersey investigation had been ongoing since at least July 2018, and yet it was never included in any of Vivint's public statements to investors.

88. Similarly, the Office of the NYAG reached a $1.95 million settlement with Vivint on or around January 6, 2020. The NYAG investigation found, among other things, that Vivint sales representatives represented themselves as working for the local utility company, engaged in high pressure sales tactics to induce customers into signing contracts without an opportunity to review or understand the contract, overstated potential savings, and that some customers had alleged forgery of their signatures. A large part of the NYAG findings are redacted and Vivint did not admit or deny the findings. Again, as reported by Marcus Aurelias, the NYAG investigation had been ongoing since at least July 2018, and yet it was never included in any of Vivint's public statements to investors.

89. On December 3, 2019, another putative class action was filed against Vivint in the United States District Court for the Northern District of California, *Dekker, et al. v. Vivint Solar, Inc., et al.*, Case No. 3:19-cv-07918-WHA (N.D. Cal. Dec. 3, 2019), alleging that "Vivint Solar's supervisors, officers, or managers train sales representatives to not scroll through every page of the PPA at the time of execution" and "to cursorily and deceptively describe arbitration as 'faster and cheaper' than the courts when prompting consumers to initial the arbitration provision." The complaint further alleges that "[f]rom the highest levels of the company, sales managers are directed and incentivized to deliver pitches that go far beyond what is stated on the website and the Operations Manual" and lists as deceptive sales practices misrepresentations and/or omissions

regarding rate increases, charges if a customers' home is sold, the filing of UCC statements, and purported credits and rebates.

90.    The Marcus Aurelius Report also stated that the Attorney General of Hawaii has been investigating Vivint since at least July of 2018, and yet again, there has been no disclosure by Defendants.

## V.    MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

91.    On March 5, 2019, the first day of the Class Period, Vivint issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, titled "Vivint Solar Reports Fourth Quarter and Full Year 2018 Results," announcing the Company's financial results for the quarter and year ended December 31, 2018 (the "March 2019 Press Release"). The March 2019 Press Release stated in relevant part:

**Fourth Quarter 2018 Operating Highlights**

Key operating and development highlights include:

- MW Booked of approximately 63 MWs for the quarter.
- MW Installed of approximately 54 MWs for the quarter. Total cumulative MWs installed were approximately 1,061 MWs.
- Installations were 7,730 for the quarter. Cumulative installations were 154,598.
- Estimated Gross Retained Value increased by approximately $62 million during the quarter to approximately $2.0 billion. Estimated Gross Retained Value per Watt at quarter end was $2.06.
- Cost per Watt was $3.12, a decrease from $3.21 in the third quarter of 2018 and an increase from $2.95 in the fourth quarter of 2017.

*        *        *

For the first quarter of 2019, Vivint Solar expects:

- MW Installed: 43 - 45 MWs
- Cost per Watt: $3.45 - $3.52

For the full year 2019, Vivint Solar expects 15% growth for MWs Installed.

*     *     *

**Glossary of Definitions**

"*Installations*" represents the number of solar energy systems installed on customers' premises.

"*MWs or megawatts*" represents the DC nameplate megawatt production capacity.

"*MW Booked*" represents the aggregate megawatt nameplate capacity of solar energy systems that were permitted during the period net of cancellations in the period.

"*MW Installed*" represents the aggregate megawatt nameplate capacity of solar energy systems for which panels, inverters, and mounting and racking hardware have been installed on customer premises in the period.

92.     The March 2019 Press Release also included excerpts of Vivint's financial statements, stating that sales and marketing expenses totaled $18 million, general and administrative expenses totaled $21.8 million, and net losses of $86.8 million for the three months ended December 31, 2018.  For the year ended December 31, 2018, sales and marketing expenses totaled $58.9 million, general and administrative expenses totaled $93.7 million, and net losses were $279.6 million

93.     The same day, the Company filed its 2018 Form 10-K with the SEC, signed by defendants Bywater and Russell, affirming the information provided in the March 2019 Press Release.  Bywater and Russell also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial reporting; the disclosure of any material changes to the Company's internal control over financial reporting; stating that the annual report did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" and, that "[a]ny fraud, whether or not material, that involves management or other

employees who have a significant role in the [Company's] internal control over financial reporting" was disclosed.

94.     Under "Risk Factors" in the 2018 Form 10-K, the Company stated that restrictions on direct-selling could adversely impact Vivint's financial condition, as well as negative perceptions of its sales force, stating, in relevant part:

> **_The majority of our business is conducted using one channel, direct-selling._**
>
> Historically, our primary sales channel has been a direct sales model. We also sell to customers through our inside sales team but continue to find greatest success using our direct sales channel. In addition, we have entered into sales dealer agreements with Vivint and others. We may sell through additional distribution channels in the future, including homebuilders and retailers. We compete against companies with experience selling solar energy systems to customers through a number of distribution channels, including homebuilders, home improvement stores, large construction, electrical and roofing companies, the internet and other third parties and companies that access customers through relationships with third parties in addition to other direct-selling companies. Our less diversified distribution channels may place us at a disadvantage with consumers who prefer to purchase products through these other distribution channels. If customers demonstrate a preference for other distribution channels, we may need to reduce our direct-selling efforts. **_We are also vulnerable to changes in laws related to direct sales and marketing that could impose additional limitations on unsolicited residential sales calls and may impose additional restrictions such as adjustments to our marketing materials and direct-selling processes, and new training for personnel. If additional laws affecting direct sales and marketing are passed in the markets in which we operate, it would take time to train our sales force to comply with such laws, and we may be exposed to fines or other penalties for violations of such laws. If we fail to compete effectively through our direct-selling efforts or are not successful in developing other sales channels, our financial condition, results of operations and growth prospects could be adversely affected._**
>
> **_We are highly dependent on our ability to attract, train and retain an effective sales force._**
>
> The success of our direct-selling channel efforts depends upon the recruitment, retention and motivation of a large number of sales personnel to compensate for a high turnover rate among sales personnel, which is a common characteristic of a direct-selling business. In order to grow our business, we need to recruit, train and retain sales personnel on a continuing basis. Sales personnel are attracted to direct-selling by competitive earnings opportunities, and direct-sellers typically compete for sales personnel by providing a more competitive earnings opportunity than that

offered by the competition.  We believe competitors devote substantial effort to determining the effectiveness of such incentives so that they can invest in incentives that are the most cost effective or produce the best return on investment.  We have historically compensated our sales personnel on a commission basis, based on the size of the solar energy systems they sell and recently have begun compensating based on system size, contract rate and the expected number of hours the rooftop will be exposed to full sunlight.  Some sales personnel may prefer a compensation structure that also includes a salary and equity incentive component.  There is significant competition for sales talent in our industry, and from time to time we may need to adjust our compensation model to include such components.  **These adjustments have caused our customer acquisition costs to increase and could otherwise adversely impact our operating results and financial performance.**

In addition to our sales compensation model, our ability to recruit, train and retain effective sales personnel could be harmed by additional factors, including:

> • any adverse publicity regarding us, our solar energy systems, our distribution channel or our industry;

> • lack of interest in, or the technical failure of, our solar energy systems;

> • lack of a compelling product or income opportunity that generates interest for potential new sales personnel, or perception that other product or income opportunities are more attractive;

> • **any negative public perception of our sales personnel and direct-selling businesses in general;**

> • **any regulatory actions or charges against us or others in our industry;**

> • general economic and business conditions; and

> • potential saturation or maturity levels in a given market which could negatively impact our ability to attract and retain sales personnel in such market.

We are subject to significant competition for the recruitment of sales personnel from other direct-selling companies and from other companies that sell solar energy systems in particular.  Regional and district managers of our sales personnel are instrumental in recruiting, retaining and motivating our sales personnel.  When managers have elected to leave us and join other companies, the sales personnel they supervise have often left with them.  We may experience increased attrition in our sales personnel in the future, which may impact our results of operations and growth.  The impact of such attrition could be particularly acute in those jurisdictions, such as California, where contractual non-competition agreements for service providers are not enforceable or are subject to significant limitations.

29

**It is therefore continually necessary to innovate and enhance our direct-selling and service model as well as to recruit and retain new sales personnel.**  If we are unable to do so, our business could be adversely affected.

*     *     *

*Damage to our brand and reputation, or change or loss of use of our brand, could harm our business and results of operations.*

**We depend significantly on our reputation for high-quality products, best-in-class customer service and the brand name "Vivint Solar" to attract new customers and grow our business**.  If we fail to continue to deliver our solar energy systems within the planned timelines, if our offerings do not perform as anticipated or if we damage any of our customers' properties or delay or cancel projects, our brand and reputation could be significantly impaired.  Future technical improvements may allow us to offer lower prices or offer new technology to new customers; however, technical limitations in our current solar energy systems may prevent us from offering such lower prices or new technology to our existing customers.  The inability of our current customers to benefit from technological improvements could cause our existing customers to lower the value they perceive our existing products offer and impair our brand and reputation.

**We have focused particular attention on growing our direct sales force, leading us in some instances to take on candidates who we later determined did not meet our standards.  In addition, given our direct sales business model and the sheer number of interactions our sales and other personnel have with customers and potential customers, it is inevitable that some customers' and potential customers' interactions with our company will be perceived as less than satisfactory.  This has led to instances of customer complaints, some of which have affected our digital footprint on rating websites and social media platforms.  If we cannot manage our hiring and training processes to avoid or minimize these issues to the extent possible, our reputation may be harmed and our ability to attract new customers would suffer.**

*     *     *

*A failure to comply with laws and regulations relating to our interactions with current or prospective residential customers could result in negative publicity, claims, investigations and litigation, and adversely affect our financial performance.*

**Our business focuses on contracts and transactions with residential customers.  We must comply with numerous federal, state and local laws and regulations that govern matters relating to our interactions with consumers, including those pertaining to privacy and data security, consumer financial and credit transactions, home improvement contracts, warranties, door-to-door solicitation as well as specific regulations pertaining to sales and installations**

30

of solar energy systems.  **These laws and regulations are dynamic and subject to potentially differing interpretations, and various federal, state and local legislative and regulatory bodies may initiate investigations**, expand current laws or regulations, or enact new laws and regulations, regarding these matters. Changes in these laws or regulations or their interpretation could dramatically affect how we do business, acquire customers, and manage and use information we collect from and about current and prospective customers and the costs associated therewith.

Several states in which we operate, including Arizona, California, Florida, Maryland, Nevada, New Mexico, New York and Utah, have enacted laws and regulations that provide enhanced rights and require increased disclosures to customers.  Most of these laws and regulations are specific to the solar industry and have required changes to our contracts and processes.  Some of the laws have been enacted along with other changes to state law that further impact the residential solar industry.  **Other laws and regulations, such as the ones that relate to licensing of sales representatives, are applicable to a wide array of industries, and failure to comply with such regulations could result in citations, fines, license suspensions, revocations and other penalties.  Further, to the extent that states undertake enforcement actions against us or other states enact further laws or regulations applicable to our industry, we may be required to expend additional resources in order to modify our business practices to meet these regulatory requirements.**

**We strive to comply with all applicable laws and regulations relating to our interactions with residential customers.**  It is possible, however, that these requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices.  For example, in March 2018, the New Mexico Attorney General's office filed an action against us and certain of our officers alleging violation of state consumer protection statutes.  **If federal, state or other local regulators or agencies were to initiate an investigation against us or enact regulations relating to the marketing of our products to residential consumers, responding to such investigation or complying with such regulations could divert management's attention to our business, require us to modify our operations and incur significant additional expenses, which could have an adverse effect on our business, financial condition and results of operations or could reduce the number of our potential customers.**

We cannot ensure that our sales force will comply with our standard practices and policies, as well as applicable laws and regulations, including sales licensure requirements.  **Any such non-compliance, or the perception of noncompliance, potentially could expose us to claims, proceedings, litigation, investigations, and/or enforcement actions by private parties and regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect our business.**  We have incurred, and will continue to incur,

significant expenses to comply with the laws, regulations and industry standards that apply to us.

95.    The 2018 Form 10-K "Risk Factors" also included the following:

**We are exposed to the credit risk of our customers.**

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease.  The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us.  Accordingly, we are subject to the credit risk of our customers.  **As of December 31, 2018, the average FICO score of our customers was approximately 760.  However, as we grow our business, the risk of customer defaults could increase.  Our reserve for this exposure is estimated to be $5.2 million as of December 31, 2018, and our future exposure may exceed the amount of such reserves.**  While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system.  While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be unable to purchase a solar energy system.  This could reduce our potential customer pool and limit our Systems Sales.

96.    The 2018 Form 10-K financial statements also included a note about legal proceedings, which included a total of seven actions, **with only three** of them relating sales misconduct, stating, in relevant part:

In March 2018, the New Mexico Attorney General's office filed an action against the Company and several of its officers alleging violation of state consumer protection statutes and other claims.  The Company disputes the allegations in the lawsuit and intends to defend itself in the action.  The Company is unable to estimate a range of loss, if any, were there to be an adverse final decision.  If an unfavorable outcome were to occur in this case, it is possible that the impact could be material to the Company's results of operations in the period(s) in which any such outcome becomes probable and estimable.

In June 2018, four of the Company's customers, on behalf of themselves and a purported class, named the Company in a putative class action alleging violations of the Consumers Legal Remedies Act and California Business and Professions Code Section 17200 and requesting relief pursuant to Section 1689 of the California Civil Code.  The complaint sought (1) rescission of their PPAs along with restitution to the plaintiffs individually and (2) declaratory and injunctive relief. The Company disputes the allegations in the complaint and intends to vigorously defend itself.  On November 14, 2018, the Company entered into a settlement agreement with the four customers whereby the customers agreed to dismiss the

putative class action in exchange for rescission of their contracts, removal of the systems that the Company installed on their properties, immaterial compensation payments to each customer and an immaterial payment for attorneys' fees and costs.

In July 2018, an individual filed a putative class action lawsuit in the U.S. District Court for the District of Columbia, purportedly on behalf of himself and other persons who received certain telephone calls. The lawsuit alleges that the Company violated the Telephone Consumer Protection Act and some of its implementing regulations. The complaint seeks statutory penalties for each alleged violation. The Company disputes the allegations in the complaint, has retained counsel and intends to vigorously defend itself in the litigation. The Company is unable to estimate the amount or range of potential loss, if any, at this time.

*    *    *

In addition to the matters discussed above, in the normal course of business, the **Company has from time to time been named as a party to various legal claims, actions and complaints.** While the outcome of these matters cannot be predicted with certainty, the Company does not currently believe that the outcome of any of these claims will have a material adverse effect, individually or in the aggregate, on its consolidated financial position, results of operations or cash flows.

The Company accrues for losses that are probable and can be reasonably estimated. The Company evaluates the adequacy of its legal reserves based on its assessment of many factors, including interpretations of the law and assumptions about the future outcome of each case based on available information.

97. Defendants also held an earnings conference call on March 5, 2019 during which the Individual Defendants reiterated the financial results for the quarter and year ended December 31, 2018. Defendant Bywater attributed growth in 2018, in part, to sales activities, stating, in relevant part:

> **I am also particularly pleased that our growth in 2018 essentially occurred in markets with the most advantageous system economics. This was a result of concerted management focus and actions on concentrating our sales activities in our most favorable markets. The sales momentum we are experiencing will require continued focus in management to assure we remain a clear leader in the most advantageous markets.** We are also excited about the prospects of creating other customer acquisition models and access new and existing markets in more profitable ways in 2019 and beyond.
>
> **As important as growth is, it is important to operate with the right unit economics, performance the quality. It is easy to grow for growth sake without regard of profit or long term sustainability or customer satisfaction. That kind**

33

**of growth violates our core principles and values and a tradeoff we are not willing to make.**

Over the past year, we have done much to improve our profitability.  As you might remember at the beginning of 2018, **we introduced our dynamic pricing program which provides increased sales incentives to our sales force for finding systems with the best attributes.  Although it increases our customer acquisition cost, the improvement in system attributes more than offsets the increase in costs.**

98.    When questioned about future growth for the Company, defendant Bywater stated:

I'll add one thing to that, Philip.  I'll echo what Dana said.  Also it's really, really important that our thesis is we grow and also do well on new economics.  We all experienced 2015 and 2016 where the market grew a bunch of companies in the bankruptcy and they were not growing with anything around a positive unit economic.  **You're talking about for Vivint Solar, that's a primary core belief that we have, which is we're going to grow and we believe we'll grow above market and we're going to do it the right way with quality and with consumer protection and we're going to do it around taking care of our shareholders with unit margins that are great.  We're going to create NPV per watt that's industry-leading or on-par with our peers.**

99.    On May 9, 2019, the Company issued a press release, attached as Exhibit 99.1 to a

Form 8-K filed with the SEC, titled "Vivint Solar Reports First Quarter 2019 Results," announcing

Vivint's financial results for the quarter ended March 31, 2019 (the "May 2019 Press Release").

The May 2019 Press Release stated, in relevant part:

**First Quarter 2019 Operating Highlights**

Key operating and development highlights include:

- MW Installed of approximately 46 MWs for the quarter.  Total cumulative MWs installed were approximately 1,107 MWs.
- Installations were 6,514 for the quarter.  Cumulative installations were 161,112.
- Estimated Gross Retained Value increased by approximately $54 million during the quarter and is approximately $2.1 billion. Estimated Gross Retained Value per Watt at quarter end was $2.04.
- Cost per Watt was $3.46, an increase from $3.18 in the fourth quarter of 2018 and an increase from $3.22 in the first quarter of 2018.
- Margin created was $45 million, a 29% increase from the first quarter of 2018.  Unlevered NPV per Watt was $0.99.

\*       \*       \*

34

For the second quarter of 2019, Vivint Solar expects:

- MW Installed: 52 - 55 MWs
- Cost per Watt: $3.32 - $3.40

100. The May 2019 Press Release also included excerpts of Vivint's financial statements, stating, among other things that sales and marketing expenses totaled $29.6 million, general and administrative expenses totaled $23 million, and net losses of $89.2 million as of March 31, 2019.

101. Vivint also filed its quarterly report for the period ending March 31, 2019 on Form 10-Q with the SEC on May 9, 2019 (the "1Q19 10-Q"), affirming the information provided in the May 2019 Press Release. The 1Q19 10-Q was signed by defendants Bywater and Russell and contained their signed certifications pursuant to SOX. The statements therein were the same statements as set forth in ¶ 93 herein.

102. The 1Q19 10-Q included the same, or substantially the same, language under "Risk Factors" regarding the impacts of restrictions on direct-selling, as well as negative perceptions of Vivint's sales force as stated in ¶ 94 above.

103. The 1Q19 10-Q "Risk Factors" also included the following:

***We are exposed to the credit risk of our customers.***

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease. The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us. **Accordingly, we are subject to the credit risk of our customers. As of March 31, 2019, the average FICO score of our customers was approximately 760. However, as we grow our business, the risk of customer defaults could increase. Our reserve for this exposure is estimated to be $6.0 million as of March 31, 2019, and our future exposure may exceed the amount of such reserves.** While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system. While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be

unable to purchase a solar energy system. This could reduce our potential customer pool and limit our System Sales.

104. The 1Q19 10-Q included a note about legal proceedings, listing six actions, **only two** of which pertained to sales misconduct, and the general language regarding legal proceedings as stated in ¶ 96 above.

105. An earnings conference call was also held on May 9, 2019. During the call, the Individual Defendants reiterated the financial information, in part, as provided in the May 2019 Press Release. Additionally, defendant Bywater stated:

> Our direct sales organization has been the foundation of our business since the inception of the company in 2011. We continue to adapt and change in this area as well. We have adjusted programs and compensation to compete with others who are vying for the same personnel. This competition has created a situation where over the past several years we have seen an inflation in customer acquisition costs where more of the economics are passed on to salespeople and the returns of some markets have decreased.

> This trend continues and competition for direct sales personnel continues to be fierce. As a result, cost for direct sales teams continue to increase. Therefore we will continue to see some increase in our overall customer acquisition costs separate from the portion of that cost driven by compensation structure related to our dynamic pricing model. We do believe that other routes with lower costs are emerging and will continue to expand due to customer awareness of residential solar, the current economic environment and the pending decrease in the tax credits.

> **Direct sales will continue to be a meaningful part of our business and we will meet market conditions where returns are acceptable. While educating consumers, investment in new routes and creating the technology required to capture customer demand we believe ecommerce, digital marketing and enhanced inbound interest will accelerate and we are investing in building capabilities and expect a ramp-up in these areas. Similarly experience we have seen with retail homebuilders and inside sales.**

> **We are committed to creating more efficient direct routes to customers that improve our ability to increase returns and provide sort of more customers in new markets. As we are making these investments we have done a good job, maintaining or increasing our project value with higher system attributes and better margins. We hope to continue this trend while making significant investments both in maintaining our current programs and investing in new more efficient routes to market. We will keep you updated as we progress and give you outlooks on our key metrics.**

106.    Bywater later added:

I think, I'll start with – you've heard me Brian, **over time really talk about being customer-centric and we are just really focusing on bringing the right product to the right customer through the right channel at the right price point.  And we've really worked on that.  If you compare where we were even a year ago versus two years ago I really – it's hard for me to express how pleased I am with how quickly these channels have been developing just the innate desire of the market to have options and they're really pleased that we're getting into these spaces.  So I've been really pleased with that.  I love how it's developing and I love how we're working to make sure that we're just doing what's right for the customer.  We have not quantified it.**

For competitive reasons, I won't quantify it.  But we do believe – **you've got our overall growth so you got some clarity there on what we mean.  I'm hoping that and I'm very confident that these are pretty deep wells and that they'll provide us with great growth prospects and also growth optimization over time.**  And I think the value of having multiple channels is not the right thing for the consumer, but allows us to optimize over time as well and find the right blend.

So you didn't misread my optimism and my enthusiasm about them.  And there's still other channels that we're working on right now that I think are equally exciting and equally valuable to our consumers and to our shareholders.  And that will allow us to get into new markets that we're not in today with different cosmos.

So, I couldn't be more optimistic about our future and the way we're approaching the future, with models that work today and that models will -- that will work tomorrow.  **And that constant evolution and optimization is part of our culture that we have and we're very open to embracing one of the best answers for our consumer** and for the models that work at the appropriate times in this industry.

107.    On August 8, 2019, the Company issued a press release, attached as Exhibit 99.1

to a Form 8-K filed with the SEC, titled "Vivint Solar Reports Second Quarter 2019 Results,"

announcing Vivint's financial results for the quarter ended June 30, 2019 (the "August 2019 Press

Release").  The August 2019 Press Release stated, in relevant part:

**Second Quarter 2019 Operating Highlights**

Key operating and development highlights include:

- MW Installed of approximately 56 MWs for the quarter.  Total cumulative MWs installed were approximately 1,163 MWs.
- Installations were 8,163 for the quarter.  Cumulative installations were 169,275.

- Estimated Gross Retained Value increased by approximately $68 million during the quarter to approximately $2.1 billion. Estimated Gross Retained Value per Watt at quarter end was $2.02.
- Cost per Watt was $3.56, an increase from $3.46 in the first quarter of 2019 and an increase from $3.23 in the second quarter of 2018.
- Margin created was $49 million, a 21% increase from the second quarter of 2018.  Unlevered NPV per Watt was $0.88.

*     *     *

For the third quarter of 2019, Vivint Solar expects:

- MW Installed: 62 - 65 MWs
- Cost per Watt: $3.36 - $3.44

108.    The August 2019 Press Release also included excerpts of Vivint's financial statements, stating, among other things that sales and marketing expenses totaled $66.7 million, general and administrative expenses totaled $54.3 million, and net losses of $176.9 million for the six months ended June 30, 2019.

109.    Vivint also filed its quarterly report for period ending June 30, 2019 on Form 10-Q with the SEC on August 8, 2019 (the "2Q19 10-Q"), affirming the information provided in the August 2019 Press Release.  The 2Q19 10-Q was signed by defendants Bywater and Russell and contained their signed certifications pursuant to SOX.  The statements therein were the same statements as set forth in ¶ 93 herein.

110.    The 2Q19 10-Q included the same, or substantially the same, language under "Risk Factors" regarding the impacts of restrictions on direct-selling, as well as negative perceptions of Vivint's sales force as stated in ¶ 94 above.

111.    The 2Q19 10-Q "Risk Factors" also included the following:

***We are exposed to the credit risk of our customers.***

Our customers most commonly purchase energy or lease solar energy systems from us pursuant to one of two types of long-term contracts: a PPA or a Solar Lease.  The terms of PPAs and Solar Leases are typically for 20 years and require the customer to make monthly payments to us.  **Accordingly, we are subject to the credit risk**

**of our customers. As of June 30, 2019, the average FICO score of our customers was approximately 755. However, as we grow our business, the risk of customer defaults could increase. Our reserve for this exposure is estimated to be $6.9 million as of June 30, 2019, and our future exposure may exceed the amount of such reserves.** While we do not currently extend credit to customers interested in System Sales, many of those customers are interested in financing the purchase of a solar energy system. While these customers may seek third-party financing through their own lender or a lender with whom we have a relationship, if they do not have sufficient credit to qualify for a loan, they may be unable to purchase a solar energy system. This could reduce our potential customer pool and limit our System Sales.

112. The 2Q19 10-Q included a note about legal proceedings, listing six actions, *only two* of which pertained to sales misconduct, and the general language regarding legal proceedings as stated in ¶ 96 above.

113. Further, the 2Q19 10-Q stated the following about general and administrative expenses:

> General and administrative expenses include personnel costs, such as salaries, bonuses and stock-based compensation related to our general and administrative personnel; professional fees related to legal, human resources, accounting and structured finance services; travel; and allocated facilities and information technology costs. **In the second half of 2019, we expect general and administrative expenses to decrease in absolute dollars compared to the first half of 2019.**

114. Defendants held an earnings conference call on August 8, 2019 as well. During the earnings conference call, the Individual Defendants reiterated the financial information provided in the August 2019 Press Release and 2Q19 10-Q. Defendant Bywater commented on the direct sales model, stating, in relevant part:

> **Competition for our direct sales organization has created inflation over the past several years in customer acquisition costs. This trend continues and competition for direct sales personnel continues to be intense. As a result, costs for direct sales teams have increased.** Therefore, we have seen and may continue to see some increase in our overall customer acquisition costs, separate from the portion of that cost driven by compensation structure related to our dynamic pricing model. We do believe that other routes with lower costs are emerging and will continue to expand due to customer awareness of residential solar.

115.     When asked about general and administrative expenses, defendant Russell stated:

We won't have any significant ramp-ups in G&A expense.  There will be some as we develop more programs as we have more volume, there will be some, but it certainly won't scale proportionate to volume increases or things like that.  So, we feel pretty good about the expense structure.  I think we have talked about making some investments in ecommerce and in other elements that we think are valuable for us that are investments in the future.  And those are the kind of things that we will be proactive about and make investments in, because we think it will contribute and help deliver volume in a more affordable way in the future, **but we don't see any kind of significant ramp up in our G&A or back office expenses.**

116.     The above statements were materially false and/or misleading and/or failed to disclose that:  (i) the Company repeatedly engaged in deceptive, fraudulent, and unethical sales practices, such as forgery and unauthorized credit checks; (ii) that as a result, the Company's reported sales and megawatts installed were overstated; (iii) that as a result, the Company's general and administrative expenses were understated; (iv) that as a result, the Company's average customer credit score was misstated; (v) that the sales practices were likely, and did, lead to regulatory scrutiny; (vi) that the sales practices were likely to, and did, lead to a multitude of individual and class action lawsuits; (vii) that as a result, the Company would be forced to, *inter alia*, accept contract cancellations and institute costly remedial and proactive measures; (viii) that as a result, the Company's earnings would be materially and adversely impacted; and (ix) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VI.     THE TRUTH EMERGES

117.     On September 27, 2019, the Marcus Aurelius Report was issued, describing a "largely concealed [] growing pattern of undisclosed lawsuits alleging [Vivint] has engaged in a nationwide fraud involving forged customer contracts."  The Marcus Aurelius Report went on to describe various allegations made in lawsuits against Vivint, attaching a list of "28 undisclosed lawsuits."

118.    As more fully described in Section IV.C. above and in Appendix A, as Marcus Aurelius reported, the lawsuits, among other things:

- specifically allege Vivint forged customer contracts or otherwise engaged in fraud or deception . . . . Not only do lawsuits argue that Vivint "regularly forges signatures" on bogus solar contracts but that, despite being "routinely placed on notice about its sales agents committing forgery, fraud, and impermissible credit pulls", Vivint continues to prey on consumers and even "promotes its employees for this conduct";

- repeatedly accuse Vivint of forging signatures of homeowners, including elderly, disabled, and non-english speaking families onto contracts the potential customers never reviewed or agreed to;

- [and in] [a]n instance of "blatant forgery" [in one lawsuit] Vivint was so careless it inserted the wrong initials of the homeowner into the sham contract; and,

- accuse Vivint of inserting forged signatures of complete strangers, neighbors, renters, and relatives onto sham contracts.

119.    The Marcus Aurelius Report also noted that "[c]ourt documents filed in [one] case . . . reveal that Vivint was aware of '*six other instances of fraud alleged to have been committed*' by [a] rep from 2016-2017. *Yet the rep appears to have remained employed at Vivint until 2019*. In our view, this gives credibility to allegations that Vivint tacitly condones or encourages this behavior."

120.    In discussing the reasoning behind the failure to disclose these lawsuits, Marcus Aurelius stated:

Vivint must constantly generate large amounts of new solar contracts each quarter to sustain itself. The fundamental problem, in our opinion, is that a pattern of undisclosed lawsuits allege that the company's contracts are a product of fraud and outright forgery. We see a distinct risk that these alleged misdeeds have been deployed to mask weakness in the underlying business, especially considering that Vivint has missed revenue estimates in four of the last five quarters. Since 2016, "at least 11 former residential solar market leaders have been shuttered, entered into bankruptcy, or have been acquired for pennies on the dollar of capital raised", according to *Bloomberg,* which also found that industry-wide "*the share of [solar] systems that were financed using a PPA or lease has declined from over 60% in 1Q 2016 to under 40% today. More customers are choosing to buy their systems*

*outright from local installers*".  Vivint's own 10-K admits that "we believe the solar industry is becoming increasingly commoditized", which is particularly unsettling considering that Vivint has already burned more than $230 million in cash from operations since 2016, and now carries more than $1.3 Billion in total debt.

Farcically, Vivint's financials appear to anticipate *nearly zero customer defaults*, with the company having set aside only a mere $6.9 million in provisions against $2.1 Billion in gross contractual value.  Vivint retains large stakes in the investment funds it sells solar contracts to, which is why Vivint consolidates these funds into its financial statements.  We therefore believe that any incremental increase in contractual defaults, including from any forged, invalidated, and unenforceable contracts, would lead directly to losses that would be magnified by the leverage created by Vivint's debt load.

We also see a significant risk coming from Vivint's dependence on financing from a limited number of institutional tax credit investors who participate in Vivint's funds and securitizations.  If the solar tax credits paid by the government to Vivint and its investors are tied to bogus contracts, is this money at risk?  Furthermore, how long would these institutions stick around if they determine that the contracts are polluted by fraud?  We note that the company's 10-K also warns that "for example, if we experience higher customer defaults rates than we are currently experiencing in our existing investment funds, it could be more difficult or costly to attract future financing".

121.    On this news, Vivint's share price fell $0.14 per share, or over 2%, to close at $6.55 per share on September 27, 2019, on unusually high trading volume.  Over the next two trading days, the Company's share price continued to drop, closing at $6.38 per share on October 1, 2019, a 4.6% decrease from the closing share price on September 26, 2019.

## VII.    POST CLASS PERIOD REVELATIONS

122.    As stated above at Section IV.C., on October 24, 2019 it was announced that Vivint had agreed to pay $122,000 and institute certain protective and remedial sales measures pursuant to an investigation by the New Jersey AG.  On January 6, 2020, it was announced that Vivint would pay $1.95 million and institute certain protective and remedial sales measures pursuant to an investigation by the NYAG.

123.    On March 10, 2020, Vivint issued its financial results for the quarter and year ended December 31, 2019.  The Company's annual report filed with the SEC on Form 10-K (the "2019

Form 10-K") showed an increase of general and administrative expenses from $93.7 million as of December 31, 2018 to $117.8 million as of December 31, 2019. The 2019 Form 10-K explained that "the $24.1 million increase was primarily due to *an $11.7 million increase in legal settlement costs*, a $4.9 million increase in compensation and benefits, including stock-based compensation, a $3.9 million increase in professional fees and a $2.7 million increase in insurance costs." Compared to December 31, 2018, *net losses increased by almost 1.5x*, from $279.6 million as of December 31, 2018 to $423.3 million as of December 31, 2019.

124.    On this news, the Company's share price decreased by almost 14%, from a closing price per share of $9.59 on March 10, 2020, to a closing price per share of $8.25 on March 11, 2020.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

125.    As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information. Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiffs and the Class. Such actions caused the price of Vivint securities to be artificially inflated.

126.    In their respective roles as CEO and CFO of Vivint, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period. As a result, each had the opportunity to falsify the information provided to the public regarding Vivint's business and performance.

43

127.  *First*, each of the Individual Defendants themselves repeatedly made detailed statements based on purported personal knowledge as to Vivint's direct sales model, sales practices, and financial position.  *See, e.g.*, ¶¶ 93-98, 105, 115.

128.  *Second*, Vivint's corporate culture supports scienter.  As described by CW4, defendant Bywater would send emails to the Company's entire sales team urging representatives to "pick it up" when sales numbers were down.  According to CW5, an entire new team had to be created because the Customer Service department had "too much on their plate."  CW2 stated: "It's Vivint's culture.  They just kind of look the other way.  If you were a serial killer and just got out of prison today but you could install several hundred accounts, they would give you a job."  CW2 also stated that instead of firing top performing sales representatives known to be using fraudulent sales tactics, the Company simply moved them to a different location – "They've moved guys out of states because they got in too much trouble [in one location], so they moved them to a different market."  *See also* Section IV.C.

129.  *Third*, as admitted by the Company in numerous public documents, the direct sales model was the primary manner in which Vivint sold its primary product, the solar energy systems.

130.  *Fourth*, as noted by the Marcus Aurelius Report, the "uniformity in tactics," indeed "virtually identical corrupt practices" "across the county" could not have been continued for "multiple years" without the Individual Defendants "either directing" the conduct or being aware of the conduct.

131.  *Fifth*, besides the fact that it would be inconceivable for a Company's CEO and CFO to not have knowledge of multiple government investigations such as the investigations by the New Jersey AG and NYAG, in addition to a multitude of other individual and class actions, CWs have confirmed that the Individual Defendants participated in certain sales meeting and

received notice of complaints of deceptive sales practices. CW4 stated that weekly telephone conference calls were held with Vivint's sales managers, attended by Chief Sales Officer Allred and occasionally by defendant Bywater where deceptive sales practices, including forgery, were discussed. CW5 confirmed that not only did Bywater directly receive customer complaints, but that he had access to the ER team's customer complaint spreadsheet. CW5 also stated that Bywater and other senior leaders met weekly with the Senior Manager of Executive Resolutions to discuss customer complaints, in addition to receiving emails containing summaries of customer complaint investigations. CW2 stated that serious allegations against sales staff, such as forgery, were sent to Allred, Bywater, and other senior management. *See also* Section IV.C.

132. **Sixth**, as plainly admitted by Defendants in Vivint's public statements, the Company is heavily reliant on, and its "success depends on [its] ability to raise capital from third-party investors and commercial sources, such as banks and other lenders, on competitive terms to help finance the deployment of our solar energy systems." Vivint:

> rel[ies] on investment funds in order to provide solar energy systems with little to no upfront costs to our customers under our PPAs and Solar Leases. We also rely on access to capital, including through indebtedness in the form of debt facilities and asset-backed securities, to cover the costs of our solar energy systems that are sold outright until the systems are paid for by our customers, whether by cash or through third-party financing arrangements.

133. Furthermore, as admitted by the Defendants:

> **The contract terms in certain of our investment fund documents impose conditions on our ability to draw on financing commitments from the fund investors, including if an event occurs that could reasonably be expected to have a material adverse effect on the fund or on us.** The terms and conditions of our investment funds can vary and may require us to alter our products, services or product mix. **If we do not satisfy such conditions due to events related to our business or a specific investment fund or developments in our industry or otherwise, and as a result we are unable to draw on existing commitments, our inability to draw on such commitments could have a material adverse effect on our business, liquidity, financial condition and prospects. In addition to our inability to draw on the investors' commitments, we have in the past incurred and may in the future incur financial penalties for non-performance,**

45

**including delays in the installation process and interconnection to the power grid of solar energy systems and other factors.  Based on the terms of the investment fund agreements, we will either reimburse a portion of the fund investor's capital or pay the fund investor a nonperformance fee.**

To meet the capital needs of our growing business, we will need to obtain additional financing from new investors and financial institutions and investors and financial institutions who are current investors or with whom we currently have financing arrangements.  If any of the investors or financial institutions that currently provide financing decide not to invest in us in the future due to general market conditions, concerns about our business or prospects or any other reason, or decide to invest at levels that are inadequate to support our anticipated needs or materially change the terms under which they are willing to provide future financing, we will need to identify new investors and financial institutions to provide financing and negotiate new financing terms.  In addition, our ability to obtain additional financing through the asset-backed securities market or other secured debt markets is subject to our having sufficient assets eligible for securitization as well as our ability to obtain appropriate credit ratings.  **If we are unable to raise additional capital in a timely manner, our ability to meet our capital needs and fund future growth may be limited.**

In the past, we have sometimes been unable to timely establish investment funds in accordance with our plans, due in part to the relatively limited number of investors attracted to such types of funds, competition for such capital and the complexity associated with negotiating the agreements with respect to such funds.  **Delays in raising financing could cause us to delay expanding in existing markets or entering into new markets and hiring additional personnel.  Any future delays in capital raising could similarly cause us to delay deployment of a substantial number of solar energy systems for which we have signed PPAs or Solar Leases with customers.  Our future ability to obtain additional financing depends on banks' and other financing sources' continued confidence in our business model and the renewable energy industry as a whole.**  It could also be impacted by the liquidity needs of such financing sources themselves.  We face intense competition from a variety of other companies, technologies and financing structures for such limited investment capital.  If we are unable to continue to offer a competitive investment profile, we may lose access to these funds or they may only be available to us on terms that are less favorable than those received by our competitors.  **For example, if we experience higher customer default rates than we currently experience in our existing investment funds, it could be more difficult or costly to attract future financing**.  In our experience, there are a relatively small number of investors that generate sufficient profits and possess the requisite financial sophistication to benefit from and have significant demand for the tax benefits that our investment funds provide.  Historically, in the distributed solar energy industry, investors have typically been large financial institutions and a few large, profitable corporations.  Our ability to raise investment funds is limited by the relatively small number of such investors.  **Any inability to secure financing could lead us to cancel planned installations, impair our ability to**

**accept new customers or increase our borrowing costs, any of which would have a material adverse effect on our business, financial condition, results of operations and prospects.**

134.     Vivint's business model completely depends on financing and the Company would not be able to operate without the financing.  Thus, any material events, such as a decrease in sales or a large number of lawsuits, would likely lead to not only a loss of future financing, but failure to satisfy conditions of current financings, disrupting the Company's business model on an exponential scale.

135.     *Seventh*, while in possession of material, nonpublic information regarding Vivint's extensive deceptive sales practices and the resulting lawsuits and investigations, the Individual Defendants together reaped over *$2 million* in net proceeds from highly suspicious stock sales.

136.     Defendant Bywater sold 153,900 shares of Vivint stock during the Class Period, reaping net proceeds of over $1 million and reducing his share holdings from 1,326,397 shares to 1,098,432 shares.[8]  Bywater had *no stock sales* for the seven months preceding the Class Period, and only sold only 77,380 shares during the comparable period in 2018 and only 79,900 for the entire year of 2017.[9]  Thus, Bywater was highly motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Vivint's securities price and maximize individual profits.

| Date | No. Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 04/25/2019 | 51,300 | $6.00 | $307,800.00 |
| 05/07/2019 | 51,300 | $6.50 | $333,450.00 |
| 05/08/2019 | 51,300 | $7.00 | $359,100.00 |
| **TOTAL** | **153,900** | | **$1,000,350.00** |

---

[8]  Bywater sold an additional 61,310 shares during the Class Period for net proceeds of $391,878.32 to cover tax withholding obligations in connection with the settlement of awards of restricted stock units and gifted 12,755 shares.
[9]  Numbers exclude sales to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

137.     Defendant Russell sold 153,900 shares of Vivint stock during the Class Period, reaping net proceeds of over $1 million and reducing his share holdings from 506,824 shares to 330,712 shares.[10]  Russell had *no stock sales* for the seven months preceding the Class Period, and only sold only 115,855 shares during the comparable period in 2018 and only 62,500 for the entire year of 2017.[11]  Thus, Russell was highly motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Vivint's securities price and maximize individual profits.

| Date | No. Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 04/25/2019 | 51,300 | $6.00 | $307,800.00 |
| 05/07/2019 | 51,300 | $6.50 | $333,450.00 |
| 05/08/2019 | 51,300 | $7.00 | $359,100.00 |
| **TOTAL** | **153,900** | | **$1,000,350.00** |

## IX.     LOSS CAUSTION

138.     During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Vivint securities and operated as a fraud or deceit on Class Period purchasers of Vivint securities.

139.     Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Vivint's fraudulent and deceptive sales practices, resulting lawsuits and investigations, and increased regulatory scrutiny.  As detailed above, when the truth was revealed, the price of Vivint securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

---

[10]  Russell sold an additional 49,275 shares during the Class Period for net proceeds of $267,711.73 to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

[11]  Numbers exclude sales to cover tax withholding obligations in connection with the settlement of awards of restricted stock units.

140.    As a result of their purchases of Vivint securities during the Class Period, at artificially inflated prices, Lead Plaintiffs and the Class suffered damages under the federal securities laws.

141.    The artificial inflation created by Defendants' misrepresentations and omissions was removed when the Marcus Aurelius Report revealed the substantial number of undisclosed lawsuits alleging consistent repeated use of deceptive and fraudulent sales practices by Vivint sales representatives across the country. *See* ¶¶ 117-21. Following this disclosure, Vivint's share price declined by $0.14 per share, over 2%, on heavier than usual trading volume, to close on September 27, 2019 at $6.55 per share. Vivint's share price continued to drop over the next two trading days on heavier than usual trading volume to finally close at $6.38 per share on October 1, 2019, an overall decrease of 4.6%.

142.    The timing and magnitude of the price decline in Vivint's stock on the date of the disclosure above negates any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

143.    The damages suffered by Lead Plaintiffs and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## X.    NO SAFE HARBOR

144.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein.

The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

145.    To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and/or Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XI.    PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

146.    The market for Vivint securities was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false and/or misleading statements and material omissions, Vivint stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the Class purchased or otherwise acquired the Company's stock relying on the integrity of the market price of such securities and on publicly available market information relating to Vivint, and have been damaged thereby.

147.    During the Class Period, the artificial inflation of the value of Vivint's stock was caused by the material misrepresentations and omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it

drove down the value of the Company's stock, causing Lead Plaintiffs and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

148.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Vivint securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold Vivint securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

149.    Based upon the foregoing, Lead Plaintiffs and the Class are entitled to a presumption of reliance upon the integrity of the market.

150.    Alternatively, Lead Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    CLASS ACTION ALLEGATIONS

151.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Vivint securities between March 5, 2019 and September 26, 2019, inclusive,

and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any excluded person or entity has or had a controlling interest.

152. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vivint securities were actively traded on the NYSE. As of March 1, 2019, Vivint had over 120 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members of the proposed Class. Record owners and other members of the Class can be identified from records maintained by Vivint or its transfer agent and notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

153. Lead Plaintiffs' claims are typical of the claims of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

154. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

155. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Vivint, in particular the Company's deceptive sales practices, legal battles, and resulting effects on Vivint, including, but not limited to, overstatements of reported sales and megawatts installed as the Company would be forced to exit the contracts in some instances and/or reimburse customers, misstatements of reported customer credit scores, understatements of legal expenses, increased regulatory scrutiny, and as a result of the foregoing, earnings misstatements;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

- whether the prices of Vivint securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

156. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

157. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

158. During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate

and maintain the market price of Vivint securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Vivint securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

159. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Vivint's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

160. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

161. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vivint securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Vivint's true condition.

162.    The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

163.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As senior officers of Vivint, the Individual Defendants had knowledge of the details of Vivint's internal affairs.

164.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Vivint.  As senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vivint's businesses, operations, financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Vivint securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Vivint's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the Class purchased or otherwise acquired Vivint securities at artificially

inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

165. During the Class Period, Vivint securities were traded on an active and efficient market. Lead Plaintiffs and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Vivint securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Vivint securities was substantially lower than the prices paid by Lead Plaintiffs and the Class. The market price of Vivint securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and the Class.

166. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

167. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

168. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169.     During the Class Period, the Individual Defendants participated in the operation and management of Vivint, and conducted and participated, directly and indirectly, in the conduct of Vivint's business affairs.  Because of their senior positions, they knew the adverse non-public information about Vivint's misstatements.

170.     As directors and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Vivint's financial condition and results of operations, and to correct promptly any public statements issued by Vivint which had become materially false or misleading.

171.     Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Vivint disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Vivint to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Vivint within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vivint securities.

172.     Each of the Individual Defendants, therefore, acted as a controlling person of Vivint.  By reason of their senior management positions and/or being a director of Vivint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Vivint to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Vivint and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

173.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Vivint.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs pray for judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.      Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 29, 2020                          **BRAGAR EAGEL & SQUIRE, P.C.**

                                              By: */s/ W. Scott Holleman*
                                              W. Scott Holleman
                                              885 Third Avenue, Suite 3040
                                              New York, NY 10022
                                              Telephone: (646) 860-9449
                                              Facsimile: (212) 214-0506
                                              Email: holleman@bespc.com

                                              -and-

Melissa A. Fortunato
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone:  (415) 568-2124
Email:  fortunato@bespc.com

*Lead Counsel for Lead Plaintiffs
and the Proposed Class*

# Appendix A

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 10/9/2015 | Luckett v. Vivint Solar Developer, LLC | 37-2015-00034010 | California Superior Court, San Diego County | • Pressured homeowners to sign PPA Agreement without explaining its full terms |
| 12/22/2016 | Littlejohn v. Vivint Solar, Inc. | 1:16-cv-09446 | United States District Court, District of New Jersey | • Obtained Plaintiff's consumer credit score without a permissible purpose |
| 10/30/2017 | Ibrahim v. Vivint Solar Developer, LLC | 30-2017-00952409 | California Superior Court, Orange County | • Forged Plaintiff's signature on a contract<br>• Impersonated an agent of Southern California Edison<br>• Lied about cost of solar panels<br>• Lied about terms of "release" Plaintiff signed |
| 11/16/2017 | Southern California Edison Company and Edison International v. Vivint Solar, Inc. | 2:17-cv-08388 | United States District Court, Central District of California | • Falsely represented themselves to be Edison representatives<br>• Defendants are using counterfeit Edison trademarks in its marketing efforts |
| 12/13/2017 | Davenport v. Vivint Solar Developer, LLC | 2017-CP-38-01689 | South Carolina Court of Common Pleas of the First Judicial Circuit – County of Orangeburg | • Sold solar panels to an obviously incompetent individual who is unable to make a business transaction<br>• Pressured elderly person with aggressive tactics<br>• Created an email account for Plaintiff without consent |
| 1/20/2018 | Droney v. Vivint Solar | 1:18-cv-00849 | United States District Court, District of New Jersey | • Lied about being an agent of Atlantic City Energy<br>• Lied about terms of "release" Plaintiffs signed<br>• Pulled Plaintiffs' credit report without their consent |
| 2/2/2018 | Pulipati v. Vivint Solar, Inc., et al. | RG18891702 | California Superior Court, Alameda County | • Obtained Plaintiff's consumer credit score under false pretenses<br>• Forged signature |

1

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 3/8/2018 | State of New Mexico v. Vivint Solar Developer LLC, et al. | D-202-cv-201801936 | New Mexico District Court, Albuquerque District Court | • Encourage an "anything goes" approach to door-to-door sales<br>• Encourage salespeople to overstate the cost savings of solar panels to customers<br>• Requires salespeople to tell customers that removal of solar panels is free if they sell their home<br>• Do not provide customers with solar panel contract (PPA), at the time of its execution |
| 4/3/2018 | Hewapathirana v. Vivint Solar, Inc., et al. | 37-2018-00016438 | California Superior Court, San Diego County | • Falsely claimed to be an SDG&E agent<br>• Falsely claimed solar panels and services would be free<br>• Forged Plaintiff's signature on the agreement |
| 6/20/2018 | Rasmussen v. Vivint Solar, Inc. et al. | 18-004129 | Sixth Judicial Circuit Court of Florida in and for Pinellas County | • Obtained Plaintiff's consumer credit score under false pretenses<br>• Enrolled Plaintiff in contracts for solar service and financing without her knowledge or consent |
| 6/27/2018 | Garcia v. Vivint Solar, Inc., et al. | 37-2018-00031927 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Lied about price (free) of solar panels<br>• Forged Plaintiffs' signatures on solar panel contracts |
| 6/27/2018 | Linehan v. Vivint Solar, Inc., et al. | 37-2018-00032142 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Lied about necessity of contracts<br>• Lied about price of solar panels<br>• Forged Plaintiffs' signatures on solar panel contract |
| 6/27/2018 | Muro v. Vivint Solar, Inc., et al. | 37-2018-00032144 | California Superior Court, San Diego County | • Lied about being an agent of SDG&E<br>• Forged Plaintiffs' signatures on solar panel contract |

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 7/1/2018 | Rogers v. Vivint Solar, Inc., et al. | 1:18-cv-01567 | United States District Court, District of Columbia | • Made calls to individuals on the National Do-Not-Call Registry<br>• Utilized Robocalls to advertise without consent of those being called |
| 7/25/2018 | Alvarado v. Vivint Solar, Inc., et al. | RG18914129 | California Superior Court, Alameda County | • Obtained Plaintiff's consumer credit score without her consent<br>• Forged Plaintiff's signature on solar panel contract |
| 8/2/2018 | Knight v. Vivint Solar | CAM-L-002852-18 | Superior Court of New Jersey, Law Division – Camden County | • Plaintiff was told to sign a document (iPad) without being able to review the document<br>• Plaintiff was lied to about contents of document she was told to sign<br>• Lied about the costs of the solar panels once installed<br>• Forgery |
| 8/2/2018 | Reilly v. Vivint Solar | 18-cv-12356 | United States District Court, District of New Jersey | • Obtained Plaintiff's consumer credit score without his consent<br>• Forged Plaintiff's signature on solar panel contract<br>• Stole Plaintiff's identity to make sale to Melissa Knight (above case) |
| 8/6/2018 | Fisher v. Vivint Solar, Inc., et al. | RG18915535 | California Superior Court, Alameda County | • Lied about cost of solar panels<br>• Targeted Plaintiff because elderly<br>• Lied about necessity of contract<br>• Forged Plaintiff's signature on solar panel contract<br>• Forged Plaintiff's daughter's signature on solar panel agreement<br>• Did not send solar panel agreement to Plaintiff<br>• Obtained voided check from Plaintiff under false pretenses<br>• Began automatically withdrawing funds out of Plaintiff's account without her consent |

## Known Deceptive Sales Practices Lawsuits

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 8/7/2018 | Morken v. Vivint Solar, Inc., et al. | RG18915745 | California Superior Court, Alameda County | • Obtained Plaintiff's credit without her consent<br>• Forged Plaintiff's signature on solar panel contract<br>• Did not send Plaintiff copy of solar panel contract<br>• Contract was for property that Plaintiff did not own (related to above case) |
| 8/9/2018 | Ritter v. Vivint Solar Developer, LLC, et al. | 37-2018-00039688 | California Superior Court, San Diego County | • Forged signature of Plaintiff's deceased husband<br>• Targeted Plaintiff because elderly |
| 8/22/2018 | August v. Vivint Solar, Inc., et al. | 37-2018-00042289 | California Superior Court, San Diego County | • Forged Plaintiff's signature on solar panel contract of Plaintiff's neighbor<br>• Falsely claimed Plaintiff was extending her credit to her neighbor<br>• Did not provide copy of contract to Plaintiff<br>• Targeted Plaintiff because elderly |
| 9/10/2018 | Harrison v. Vivint Solar | BUR-DC-007748-18 | Superior Court of New Jersey, Burlington County | • Forged signature on solar panel contract<br>• Plaintiff was never provided with a contract<br>• Used someone else's contact information on contract |
| 1/1/2019 | Rutledge v. Vivint Solar, et al. | P-1300-cv-201900001 | Superior Court of Arizona, Yavapai County | • Lied to Plaintiff about price of solar panels<br>• Obtained signature of Plaintiff under false pretenses<br>• Targeted Plaintiff because elderly |
| 1/11/2019 | Elizalde v. Vivint Solar, Inc., et al. | 37-2019-00001757 | California Superior Court, San Diego County | • Entered Plaintiff into a financing agreement without her consent<br>• Did not provide Plaintiff with financing agreement<br>• Did not provide Plaintiff with financing agreement in Spanish<br>• Forged Plaintiff's signature on financing agreement |

4

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 1/30/2019 | Gorin v. Vivint Solar Developer, LLC | C-12-cv-19-000089 | Circuit Court for Hartford County, Maryland | • Falsely represented costs related to solar panels<br>• Vivint Salesperson did not possess Maryland Home Improvement Salesperson's license |
| 3/6/2019 | Cormier v. Vivint Solar, Inc., et al. | 37-2019-00012511 | California Superior Court, San Diego County | • Falsely represented themselves as agents of San Diego Gas & Electric to Plaintiff's tenants<br>• Falsely represented to Plaintiffs' tenants that Plaintiffs were required to install solar panels on property<br>• Obtained Plaintiffs' credit report without their consent<br>• Forgery |
| 3/6/2019 | Mees v. Vivint Solar, Inc., et al. | RG19009828 | California Superior Court, Alameda County | • Obtained credit report under false pretenses |
| 3/7/2019 | Belanger v. Vivint Solar Developer, LLC | HHB-CV-19-6051481-S | Connecticut Superior Court, Hartford County | • Forged Plaintiff's signature on solar panel contract |
| 3/29/2019 | Shackleford v. Vivint Solar Developer LLC, et al. | 1:19-cv-00954 | United States District Court, District of Maryland | • Falsely claimed to have been sent by Baltimore Gas & Electric<br>• Lied about costs of solar panels<br>• Obtained Plaintiff's credit report without her consent<br>• Obtained Plaintiff's signature under false pretenses |

**Known Deceptive Sales Practices Lawsuits**

| Date Filed | Case Name | Case Number | Location | Deceptive Sales Practice |
|---|---|---|---|---|
| 12/3/2019 | Dekker, et al. v. Vivint Solar, Inc., et al. | 3:19-cv-07918 | United States District Court, Northern District of California | • Specifically targets vulnerable customers<br>• Vivint trains door-to-door salespeople to deceive customers<br>• Utilize convoluted contract that is 20 years in length<br>• Salespeople attempt to have customers sign contracts without first reviewing them<br>• Falsely claims to install, maintain solar panel "for free" |